CFK

**PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS BY A**

**PERSON IN STATE CUSTODY   19   6132**

| IN THE UNITED STATES DISTRICT COURT | EASTERN DISTRICT OF PENNSYLVANIA |
|---|---|
| Michael Grant | CP-51_CR-0003425-2007<br>CP-51-CR-0003426-2007 |
| SCI Huntingdon | HV-2196 |
| Michael Grant                    v. | Kevin Kauffman, Superintendent of SCI Huntingdon, PA DOC<br>and<br>District Attorney of the county of Philadelphia<br>and<br>Attorney General of the state of Pennsylvania |

RECEIVED

DEC 26 2019

## PETITION

1. Petitioner is Challenging the judgment entered by the Court of Common Pleas of Philadelphia County, 1301 Filbert Street, Philadelphia, PA 19107 for docket numbers CP-51_CR-0003425-2007 and CP-51-CR-0003426-2007.

2. Following a plea of not guilty in a jury trial, Petitioner was convicted of Attempted Murder, Aggravated Assault, Robbery, Robbery of a Motor Vehicle, Possession of an Instrument of Crime, Violations of the Uniform Firearms Act and Criminal Conspiracy. The judgment of 25-50 years of confinement was entered on September 25, 2008.

3. Petitioner appealed the conviction to the Superior Court of Pennsylvania; docket number 114 EDA 2009. The grounds raised were:

   a. Court erred in denying Petitioner's motion to suppress the identification evidence from the complainant, Manh Doan, under Article 1, Section 9 of the Pennsylvania Constitution and the Fourteenth Amendment of the United States Constitution.
   i. The police actions in this case – showing a single photo array after telling the witness the array contained a "suspect" and "seven fillers – created such a suggestive situation as to risk a misidentification by Mr. Doan.
   ii. Mahn Doan's description of the offender from the night of the incident was so dissimilar to the Petitioner's actual physical appearance that the identification itself

was unreliable and thus the admission of the identification testimony deprived Petitioner of his rights to a fair trial and due process of law.

b.  Court erred in allowing the Commonwealth to bolster the testimonay of Officer Mike Williams with a coincidental playing of the 911 recording during his live testimony. The 911 recording was inadmissible as it constituted a prior consistent statement and the only purpose it served was to increase the credibility of the testifying witness. Further, Petitioner was prejudiced by having the recording played, as it was an overly emotional rendering of the events which caused the jurors to react emotionally, rather than rationally judge the facts as they were presented. Finally, the introduction of the evidence was cumulative.

c.  Court erred in allowing the testimony of Sharee Bostic on any points.

i. Ms. Bostic's testimony regarding a letter received from Petitioner from prison should have been barred as violative of Pennsylvania Rule of Evidence 1002 (the "best evidence" rule).

ii. Ms. Bostic's testimony regarding the supposed straw purchase involving Petitioner was inadmissible under Rule 404(b) of the Pennsylvania Rules of Evidence, and the potention for prejudice far outweighed any minimal probative value. Moreover, it was too remote to the incident at issue here to be at all relevant under Rule 403 of the Pennsylvania Rules of Evidence.

d.  In the alternative, Ms. Bostic should not have been allowed to testify to all of the events she did. The cumulative effect of such testimony prejudiced Petitioner and denied him his rights to a fair trial and due process of law.

e.  Court erred in permitting the testimony of Lawandra Casey.

i. Ms. Casey's testimony was inadmissible against Petitioner under Rule 404(b) of the Pennsylvania Rules of Evidence and the effect of that testimony was to greatly prejudice Petitioner.

ii. Moreover, given the representations from the Commonwealth regarding Ms. Casey's limitations as a witness, effective cross-examination of Ms. Casey was impossible, depriving Petitioner of his right to counsel as guaranteed by the Sixth Amendment of the United States Constitution and Article 1, Section 9 of the Pennsylvania Constitution.

iii. Ms. Casey's testimony regarding having seen Petitioner with guns on his person was similarly inadmissible and overly prejudicial as well as vague and should not have been admitted.

iv. The evidence to which Ms. Casey testified was cumulative and should not have been allowed as it prejudiced Petitioner and denied him a fair trial.

f.  Court erred in denying Petitioner's request for a jury instruction concerning missing evidence – to wit, "ped stop memos" – and the letter from Petitioner Sharee Bostic testified to. The jury should have been instructed that it could draw an adverse inference against the Commonwealth for its failure to produce those items.

g.  i. The Commonwealth engaged in improper argument during closing arguments when it claimed tha the Petitioner's coat "would absorb lots and lots and lots of blood" to explain the absence of blood within Antuwan White's car. There was no evidence presented at trial regarding the amount of blood retained by the coat, its absorbent ability or the absorption rate of blood. As such, there was no factual or scientific basis for that argument.

ii. Court should have instructed the jury that testimony from Gregory Parker, Sharee Bostic and Lawandra Casey came from a "corrupt source" and therefore should have been taken with caution.


4. On August 4, 2010, the appeal was denied.

5. Petitioner sought review of his appeal by the Supreme Court of Pennsylvania, docket number 483 EAL 2010. On March 30, 2011, Petitioner's Petition for Allowance of Appeal was denied.

6. On November 30, 2011, Petitioner the filed a PCRA with the Court of Common Pleas of Philadelphia; docket numbers CP-51_CR-0003425-2007 and CP-51-CR-0003426-2007. The grounds raised were:

a.  Trial Counsel and Appellate Counsel were ineffective for not raising the issue that the Petitioner was denied a speedy trial pursuant to PA.R.CP.Rule 600.

b. Trial Counsel and Appellate Counsel were ineffective for not raising the issue that several incidents of negligence and/or police misconduct occurred, which individually and/or cumulatively resulted in bad faith.

c. Appellate Counsel and Motion Counsel were ineffective while arguing for suppression of the in-court and out-of-court identification by the complainant as a result of failure to investigate.

d. Preliminary Counsel was grossly ineffective for failure to investigate.

e. Preliminary Court was in error for denying the lineup as requested by the defense attorney for the Petitioner.

f. Appellate Counsel ws ineffective for not raising the issue that Trial Counsel was ineffective for not objecting the violation commited by ADA Wilson when she did not disclose the results of the expert ballistice examination during the motion in *limine*, resulting in the Court allowing the testimony of Sharee Bostic and Lawandra Casey.

g. Trial Counsel was ineffective for failure to adequately investigate.

h. Trial Counsel was ineffective for failure to request adequate jury instructions.

i. Trial Counsel was ineffective for failure to object or request a mistrial when ADA Wilson acted in bad faith by including speculative, inaccurate comments and comments intended solely to inflame the jury and create bias and hostility toward the Petitioner during trial.

j. Commonwealth violated <u>Brady</u> by intentionally withholding or by gross negligence failing to discover the complainant's criminal record, to include for *crimen falsi*.

k. Trial Counsel was ineffective for failing to competently investigate whether there were any eye witnesses or alibi witnesses.

l. Trial Counsel and Appellate Counsel were ineffective in challenging the introduction of the 911 tapes of police officers at trial where they were offered to inflame the emotions of the jurors, and where its probative value was substantially outweighed by its unfair prejudice, confusion of issues, undue delay and cumulative effect.

m. Trial Counsel was ineffective for failing to challenge with post-sentence motions the excessiveness of the sentence where the lower court entered a sentence more

than needed for the protection of the public, and where many of the charges received sentences that were upward guideline departures where the Court failed to consider compelling mitigating factors presented by the Petitioner

7. On June 1, 2017, the Petitioner's PCRA was denied. Petitioner then appealed to the Superior Court of Pennsylvania; docket number 1847 EDA 2017. The grounds raised were:

   a. Did the Commonwealth violate Brady by intentionally withholding or by gross negligence failing to discover the complainant's criminal record, to include crimen falsi?

   b. Was trial (and appellate counsel) ineffective for not raising a speedy trial motion to dismiss?

   c. Were trial and appellate counsel ineffective for not raising issues of police negligence and/or misconduct?

   d. Were trial and appellate counsel ineffective while arguing for suppression of the in-court and out-of-court identification by the Petitioner as a result of failure to investigate?

   e. Was trial counsel ineffective for failing to competently investigate whether there were any eye witnesses or alibi witnesses?

   f. Did the lower court err in not granting a lineup as requested by trial counsel for the Petitioner where the identification testimony in this matter was tainted?

   g. Were trial and appellate counsel ineffective in challenging the introduction of the 911 tapes of police officers at trial where they were offered to inflame the emotions of the jurors, and where its probative value was substantially outweighed by its unfair prejudice, confusion of issues, undue delay and cumulative effect?

   h. Was appellate counsel ineffective for not raising trial counsel's failure to object to the Commonwealth's failure to disclose the results of the ballistic expert's ballistics examination, during the motion in limine, which resulted in the lower court's permitting the testimony of Sharee Bostic and Lawandra Casey?

   i. Was trial counsel ineffective for failing to request adequate jury instructions?

5

j.  Was trial counsel ineffective for failing to object to or request a mistrial when the Commonwealth acted in bad faith by including speculative and inaccurate comments at trial intended to create bias and hostility toward Petitioner, while bolstering the complainant's testimony?

k.  Was trial counsel ineffective for failing to challenge with post-sentence motions the excessiveness of the sentence where the lower court entered a sentence more than needed for the protection of the public, and where many of the charges received sentences that were upward guideline departures where the trial court failed to consider compelling mitigating factors presented by the Petitioner?

8. On June 1,2017, The Superior Court of Pennsylvania denied Petitioner's appeal. Petitioner then filed a Petition for Allowance of Appeal to the Supreme Court of Pennsylvania on June 5, 2017; docket number 274 EAL 2019.

9. On October 16, 2019, the Supreme Court of Pennsylvania denied Petitioner's "Petition for Allowance of Appeal."

6

## GROUNDS RAISED

**Ground 1:** The Commonwealth violated Brady by intentionally withholding or by gross negligence failing to discover the complainant's criminal record, which included (among other things) *crimen falsi*. In the alternative, trial counsel was ineffective for failing to investigate the complainant's criminal record.

During trial, the Commonwealth never disclosed to the Petitioner that the complainant had multiple convictions, including *crimen falsi*. This is especially crucial, because the complainant gave eyewitness testimony identifying the Petitioner, which was in stark contrast to his initial description. The complainant initially described his attacker as 5'4", 140lbs. and dark skinned with a silver beard, wearing a black puffy coat. At the time the Petitioner was 5'9", 353lbs., light skinned with a completely black goatee only, and was shot through the arm while wearing a brown varsity jacket with white sleeves. There is no disputing the jacket the Petitioner was wearing, as there is an entry hole and an exit hole from the bullet he was struck with. Prejudice is simple to show; instead of trial counsel being able to provide the jury with valid information showing the complainant as a career criminal with a record of deceit, his testimony was able to go wholly unimpeached and he was able to be seen as an honest man. Although the complainant's description of the attacker purported to be the Petitioner moments after the incident was in absolute disparity with the Petitioner's physical characteristics (and his description of the second attacker who was arrested post incident and plead guilty was 100% spot on), without the complainant's criminal record being disclosed trial counsel was unable to impeach his testimony and he remained in the eyes of the jury a victim with no discernible reason to lie. In the instant case, where the only physical evidence was completely circumstantial and the identification unsupported by the initial statement and description, there is reasonable probability the outcome of the trial would have been different.

This issue was unknown to the Petitioner during direct appeal; it was not discovered until the Petitioner was already into the PCRA phase. The PCRA was amended to include this issue. Judge Sandy L.V. Byrd of the Court of Common Please of Philadelphia County declined to have an evidentiary hearing on this issue and instead dismissed the Petitioner's petition. This issue was also dismissed by the Pennsylvania Superior Court.

**Ground 2:** Trial and appellate counsel were ineffective for not raising the issues of police negligence and/or misconduct which occurred.

The incidents of police negligence and/or misconduct, which separately and especially cumulatively were "bad faith" acts and unfairly prejudiced the Petitioner, are as follows:

1. Detective Maloney had the Petitioner held under arrest prior to an arrest warrant being issued.
2. Detective Deayoung Park conducted a Photo Array Lineup while the Petitioner was under arrest without counsel.
3. Said Photo Array Lineup included five individuals of a much darker complexion than the Petitioner.
4. Said Photo Array Lineup included five individuals considerably smaller than the Petitioner.
5. The complainant was informed that a suspect was included in the lineup.
6. Officer Donna Jaconi neglected to send the prints gathered for examination which could potentially have eliminated the Petitioner as a suspect.
7. The gunshot residue tests requested by the investigating detective were never conducted.

8. Officer Jose Roman inaccurately stated to the jury that the Petitioner was immediately identified by the claimant.

9. Officer Zirilli testified untruthfully that he called 911, and was then unavailable to the defense the following day.

1. Before the claimant was shown the photo array (which allegedly led to the arrest), the Petitioner was subjected to an abuse of process and already placed under arrest. This is manifest by the fact that the Petitioner was handcuffed, guarded by police, and his property was seized and marked as evidence. This arrest occurred at approximately 3:00 am on December 30th, 2006, as marked on Philadelphia Police Property Receipt #2701715, while the photo identification made by the Complainant (in absolute disparity to the description he gave post incident) which supposedly was the arresting evidence did not occur until 4:00 am as noted on the Philadelphia Police Photo Array.

At the time when the Petitioner was under arrest, placed in handcuffs and arrested by police, absolutely and unequivocally not free to leave, no evidence or circumstances requiring the Petitioner's arrest existed. The haste to find the culprit resulted in the infringement of the Petitioner's constitutionally protected right to due process. This is exemplified by the fact that the aforementioned property receipt refers to the Petitioner as "defendant" and "offender," lists his property as evidence and has typed in all caps "ATT[EMPTED] MURDER ON POLICE OFFICER," even though there is no box to list any crimes (perhaps to limit any possible tampering or bias). This was all approximately an hour before the identification evidence which led to the Petitioner's arrest ever took place.

2-5. Approximately an hour after the Petitioner was placed under false arrest, Detective Deayoung Park conducted a photo array. At this time the complainant, despite his vastly differing description, somehow selected the Petitioner from a photo array. Not only did the accompanying officer (who could have prevented any mistakes, suggestions, etc.) remain in the car while Detective Park showed the array in the complainant's house, but also the Petitioner did not have counsel present, as his arrest required.

.A simple view of the photo array shows that there are five individuals of a much darker complexion than the Petitioner, as well as five individuals considerably smaller than the

Petitioner. During the motion to suppress the identification evidence, Detective Deayoung Park admitted that because of the glaring inconsistencies between the complainant's description of his attacker and the Petitioner's physical characteristics, he did not allow the program to select at random subjects similar to the Petitioner's statistics. Detective Park admitted that he instead manually chose subjects he alone (and without any input from a supervisor) deemed suitable, using an amalgamation of the complainant's description and the Petitioner's measurements.

In addition, Detective Park admitted that he informed the complainant that a suspect was included in the photo array. This multitude of departures from procedure establish the fact that the Petitioner would have benefitted by the presence of counsel.

6. After simply using her naked eye to view fingerprints on the complainant's car, Officer Donna Jaconi declined to submit them for investigation. She stated she felt they were useless, despite the fact that different parameters are necessary for using a fingerprint as exculpatory evidence than inculpatory evidence. She also neglected to even attempt to collect any physical evidence such as hairs, blood, etc. from the interior and exterior of the automobile. Prior to the date of the incident, Officer Jaconi was disciplined by her supervisor for sleeping and reading a newspaper during classes on fingerprints and blood splatter.

7. Philadelphia Police Property Receipt #2701715 specifically requests that the "Chem Lab[,] please check items for traces of Gun [Shot] Residue and return results to Det. Tighe." The items mentioned were the Petitioner's clothing which included a jacket with bullet entry and exit holes in the elbow area, consistent with the injuries the Petitioner suffered. Despite the fact that this could have been potentially inculpatory or exculpatory evidence, the tests were never conducted. The neglect to conduct these tests robbed the Petitioner of the opportunity to show that his clothing contained no stippling along the wrist area consistent with firing a gun (especially from the right hand as the complainant and Officer Mike Williams testified to, while the Petitioner is left handed), but also would have shown the degree of stippling near the entry hole, showing that the attacker of the Petitioner was closer than Officer Williams was during the incident where the complainant was attacked.

8. During the jury trial, Officer Jose Roman, the officer who took the initial statement from the complainant, went on the stand and told the jury that "the Complainant immediately identified the [Petitioner] at that location." This was completely counterfactual to the Petitioner's actual arrest information, where the Petitioner was arrested in the hospital with a gunshot wound many hours after the incident involving the complainant occurred. While trial counsel objected, there was no explanation to the jury whatsoever. It may have appeared to the jury that instead of them being told something that was counterfactual, they were actually given a window into factual information that they were somehow not supposed to know.

9. Approximately a year after the Petitioner's arrest, during the suppression hearing for the only (at the time) identification witness, Officer John Zirilli is briefed by the Assistant District Attorney and suddenly remembers he called 911 during the incident and can identify the Petitioner as the assailant. It is later determined that he in fact did not call 911 during trial, and when trial counsel requests that he return to court for additional testimony, he is suddenly unavailable. According to the Assistant District Attorney, he would be in trouble with having too much overtime, and that was why he could not return for additional testimony as requested by trial counsel.

**Ground 3:** Motion and appellate counsel were ineffective while arguing for suppression of the in-court and out-of-court identification by the Petitioner, as a result of failure to investigate.

During the hearing for the motion to suppress the identification evidence, motion counsel neglected to raise the issue of the Philadelphia Police Property Receipt, which showed the arrest time was prior to the photo array identification. Motion counsel never mentioned this during trial, and appellate counsel never raised this issue during the appeal.

When Detective Deayoung Park went to the home of the complainant in order to show a photo array which included a picture of the Petitioner at approximately 4:00 am December 30th, 2006, the Petitioner was in fact already under arrest. The Petitioner was assigned officers to insure that he did not attempt to leave the hospital, and his property was seized and marked "evidence" at 3:00 am on December 30th 2006. An examination of the police paperwork by motion counsel and appellate counsel would have shown that the Petitioner was improperly arrested and entitled to counsel prior to the photo array shown to the complainant, entitling the Petitioner to the assistance of counsel.

Motion counsel and appellate counsel were ineffective when they failed to litigate this issue during the suppression motion and on direct appeal.

**Ground 4:** The lower court erred in not granting a lineup as requested by preliminary counsel for the Petitioner where the identification testimony in this matter was tainted.

During the preliminary hearing, the Assistant District Attorney regurgitated the arrest information of the co-defendant of the Petitioner when requesting that the Magistrate deny the Petitioner's request for a lineup. A review of the preliminary transcript shows that he knew that one defendant was arrested at the scene and the Petitioner was actually arrested hours later in the hospital. Yet during argument, in an incident of prosecutorial misconduct, he went on to state that the Petitioner was arrested at the scene. Preliminary counsel was unaware of the Petitioner's arrest information, so the misinformation provided by the Assistant District Attorney went unchallenged.

In addition to the misleading arrest information the magistrate was provided by the Assistant District Attorney, the complainant's description of his assailant contrasted the petitioner's actual physical characteristics in every discernible way. In fact, the Magistrate asked the complainant while deciding whether to deny the lineup, "Did he have anything on his face?" The complainant replied, "He had a silver type of beard." At the time, the Petitioner had a stark black goatee. No one came to check the physical characteristics of the Petitioner against the description given by the complainant. The denial of the lineup was essentially based solely on the erroneous arrest information supplied by the Assistant District Attorney (who either misled purposely or at the very least indirectly mislead the Magistrate) and the description given by the complainant that completely contrasted the Petitioner's physical characteristics.

**GROUND 5:** Trial and appellate counsel were ineffective in failing to challenge the introduction of the 911 tapes of Officer Williams at trial where it was offered to inflame the emotions of the jurors, and where its probative value was substantially outweighed by its unfair prejudice, confusion of issues, undue delay and cumulative effect.

The Petitioner contends that both trial and appellate counsel were ineffective in failing to challenge the introduction of the 911 tapes of the high speed chase between off duty officer Mike Williams and the perpetrators of the robbery. Both trial counsel and appellate counsel did indeed challenge the admissibility of the 911 tapes at trial and on direct appeal, and Petitioner was colloquyed at trial and agreed to stipulate to the 911 tape's authenticity. However, Petitioner argues that trial counsel was ineffective and incompetently advised Petitioner to prior to him agreeing to stipulate to the tape's authenticity.

Petitioner argues this was such a grave error because the 911 tape of Officer Williams' high speed chase was introduced for the purpose of and had the effect (in addition to being unnecessarily cumulative) of inflaming the passions of the jury. Such inflammatory and overly prejudicial evidence greatly outweighed any probative value.

**GROUND 6:** Appellate counsel was ineffective for not raising trial counsel's failure to object to the Commonwealth's failure to disclose the results of the ballistic expert's

ballistics examination, during the motion *in limine*, which resulted in the lower court's permitting the testimony of straw purchasers Sharee Bostic and Lawandra Casey.

Petitioner contends that his direct appeal appellate counsel was ineffective for failing to raise trial counsel's failure to object to the Commonwealth's failure to disclose the results of the expert ballistician's examination at the time the motion *in limine* was argued. The ballistician's report showed it was impossible that the firearm used by the assailant was a Glock, yet ADA Wilson requested that testimony about illegal weapon purchases of Glock 9mm guns be permitted for both Lawandra Casey and Sharee Bostic. Had this information been revealed, any information about Glock firearms would have been deemed inadmissible, as the potential for prejudice against the Petitioner far outweighed the (non-existent) probative value.

Because of this error, the Petitioner was exposed to extremely prejudicial testimony of alleged prior bad acts that were not related to the crime that he was being tried on; labeling him as a straw purchaser who used women, injuriously affecting the trial by seeking to inflame and arouse the passions of the jury. This is illustrated clearly in ADA Wilson's closing arguments when she rhetorically queried the jury, "I ask you, ladies & gentlemen, what kind of man gets women to buy him these kinds of guns?"

**GROUND 7:** Trial counsel was ineffective for failure to request adequate jury instructions from Judge Sandy L.V. Byrd.

During trial, Officer Jaconi testified that she fingerprinted the interior and exterior of the vehicle and on her own (with her naked eye) determined that the fingerprints were not useful enough to be an identifiable print. Because of her opinion, she did not save and submit them for further analysis. Detective Jaconi was not sworn in as an expert witness, yet the jury was asked to accept the lay testimony of Officer Jaconi as though it were expert testimony. With the destruction of the prints, there was no way for the defense to refute Officer Jaconi's claim that the prints were non-exculpatory. The proper remedy, instructing the jury that potentially exculpable evidence was destroyed, was not requested by trial counsel.

A similar situation occurred with the lack of gunshot residue results on the clothing confiscated by Detective Maloney. At some time before 3:00 am on December 30th, 2006,

Detective Maloney confiscated a brown, tan and white jacket with a black lining; two holes and blood were on (and in) the sleeve. He also confiscated a pair of blue jeans. He then turned the items over to Detective Marano.

The case was then assigned to Detective Tighe and items were scheduled to be checked for traces of gunshot residue. Despite the lab user fee being requested in order to conduct a gunshot residue test of the clothing, results of the requested tests were never produced. The utter absence of any physical evidence directly linking the Petitioner to the crime meant that the only evidence was eyewitness testimony. Gunshot residue consistent with the firing of a weapon found on an item of clothing confirmed to have been worn by the Petitioner when he himself was shot would have potentially been inculpatory physical evidence. The absence of such would have been potentially exculpatory evidence. Such tests were never conducted by the Philadelphia Police Department, although they were in possession of the clothing the entire time. Trial counsel should have realized that the lack of processing the clothing amounted to destruction of evidence, as the window of opportunity to conduct the test was squandered by either negligence or bad faith by the Philadelphia Police Department, and requested an appropriate instruction for the jury.

During a trial for the attempted murder of an off duty Philadelphia police officer, Officer Jose Roman untruthfully told the jury that "[t]he complainant immediately identified the [Petitioner] at that location…" While trial counsel objected and Judge Sandy L.V. Byrd sustained the objection, there was no instruction given to the jury. Nor did trial counsel request a mistrial, elicit the proper arrest information of the Petitioner from Officer Roman during cross-examination or even ask for proper jury instruction based on the erroneous information that came directly from a Philadelphia police officer. These oversights could not have possibly have been part of a valid strategy.

This false and highly prejudicial statement by Officer Roman may have led the jury to believe that there was no window of delay between the incident and the arrest of the Petitioner. With no explanation given, the objection without instruction only served to give the outward appearance of factual information being withheld; not of false information being corrected.

Following the incident, the complainant made several statements describing in contrasting ways his ability to see his attackers. Some statements describe them as

13

wearing masks the entire time. Some describe them as wearing hats. Some describe them as arriving with masks up and then pulling them down; some arriving with them down and then pulling them up.

The one thing that does not vary in the descriptions given to police is the fact that the first assailant (purportedly the Petitioner) is described as being shorter than the complainant and approximately 140 pounds, with a dark complexion. Yet somehow the complainant chooses someone from a photo array (which he is instructed by Detective Deayoung Park contains a suspect) who is literally more than twice the weight and approximately a half foot taller, and also (contrary to all the descriptions) light complexioned.

Yet due to (what was at best) an error by ADA Glazer in which he counterfactually described the Petitioner as having been arrested at the scene, the Petitioner was denied a lineup. Yet trial counsel did not request a charge for the jury illustrating this error or the inconsistencies with the statements of the complainant and the physical description of the Petitioner. There was no possible way that trial counsel could have perceived that the defense would be better suited by not instructing the jury of this error and inconsistencies with the complainant's description and the Petitioner's physical characteristics.

Trial counsel also had no valid reason or strategic basis not to request an identification cautionary instruction to the jury regarding Officer Joseph Zirilli. Officer Zirilli never came forward as a potential eyewitness until the hearing of the motion to suppress the identification evidence of the complainant. Officer Zirilli not only never filed a police report regarding the incident, but he also claimed to have called 911, although it was later proven that the complainant called 911.

ADA Wilson, when trial counsel requested that Officer Zirilli return for further testimony, claimed that Officer Zirilli would not be available for further questioning due to overtime restraints. Yet despite this, and the discrepancies between his description and the Petitioner's physical characteristics, trial counsel never requested jury instruction illustrating these incongruities.

**Ground 8:** Trial counsel was ineffective for failing to object to or request a mistrial when the Commonwealth acted in bad faith by making speculative and inaccurate comments at trial intended to create bias and hostility toward the Petitioner, while bolstering the Commonwealth's witnesses' testimony.

During closing arguments, ADA Wilson took several liberties with her speech. These indiscretions served no purpose but to bias the jury; inflaming them against and making them hostile towards the Petitioner. This included inflammatory remarks, statements beyond legitimate inference, and personal opinions of the veracity of the Commonwealth's witnesses; effectively bolstering their testimony by her position as Assistant District Attorney.

ADA Wilson vouched for the complainant's claim of being knowledgeable about firearms without any certification whatsoever, effective bolstering his testimony by claiming during her closing argument that "...Mahn Doan knows about 9mms. He told us he used to be a gun guy before he got married and then got rid of the guns, so he can identify a 9mm, and he said he had a 9mm." Contrary to the inference used by ADA Wilson, "gun guy" is not a formal classification or title that is recognized by the Court to show that anyone has the technical capacity necessary to verify the cartridge a pistol utilizes simply by looking at a firearm pointed at him by an assailant in the dark. The complainant did not testify as an expert witness, so such a claim made by a prosecutor serves only to falsely assure the jury of the witness's truthfulness.

Not only was there nothing offered by the Commonwealth to show that the complainant was an expert in weapon identification (and also no objection by trial counsel), but the complainant gave several statements saying that the weapon was a Glock 9mm. Yet this statement by the complainant, the ersatz "gun guy" according to ADA Wilson, was proven to be false by the Commonwealth's own trained and certified expert witness; a ballistician that ruled out every Glock in the world from being the weapon that the assailant alleged to be the Petitioner used.

ADA Wilson, when speaking about the fact that Officer Zirilli did not file any report or make an identification for nearly two years said that "...Maybe you wouldn't either if you were having a party at your house and you weren't there."

Yet Officer Zirilli never testified that he was having a party at his house. In fact, he testified that he was "with [his] girlfriend that night." It is not a legitimate inference to surmise that a simple night with a paramour was the equivalent of a party where Officer Zirilli would be obligated to remain, rather than fulfill his duties as an officer of the law for nearly two years.

In another example of a similar infringement by ADA Wilson, during trial she asked Officer Zirilli, "... [t]he 911 portion of the 911 tape that I played today, is it possible that there are other 911 tapes out there?" This was on redirect; after it was proven on cross-examination that the call Officer Zirilli counterfactually claimed to have made was in fact placed by the complainant. This information about other potential 911 calls not submitted as evidence before the jury was used to support Officer Zirilli's claim that he in fact called 911.

ADA Wilson then untruthfully claimed that "[t]here is also no blood on the jeans that the [Petitioner] wore into the hospital. There is blood on the coat that {trial counsel} had." Trial counsel in fact objected to this false statement, but Judge Sandy L.V. Byrd (for no apparent reason) overruled the objection to this blatant lie. A simple glimpse of the jeans worn by the Petitioner into the hospital would have incontrovertibly shown that they also were blood-stained.

ADA Wilson's professed during closing arguments that "[a] puffy coat that absorbs the blood so it doesn't get on the inside of the car, it doesn't get on your jeans. Keeps all of the mess in the inside of the coat. That's to explain why there's no blood on the inside of the car." Such a conclusion could not possibly have derived from the evidence of trial; it is beyond the scope of a layperson. Without the aid of expert testimony concluding such, this was yet another highly prejudicial speculation made by ADA Wilson using the prestige of the Commonwealth to present bald claims to the jury as facts.

ADA Wilson stated during closing arguments that "[t]here are three main reasons why [the Petitioner] is so guilty... and the third reason is all of the access he had to the 9mm guns." She also said "[t]he third reason [the Petitioner] is guilty is he had access to 9mms." Simple access to weapons chambered with the same caliber used in the crime could not possibly be a reasonable method to conclude guilt. As only one 9mm was used (besides Officer Williams' service weapon), these uncontested statements of ADA Wilson could only have served the purpose of confusing and inflaming the passions or prejudices of the jury; clear examples of unprofessional conduct on behalf of the prosecutor.

ADA Wilson also claimed that "[t]he [Petitioner] had access to the very kind of gun that was used in this case. the very kind of gun was used to shoot at the officer, the very kind of gun that was used to rob and carjack [the complainant." Yet the ballistician presented by the Commonwealth could not conclude what type of 9mm weapon was used. in fact,

16

he was only able to exclude Glock and Smith and Wesson as possibilities, leaving a virtual cornucopia of possible weapons. The sheer amount of 9mm chambered weapons produced and readily available to whoever desires one, legally or illegally, is staggering; there is no way ADA Wilson could have responsibly concluded that access to weapons that could have possibly been used was the linchpin she iimplied it to be when addressing the jury during closing arguments.

ADA Wilson also aroused the passions of the jury by asking rhetorically during the closing arguments, "I ask you, ladies and gentlemen, what kind of man gets women to buy him these kind of guns?" None of the charges presented to the jury contained straw purchasing as an element necessary to convict; ADA Wilson claimed that she needed the testimony of the Petitioner's alleged straw purchases for its probative value; to show that the Petitioner had access to 9mm weapons. ADA Wilson also claimed during the motion *in limine* that the Petitioner, who owned legal firearms, did not own 9mm handguns, yet she had a list of all firearms owned by the Petitioner that included three 9mm handguns. Incidentally, this went without objection by trial counsel.

In addition, during the motion *in limine*, ADA Wilson had incontrovertible evidence that the weapon procured by Lawanda Casey could not possibly have been the weapon used in the crime; both in the form of the Commonwealth's ballistician's determination that a Glock was not used, and by the Commonwealth having that weapon in custody and available for testing. Despite her argument to the contrary during the motion *in limine*, her statement during closing arguments established her true intentions; to inflame the jury and arouse their passions against the Petitioner.

ADA Wilson, when speaking about the police officers who testified in her closing arguments, vouched for their credibility when she said, "[t]he witnesses that we put forward are the police. The police have testified honestly." She also made an unfair and improper remark about the Petitioner and her opinion of his guilt when she added, "Greg Parker... Birds of a feather flock together," referring to Mr. Parker's (despite testifying against the Petitioner) criminal convictions and the fact that he was an associate of the Petitioner.

ADA Wilson also gave a wholly inaccurate description of the legal process while addressing the jury during closing arguments, incorrectly suggesting that the fact that there were several inconsistencies with statements, paperwork, missing test results, missing evidence, etc. was the only reason that the Petitioner was afforded a trial. She declared, "If those documents were totally thorough in every single thing that was in them and every single thing in these documents, there would be no need for a jury trial. We would have just skipped right over it and moved them in, and the Judge could have decided or could have had a great time in the back reading through all of them."

ADA Wilson also solicited testimony from Detective Marano describing the entire SEM (gunshot residue) test that was conducted for the Petitioner's co-defendant during trial. Not only was Detective Marano never sworn in as an expert witness, but the Petitioner's co-defendant had a separate trial, and the Petitioner was never given a SEM test. This testimony only served to muddy the waters and insinuate to the jury that the Petitioner was also given a SEM test. In addition, Detective Marano testified that gunshot residue does not stay in clothing, which is counterfactual; stippling patterns from gunshots that exist in clothing not only do not dissipate like other gunshot residue, but they can reliably be used to gauge approximate distance between the assailant and victim, as well as if there was an object between them.

ADA Wilson, Judge Byrd and trial counsel also had a discussion off and on the record without the Petitioner present regarding the juror questions. They agreed that "recollection controls" would be the response to questions about things that were never mentioned during trial, such as the Petitioner's weight during the time he was in the hospital, the date of the Petitioner's picture entered

into the photo array, the Petitioner's weight during arrest, the Petitioner's facial hair while in the hospital, etc. While all of this information was readily available, none of it was disclosed during trial, therefore there was no way for the juror's recollection to possibly deduct the answers.

**GROUND 9:** Trial counsel was ineffective for failing to file post sentence motions challenging the excessiveness of the sentence that was more than necessary to protect the public, where may of the charges received sentences that were upward guideline departures and where the trial court failed to consider mitigating factors presented by the Petitioner.

The sentence did not properly consider the Petitioner's high intelligence, youth, high probability of rehabilitation, service in Job Corps, work history which included IT and computer repair and the Petitioner's ability to obtain legitimate employment, previous legitimate business endeavors, family support, and prior record score of zero.

Petitioner contends that there is a substantial question that the sentence is not appropriate under the Sentencing Code. Petitioner contends that the lower court flatly failed to consider the several substantial mitigating factors that were present on behalf of the Petitioner. As such, trial counsel was ineffective by not attacking the sentence in a post-sentence motion, therefore preserving the issue on direct appeal.

---

All of the aforementioned grounds were raised through a PCRA in the Court of Common Pleas of Philadelphia County, 1301 Filbert Street Philadelphia, PA 19107 (docket numbers CP-51-CR-0003425-2007 and CP-51-CR-0003426-2007). Judge Sandy L.V. Byrd denied the petition without a hearing. The Petitioner then appealed to the Superior Court of Pennsylvania (docket number 1847 EDA 2017); this was also denied.

Kate Duffy represented the Petitioner at the preliminary hearing, William Byron Houston during the suppression motion hearing, Myrthri Jayaraman during trial and Jill Heilman during the direct appeal; all of them are located at 1441 Sansom Street, Philadelphia, PA 19102.

During the PCRA, the Petitioner was represented by Emily Cherniack, Esquire, located at 1500 John F. Kennedy Boulevard Suite 1010, Philadelphia, PA 19102. During the appeal of the PCRA, the Petitioner was represented by Daniel Alvarez, located at 100 s. Broad Street Suite 1216, Philadelphia, PA 19110.

The Petitioner has no future sentences to serve after completing the sentence for the judgment that he is challenging.

**WHEREFORE,** the Petitioner asks that the Court vacate the judgment of sentence and remand for new trial, of whatever other remedies are appropriate based upon the grounds raised herein.

Respectfully Submitted,

12/20/19
Date

Michael Grant, Petitioner

I declare under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on _____ 12/20/19 _____.

Executed on _____ 12/20/19 _____.

Michael Grant, Petitioner

CFK

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

19    6132

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____1100 Pike Street, Huntingdon, PA 16654_____

Address of Defendant: _____

Place of Accident, Incident or Transaction: _____ Philadelphia _____

---

*RELATED CASE, IF ANY:*

Case Number: _____    Judge: _____    Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?    Yes ☐    No ☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?    Yes ☐    No ☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?    Yes ☐    No ☐

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?    Yes ☐    No ☐

I certify that, to my knowledge, the within case ☐ is / ☐ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _____12/26/2019_____    _Daniel McCaule_    _____
                                *Attorney-at-Law / Pro Se Plaintiff*    *Attorney I.D. # (if applicable)*

---

**CIVIL:** (Place a √ in one category only)

*A.    Federal Question Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Patent
☐ 6. Labor-Management Relations
☐ 7. Civil Rights
☑ 8. Habeas Corpus    2254
☐ 9. Securities Act(s) Cases
☐ 10. Social Security Review Cases
☐ 11. All other Federal Question Cases
      *(Please specify):* _____

*B.    Diversity Jurisdiction Cases:*

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify):* _____
☐ 7. Products Liability
☐ 8. Products Liability – Asbestos
☐ 9. All other Diversity Cases
      *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____, counsel of record *or* pro se plaintiff, do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

DATE: _____    _____    _____
              *Attorney-at-Law / Pro Se Plaintiff*    *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

CFK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

Grant                                          :                    CIVIL ACTION
                                               :
                            v.                 :
                                               :                    NO. **19    6132**
Kauffman, et. al.                              :

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.        **2254** (☒)

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human
    Services denying plaintiff Social Security Benefits.                                (☐)

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.  (☐)

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                                 (☐)

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.                                                                     (☐)

(f) Standard Management – Cases that do not fall into any one of the other tracks.       (☐)

DEC **2 6** 2019                    _Paul McCormick_                    _____
**Date**                            **Deputy Clerk**                    **Attorney for**


_____                    _____                    _____
**Telephone**                       **FAX Number**                      **E-Mail Address**

(Civ. 660) 10/02

Name Michael Grant

Number JIV-2196

1100 Pike Street

Huntingdon, PA 16654-1112

Inmate Mail - PA DEPT OF CORRECTIONS



Clerk
United States District Court for the
Eastern District of Pennsylvania
601 Market Street
Philadelphia, PA 19106

INMATE MAIL
PA DEPARTMENT
OF CORRECTIONS



