IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL GRANT, | : | CIVIL ACTION |
| Petitioner, | : | |
| | : | |
| v. | : | NO. 19-6132 |
| | : | |
| KEVIN KAUFFMAN, et al., | : | |
| Respondents. | : | |

## REPORT AND RECOMMENDATION

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                                    July 27, 2022

Before the Court for Report and Recommendation is the *pro se* petition of Michael Grant

("Grant" or "Petitioner"), a prisoner incarcerated at SCI-Coal Township, in Northumberland

County, Pennsylvania for the issuance of a writ of habeas corpus filed pursuant to 28 U.S.C. §

2254.[1] Grant is serving an aggregate term of 25-50 years of imprisonment following his

convictions in the Philadelphia Court of Common Pleas for attempted murder, aggravated assault,

robbery, criminal conspiracy, and related firearm offenses. By this petition he seeks habeas relief

on nine (9) grounds. For the reasons that follow, we recommend that the petition be denied and

dismissed in its entirety.

---

[1] Petitioner was previously incarcerated at SCI-Huntington, in Huntington County, Pennsylvania.
On June 27, 2022, he communicated his change of address with the Court. (Doc. 28.) Although
Petitioner is currently confined within the Middle District of Pennsylvania, which includes
Northumberland County, *see* 28 U.S.C. § 118(b), venue is proper here pursuant to 28 U.S.C. §
2241(d) in that his confinement grew out of a prosecution and conviction in a Court of Common
Pleas within the Eastern District of Pennsylvania.

# I. FACTUAL HISTORY AND PROCEDURAL HISTORY[2]

The Pennsylvania Superior Court provided a summary of the factual background of Grant's case on collateral appeal:

> At approximately 6:45 p.m. on December 29, 2006, [Grant] and his co-defendant, Antwuan White, approached Mahn Doan outside of 2800 Bittern Place in Philadelphia. [Grant] and White, who were wearing ski masks and dark coats, held Doan at gunpoint. They ordered Doan to hand over his money and car keys. When Doan pretended to not understand English, [Grant] removed his mask, grabbed Doan by the jacket, and repeated his demand. In order to stall, Doan handed them the wrong set of keys. When [Grant] and White discovered that the keys did not fit the car door, [Grant] threatened to shoot Doan if he did not relinquish the correct key. Doan complied, and [Grant] and White drove away with the car, Doan's cell phones, and his four dollars.
>
> Doan then went across the street to the home of a police officer [Officer John Zirilli], who called 911 for Doan. Coincidentally, another off-duty police officer [Officer Michael Williams] witnessed the incident from his car and pursued [Grant] and White. The pursuit turned into a high-speed car chase [through a residential neighborhood]. At the intersection of 65th Street and Eastwick Street, [Grant] exited the stolen vehicle to fire several gunshots at [Officer Williams] pursuing them. [Grant] then returned to the car, and the chase resumed. As they crossed the Passyunk Bridge, [Grant] again fired his weapon at [Officer Williams], who returned fire. When [Grant] and White reached the corner of Sixth and Ritner Streets, they stopped the vehicle and attempted to escape on foot. The officer chased and arrested White. Doan was brought to the scene and identified White as one of his assailants.
>
> [Grant] was arrested later at the University of Pennsylvania Hospital [in the early morning of December 30, 2006] when he sought treatment for a gunshot wound to the arm. Although [Grant's]

[2] In preparing this Report and Recommendation, we have reviewed Grant's *pro se* "Petition for Writ of Habeas Corpus" (Doc. 1); Grant's legal memorandum (Doc. 7); Grant's first and second amendments (Docs. 5, 20); Grant's reply brief (Doc. 19); the District Attorney of Philadelphia's response brief (Doc. 16); the original state court record that we received from the Clerk of Court of the Philadelphia County Court of Common Pleas ("N.T."); and the state court opinions from Grant's direct appeal, *Commonwealth v. Grant*, No. 114 EDA 2009, slip. op. (Pa. Super. Aug. 4, 2010) ("*Grant I*") and collateral appeal, *Commonwealth v. Grant*, No. 1847 EDA 2017, 2019 WL 1988665, at *4 (Pa. Super. Ct. May 6, 2019) ("*Grant II*").

physical characteristics did not match the first description given by Doan, the police had reason to believe that [Grant] was the second perpetrator [after Officer Chris Campbell investigated the circumstances of Grant's injury]. The police constructed a photographic array around [Grant's] actual physical characteristics and presented the array to Doan for identification. The presenting officer [Detective Deayoung Park] informed Doan that the police had a suspect, but the officer did not suggest which one of the eight persons in the array was the suspect. Doan positively identified [Grant] from the array.

The court held a preliminary hearing on March 20, 2007, and the matter was held for court. The Commonwealth filed the Information on April 2, 2007. [Grant] was released on nominal bail to house arrest with electronic monitor on July 27, 2007, pursuant to Pa.R.Crim.P. 600(E). The court revoked [Grant's] release after his arrest for having two women [Ms. Lawandra Casey and Ms. Sharee Bostic] purchase firearms for him.

Prior to trial, [Grant] moved to suppress all identifications and the testimonies of [Ms. Casey and Ms. Bostic].[3] Both Bostic and Casey were prepared to testify that they had straw purchased nine millimeter (9mm) handguns for [Grant]—the same caliber of weapons as the shell casings recovered from the scene. The trial court denied [Grant's] motions to suppress. The court also granted, over [Grant's] objection, the Commonwealth's motion *in limine* to introduce the 911 recordings that captured some of the incident in live action. All of the foregoing evidence was admitted at trial. In addition, [Grant's counsel] stipulated to the authenticity of the 911 tapes prior to their introduction to the jury.

*Commonwealth v. Grant*, No. 1847 EDA 2017, 2019 WL 1988665, at *1 (Pa. Super. Ct. May 6, 2019) ("*Grant II*").

From September 17, 2008 to September 23, 2008, Grant was tried before a jury in the Philadelphia Court of Common Pleas. Grant was represented by Mythri Jayaraman, Esq. and Erica

---

[3] Petitioner sought to suppress Mr. Doan's photo array identification at a hearing that was held on October 9, 2007 and October 10, 2007. We note that the state court records mistakenly date this hearing as being held in 2008. The next suppression hearing, which addressed the admissibility of Ms. Casey and Ms. Bostic's testimony, was held only two days before Petitioner's trial commenced, on September 15, 2008.

Wilson, Esq. represented the Commonwealth. Grant was convicted of his charged crimes and on November 25, 2008, he was sentenced to an aggregate term of twenty-five to fifty years of imprisonment, followed by fifteen years of probation. Grant filed a timely direct appeal with the Pennsylvania Superior Court, challenging his conviction on three grounds: (1) The lower court erred in denying Grant's motion to suppress Mr. Doan's identification, which was based on an "unduly suggestive" photo array; (2) the lower court erred in permitting the Commonwealth to play "highly prejudicial" recordings of the 9-1-1 calls; and (3) the lower court erred in permitting Ms. Casey and Ms. Bostic to testify. *See Commonwealth v. Grant*, No. 114 EDA 2009, slip. op. at 4 (Pa. Super. Aug. 4, 2010) ("*Grant I*"). On August 4, 2010, Grant's judgment of sentence was affirmed. *See id*. at 17. The Pennsylvania Supreme Court subsequently denied allowance of appeal on March 20, 2011. *See Commonwealth v. Grant*, 19 A.3d 1050 (Pa. 2011).

On November 30, 2011, Grant timely filed a *pro se* PCRA petition. Counsel was subsequently appointed, and Grant filed various amendments and supplements to his PCRA petition. All tolled, Grant raised ten grounds for relief: (1) The Commonwealth violated *Brady* by intentionally withholding Mr. Doan's criminal record; (2) trial counsel was ineffective for not raising a speedy trial motion to dismiss; (3) trial and appellate counsel were ineffective for failing to raise issues of police negligence and misconduct; (4) trial and appellate counsel were ineffective for failing to adequately challenge the admissibility of Mr. Doan's identification; (5) trial counsel was ineffective for failing to adequately investigate Grant's alibi; (6) trial and appellate counsel were ineffective for failing to adequately challenge the admissibility of the 9-1-1 recordings; (7) appellate counsel was ineffective for failing to challenge the admissibility of ballistics evidence; (8) trial counsel was ineffective for failing to request adequate jury instructions; (9) trial counsel was ineffective for failing to object to or request a mistrial due to prosecutor's misconduct in

closing argument; and (10) trial counsel was ineffective for failing to file a motion challenging the excessiveness of Grant's sentence. *See Grant II* at *3. The PCRA court dismissed the petition. On appeal, the Superior Court affirmed the PCRA court's decision, after determining that Grant's claims were either without merit or waived due to procedural defects in his appeal. The Pennsylvania Supreme Court denied allowance of appeal on October 16, 2019. *See Commonwealth v. Grant*, 218 A.3d 852 (Pa. 2019)

On December 26, 2019, Grant filed this timely *pro se* "Petition for Writ of Habeas Corpus," raising nine grounds for relief. (Doc. 1.) Grant filed a first amendment to his petition on January 27, 2020, which we granted in part. (Docs. 5, 9.) He then filed a Memorandum of Law in support of his petition on June 22, 2020. (Doc. 7.) On December 4, 2020, Respondents filed their response in opposition to Grant's petition. (Doc. 16.) Petitioner then filed a second amendment to his petition on January 12, 2021, which we granted. (Docs. 20, 21.) Grant also availed himself of the opportunity to file a reply brief, which was submitted on January 14, 2021. (Doc. 19.) As set forth below, Grant's claims are without merit or procedurally defaulted. Given these circumstances, we cannot recommend that his petition be granted on any of his stated grounds for relief.

## II.    LEGAL STANDARDS

Before we begin our discussion of Grant's particular claims, we set out the legal standards that govern our review.  First, we explain a petitioner's obligation to exhaust available state court remedies as to his claims and the consequences of a failure to do so, in addition to the procedural default of claims according to independent and adequate state grounds. We next describe the constraints upon a federal court reviewing claims that were adjudicated on the merits in state court. Finally, as a majority of Grant's claims alleged ineffective assistance of counsel, we set out the substantive standard under which those claims are considered.

## A. Exhaustion and Procedural Default

Assuming a claim is cognizable on federal habeas review, relief is ordinarily available only for a claim where the petitioner has exhausted the corrective processes available in the state courts. *See* 28 U.S.C. § 2254(b)(1). A petitioner satisfies this obligation and gives the state courts a full and fair opportunity to resolve a federal constitutional claim only when he "fairly presents" his claim in "one complete round of the state's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). A claim is "fairly presented" if the State has had the "opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)) (internal citation marks omitted). State courts must "be alerted to the fact that the prisoners are asserting claims under the United States Constitution." *Id*. at 366-67. Where a claim was *not* properly presented to the state court, and state procedural rules bar the petitioner from seeking further relief in state court, the petitioner is considered to have defaulted that claim.  *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 749 (1991).

Even if a claim is properly asserted in the state system, a federal habeas court will not review a claim rejected by the state court, "if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Walker v. Martin*, 131 S. Ct. 1120, 1127 (2011) (quoting *Beard v. Kindler*, 558 U.S. 53, 55 (2009)). In such a case, the claim is procedurally defaulted for purposes of federal habeas review. A state rule is "independent" if it is not intertwined with federal law. *Coleman*, 501 U.S. at 733. A state rule is "adequate" if it is "firmly established and regularly followed." *Johnson v. Lee*, 136 S.Ct. 1802 (2016). Specifically, state procedural rules regarding the appellate process are considered

independent and adequate grounds for a state court's decision that would preclude habeas review of a claim due to procedural default. *See Rolan v. Coleman*, 680 F.3d 311, 317-18 (3d Cir. 2012).

The consequence of a claim having been deemed procedurally defaulted is that the constitutional claim will not be reviewed by the federal court unless the petitioner can establish "cause for the default and actual prejudice as a result of the alleged violation of federal law, *or* [unless he] demonstrate[s] that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750 (emphasis added). *See also Teague v. Lane*, 489 U.S. 288, 308 (1988) (plurality opinion); *Wainwright v. Sykes*, 433 U.S. 72 (1976). To establish cause, the petitioner must show "that some objective factor external to the defense impeded [his] efforts to comply with the State's procedural rule" in the presentation of the claim to the state court. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). The fundamental miscarriage of justice exception requires that the petitioner supplement his claims with a "colorable showing of factual innocence" in order to obtain review of the defaulted constitutional claim. *McCleskey v. Zant*, 499 U.S. 467, 495 (1991).

Where an unexhausted claim alleged ineffective assistance of trial counsel, the default may be excused by the ineffectiveness of collateral review counsel where (1) collateral review counsel's failure itself met the standard for ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), and (2) the underlying ineffective assistance of trial counsel claim is "a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *See Martinez v. Ryan*, 566 U.S. 1, 14 (2012). Noting that the *Martinez* Court compared this standard to that required to issue certificates of appealability, the Third Circuit interpreted the inquiry into whether the underlying ineffectiveness claim is "substantial" as a "threshold inquiry" that "does not require full consideration of the factual or legal bases adduced in support of the

claims." *Bey v. Superintendent Greene SCI*, 856 F.3d 230, 238 (3d Cir. 2017) (quoting *Miller-El v. Cockerell*, 537 U.S. 322, 327 (2003)).

### B. Standards for State-Adjudicated Claims

Where the claim presented in the federal habeas petition was adjudicated on the merits in the state courts, the federal court shall not grant habeas relief unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

A writ may issue under the "contrary to" clause of Section 2254(d)(1) only if the "state Court applies a rule different from the governing rule set forth in [United States Supreme Court] cases or if [the state court] decides a case differently than [the United States Supreme Court has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A writ may issue under the "unreasonable application" clause only where there has been a correct identification of a legal principle from the Supreme Court but the state court "unreasonably applies it to the facts of the particular case." *Id.* This requires the petitioner to demonstrate that the state court's analysis was "objectively unreasonable." *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002).

### C. The *Strickland* Ineffective Assistance of Counsel Standard

The Supreme Court employs the two-prong test announced in *Strickland v. Washington*, 466 U.S. 668 (1984), to determine if the defendant was deprived of his right to counsel as guaranteed by the Sixth Amendment. Pursuant to *Strickland*, a defendant who raises claims based on the ineffective assistance of his counsel must prove that (1) "counsel's representation fell below an objective standard of reasonableness," and (2) there is "a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694.

To satisfy the first prong of the *Strickland* test, a defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. In evaluating counsel's performance, a reviewing court must be "highly deferential" and must make "every effort ... to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Moreover, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.*

To satisfy the second prong of the *Strickland* test, the defendant must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Id.* It follows that counsel cannot be ineffective for failing to pursue meritless claims or objections. *See, e.g., United States v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999); *United States v. Fulford*, 825 F.2d 3, 9 (3d Cir. 1987).

III. **DISCUSSION**

Petitioner raises nine grounds for relief in his *pro se* petition:

(1) The Commonwealth violated *Brady v. Maryland*, 373 U.S. 83 (1963) by failing to disclose the victim's criminal record;

(2) Trial counsel was ineffective for "not raising issues of police negligence and/or misconduct which occurred";[4]

(3) Trial counsel and appellate counsel were ineffective in attempting to challenge the admission of identification evidence;

(4) The preliminary hearing court erred in denying Petitioner's request for a lineup;

(5) Trial counsel and appellate counsel were ineffective in failing to challenge the admission of audio from a 9-1-1 call as prejudicial;

(6) Appellate counsel was ineffective "for not raising trial counsel's failure to object to the Commonwealth's failure to disclose the results of the ballistic expert's examination" on direct appeal;

(7) Trial counsel was ineffective for failing to request adequate jury instructions;

(8) Trial counsel was ineffective for failing to object to or request a mistrial based on alleged prosecutorial misconduct;

(9) Trial counsel was ineffective for failing to file post-sentence motions challenging "excessive" discretionary aspects of Petitioner's sentence.

(Doc. 1 at 1-18.) As discussed within, only one of Grant's claims, Ground One, was exhausted at the state court level and could be reviewed on its merits. The remaining eight claims, Grounds Two through Nine, are procedurally defaulted and thus cannot constitute a basis for federal habeas relief. Furthermore, upon our examination of the record and review of Grant's legal arguments,

---

[4] In Grant's original petition, this claim included allegations of ineffectiveness as to both trial and appellate counsel: "Trial *and appellate counsel* were ineffective for not raising the issues of police negligence and/or misconduct that occurred." (Doc. 1 at 7); (Doc. 7 at 18) (emphasis added). In Grant's "Second Motion to Amend Writ of Habeas Corpus Petitioner and Memorandum of Law," he requested to "remove 'and appellate counsel' from the issue." (Doc. 20 at 1.) We granted Grant's request to amend. (Doc. 21.) Accordingly, we discuss this claim only in the context of his trial counsel's alleged ineffectiveness.

we cannot discern any appropriate excuse or exception for the default. Finally, notwithstanding the default, these grounds are without merit and do not constitute a proper basis for habeas relief.

## A. Exhausted Claim

Although the majority of Grant's grounds for habeas relief are procedurally defaulted, Ground 1 survives for substantive review: "The Commonwealth violated *Brady v. Maryland*, 373 U.S. 83 (1963) by intentionally withholding or by gross negligence failing to discover the complainant's criminal record, which included (among other things) *crimen falsi*."[5] (Doc. 1 at 7.) Grant alleges that the prosecution never informed him or his counsel that Mr. Doan had prior fraud convictions with which Mr. Doan could have been impeached. (*Id.*) Specifically, Mr. Doan pleaded guilty to committing bank fraud in June 2000 and pleaded guilty to committing wire fraud, identity fraud, and making false statements to the Department of Housing and Urban Development in September 2006; these two convictions occurred in federal court in the Eastern District of Pennsylvania.[6] (*Id.*, App'x A.) Mr. Doan was also convicted of theft by unlawful taking, theft by

---

[5] Grant amended Ground 1 to read as follows: "The Pennsylvania Superior Court's determination that the Commonwealth did not violate *Brady* by intentionally withholding the complainant's criminal record, which included (among other things) *crimen falsi* convictions, resulted in: a) an unreasonable application of *Brady* and its progeny; and b) was based on an unreasonable determination of the facts in light of the evidence presented. In the alternative, trial counsel was ineffective for failing to investigate the complainant's criminal record." (Doc. 5.) We granted Grant's request to amend. (Doc. 9.) We also note that Grant raised his "alternative claim" related to his trial counsel's ineffectiveness both at the PCRA initial review stage and on PCRA appeal. Both the PCRA court and the Superior Court addressed Grant's ineffectiveness argument, but only after determining that his underlying *Brady* claim was without merit. Accordingly, the Superior Court held that Grant's counsel could not have been ineffective for failing to raise a *Brady* violation that did not prejudice Grant. *See Grant II* at *6. For the sake of consistency, we follow the same analysis here and conclude that Grant's counsel was not ineffective for failing to raise a *Brady* claim that was without merit.

[6] The relevant docket numbers for Mr. Doan's federal convictions are: 2:00-cr-00181-ER-1 and 2:06-cr-00357-MMB-1. Grant also asks us to consider a third federal conviction attributed to Mr. Doan, with which he was charged in May 2009 and pleaded guilty in November 2010. (Doc. 7, App'x A.) The relevant docket number for this third conviction is: 2:09-cr-00361-TJS-1. We note

deception, and criminal conspiracy in July 2001 in the Philadelphia Court of Common Pleas.[7] (Doc. 19 at 1.) Grant appropriately presented this claim to the Pennsylvania Superior Court on collateral appeal. The Superior Court noted that a *Brady* claim requires a showing that the government "suppressed" the evidence "either willfully or inadvertently," and that "prejudice ensued" from that suppression. *Grant II* at *5. Upon reviewing Grant's arguments, the court held that Grant's *Brady* claim was without merit, as he could not show that the Commonwealth ever possessed the evidence in question, nor was there was "a reasonable probability the outcome of the trial would have been different or that he received an unfair trial" based on the omission of the evidence. *Id.* at *6.

The Superior Court confirmed that "impeachment evidence falls within the parameters of *Brady*," and that the information about Mr. Doan's criminal history was therefore subject to the prosecution's disclosure mandate. *Id.* at *5 (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)). In the Superior Court's view, "[i]t is without doubt that the information upon which [Grant] bases his *Brady* violation claim may have impacted upon the credibility of [Mr. Doan]." *Id.* Even so, Grant was not able to demonstrate that the missing evidence was "material" to his conviction. *Id.* The court stated that the "mere possibility that an item of undisclosed information might have helped the defense or might have affected the outcome of the trial does not establish materiality in the constitutional sense." *Id.* (citing *U.S. v. Agurs*, 427 U.S. 97, 109-10 (1976)). Furthermore, to prove materiality where the undisclosed evidence affects a witness's credibility, "a defendant must demonstrate that the reliability of the witness may well be determinative of the

---

that this charge and subsequent conviction did not occur until *after* Grant's trial in September 2008, therefore, it could not have been used by Grant's counsel for impeachment purposes.

[7] The relevant docket number for Mr. Doan's state conviction is: CP-51-CR-1007872-1999.

defendant's guilt or innocence." *Id.* (citing *Commonwealth v. Johnson*, 727 A.2d 1089, 1094 (Pa. 1999)). Although the Superior Court conceded that "the evidence at issue may have been favorable to [Grant] in that it may have provided a basis to impeach the credibility of the victim's testimony," it could not accept that there was a "reasonable probability that the result of the trial would have been different" in light of the evidence presented at trial. *Id.* at *6 (citing *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995)). In particular, the Superior Court pointed out that Mr. Doan was not the only witness to identify Grant, and there was "significant circumstantial evidence of guilt." *Id.*

The Superior Court also explained that Grant's claim failed on another basis, as he could not demonstrate that that the Commonwealth ever possessed the impeachment evidence that it allegedly "willfully or inadvertently" suppressed. *Id.* at *5-6. In particular, it referenced the trial court's finding that the Mr. Doan's criminal convictions "were all prosecuted under a different name [Bruce Doan a/k/a Mahn Huu Doan] […] [t]herefore, searching for the victim's name would not have revealed the convictions." *Id.* at *6 (internal citation omitted). The court cited Pennsylvania precedent for the proposition that "withheld evidence must have been in the exclusive control of the prosecution at the time of the trial[.]" *Id.* at *5 (quoting *Commonwealth v. Haskins*, 60 A.3d 538, 547 (Pa. Super. 2012)). Accordingly, the Commonwealth could not be said to have withheld *Brady* material when it was not aware of its existence. As Grant's claim failed on both the second and third prongs of the *Brady* test, the Superior Court ultimately held that his arguments were without merit. *Id.* at *6. Grant now claims that the Superior Court's analysis was both contrary to federal law and "based on an unreasonable determination of the facts." (Doc. 7 at 9.) *See also* 28 U.S.C. §§ 2254(d)(1),(2).

### i. Alleged Misapplication of Federal Law

As to the federal law he believes was violated, Grant cites *Brady* and its progeny. (Doc. 7 at 9.) In *Brady*, the Supreme Court of the United States held that the government bears an affirmative duty to disclose evidence that is favorable to a defendant. *See* 373 U.S. at 87. The Supreme Court has since clarified that, "[t]here are three components of a true *Brady* violation: [1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; *and* [3] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999) (emphasis added). All three prongs of the *Brady* test must be satisfied in order to establish a constitutional violation *See id*. The third prong, prejudice, is satisfied where the suppressed evidence is considered "material," in that there must be "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. The materiality of *Brady* evidence depends "almost entirely on the value of the evidence relative to the other evidence mustered by the state." *Johnson v. Folino*, 705 F.3d 117, 129 (3d Cir. 2013). In light of this precedent, we conclude that the Pennsylvania Superior Court's application of *Brady* was not unreasonable. It is clear that *Brady* requires more than a mere showing that the government possessed and subsequently suppressed information.[8] Our decision

---

[8] Both Grant and Respondents also provided arguments as to the Superior Court's analysis of the second prong of the *Brady* test. Specifically, Grant challenged the Superior Court's determination that the Commonwealth did not "possess" the evidence of Mr. Doan's criminal history due to Mr. Doan's use of an undisclosed alias in those convictions. *Grant II* at *6. Respondents claim that the Commonwealth could not have possessed information about Mr. Doan's federal convictions, as that information was "within the control of the federal government, which played no role in the prosecution of this case." (Doc. 16 at 14) (citing *Gibson v. Sec'y Pa. Dep't Corr.*, 718 F. App'x. 126, 130 (3d Cir. 2017)). Grant counters that "[t]he prosecution had constructive possession" of Mr. Doan's criminal records, which included state *and* federal convictions, as the information was available on public judicial dockets and searchable by Social Security Number on the FBI criminal background database. (Doc. 7 at 11) (citing *United States v. Joseph*, 996 F.2d 36, 39 (3d Cir.

here—and in most cases—hinges on whether Grant suffered prejudice as a result of the government's non-disclosure. *See Kyles*, 514 U.S. at 437-38 ("[S]howing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a *Brady* violation, without more.").

Here, the state court made the determination that Mr. Doan's credibility was not "material" to Grant's conviction "in light of the overwhelming evidence of guilt." *Grant II* at *6 (quoting Tr. Ct. Op. 9/29/17 at 7). In particular, the state court noted that Mr. Doan was not the only witness to identify Grant as the perpetrator and that "significant" circumstantial evidence also inculpated Grant's involvement in the crime. *Id*. As to the identifications, Officer Zirilli witnessed the crime and identified Grant both in a post-incident lineup and in the courtroom on the day of trial. (N.T. 9/18/08, pp. 120, 126-27; 9/22/08 pp. 107-08.) Officer Williams also witnessed the crime and then pursued Grant in the car chase. (N.T. 9/18/08, pp. 185-88.) Although he was not able to see Grant's face, he was able to provide a description of the perpetrator's physical stature that was consistent

---

1993)). We emphasize, however, that Third Circuit decisions are not controlling in our analysis. Habeas relief depends on whether the Pennsylvania state court's decision was contrary to federal law as established by the United States Supreme Court. *See* 28 U.S.C. § 2254(d). The Supreme Court of the United States has not yet articulated a "clearly established rule" as to when the government "possesses" evidence in the context of *Brady*. At minimum, it appears that the government must have knowledge of the evidence, but there is an outstanding question as to whether that knowledge must be actual or constructive to equal "possession" by the government: "[T]he individual prosecutor has a *duty to learn* of any favorable evidence known to the others acting on the government's behalf in the case, including the police […] the prosecution's responsibility for failing to disclose *known*, favorable evidence rising to a material level of importance is inescapable." *Kyles*, 514 U.S. at 437–38 (emphasis added). Accordingly, in the absence of a "clearly established" rule regarding the circumstances that amount to government "possession" of favorable evidence, we cannot say that the Superior Court was "unreasonable" in its application of *Brady* as to the second prong of Grant's claim. *See Carey v. Musladin*, 549 U.S. 70, 77 (2006) (explaining that "the lack of holdings from this Court" on a specific rule of law precludes a finding that the state court "unreasonably applied" that law). In any event, the Superior Court's determination that the Commonwealth did not "possess" Mr. Doan's criminal records was not dispositive to its analysis of Grant's *Brady* claim.

with Grant's characteristics. Specifically, Officer Williams described the second passenger of the vehicle in the car chase as, "rather sizeable [...] built or just thick or wide." (N.T. 9/19/08 p. 47.) Grant himself stated that at the time of the incident he was "5'9", 300+ lbs." (Doc. 7 at 38.) Certain circumstantial evidence also supported Grant's conviction. Both Ms. Bostic and Ms. Casey testified that they had acted as "straw purchasers" of firearms on Grant's behalf. (N.T. 9/22/08, pp. 123-133.) Ms. Bostic testified that Grant gave her money to purchase a .9 mm handgun, registered herself as the owner of the weapon, and subsequently gave it to Grant. (*Id*.) Ms. Casey testified that she purchased a .9 mm handgun for herself at Grant's insistence, which Grant then stole and never returned. (N.T. 9/23/08, pp. 15-27.) It was later confirmed that a .9 mm handgun was used against Officer Williams in the car chase and shooting. (N.T. 9/22/08, pp. 92-94.) Furthermore, Grant's co-worker Gregory Parker testified that Grant had told him he was shot in a "struggle" with police. (N.T. 9/22/08, p. 148.) Ms. Bostic also testified that Grant had told her he was shot in the arm by police. (N.T. 9/22/08, pp. 131-132.) Finally, Officer Campbell testified that police became suspicious of Grant after he appeared at the hospital with an unexplained gunshot wound only hours after the shooting and provided the authorities with a false account of the events that caused his injury. (N.T. 9/19/08, pp. 129-53.)

Based on this evidence, the state court determined that the *Brady* material was not favorable enough to overcome the evidence presented at trial. *Grant II* at *6. Accordingly, there was no "reasonable probability" that the outcome of Grant's verdict would have been different. We cannot accept that the Superior Court was "unreasonable" in its application of *Brady*, as this conclusion is consistent with the Supreme Court's standard for determining whether *Brady* evidence was "material." *See Kyles*, 514 U.S. at 433-34. We add that, notwithstanding the lack of impeachment evidence as to Mr. Doan's *crimen falsi* history, Mr. Doan was thoroughly cross-

examined by Grant's counsel as to the inconsistencies in his various descriptions of Grant to police. (N.T. 9/18/08, pp. 91-107.) The credibility and reliability of Mr. Doan's testimony were also addressed in closing argument. (N.T. 9/23/08, pp. 96-100.) Thus, even if defense counsel had been provided with the *Brady* material, we are not convinced that this impeachment evidence would have affected the jury's consideration of the evidence such that it would have "put the whole case in such a different light as to undermine our confidence in the verdict." *Hollman*, 158 F.3d at 182. For these reasons, we conclude that Grant's claim is without merit.

### ii. Alleged Unreasonable Findings of Fact

We now turn to Grant's allegation that the Pennsylvania Superior Court's decision was based on unreasonable findings of fact, and we conclude that this claim is also without merit. Grant asserts that the Superior Court unreasonably determined that he was not prejudiced by the prosecution's non-disclosure when the record does not show the existence of an "overwhelming evidence of [Grant's] guilt." (Doc. 7 at 15.) Grant also claims that the Superior Court inaccurately determined that Mr. Doan's convictions were "all prosecuted under a different name [Mr. Doan's alias, "Bruce Doan"]" and therefore undiscoverable by the Commonwealth. (*Id*. at 14.) Regarding challenges of factual findings, the Third Circuit has indicated that "§ 2254(d)(2) applies to a state court's ultimate factual findings, and that a challenge under that section is based on the totality of the evidence presented in the state-court proceeding." *Eley v. Erickson*, 712 F.3d 837, 846, n.11 (3d Cir. 2013) (internal citations omitted). We apply a "reasonable" standard of review to the state court's factual findings. *Breighner v. Chesney*, 301 F. Supp. 2d 354, 368–69 (M.D. Pa. 2004), *aff'd*, 156 F. App'x 539 (3d Cir. 2005) (citing *Porter v. Horn*, 276 F.Supp.2d 278, 296 (E.D. Pa. 2003)). A factual determination is "unreasonable" under § 2254(d)(2) "only if the court finds that a rational jurist could not reach the same finding on the basis of the evidence in the record." *Id*.

This provision "essentially requires the habeas court to step into the shoes of an appellate tribunal, examining the record below to ascertain whether sufficient evidence existed to support the findings of fact material to the conviction." *Id*. To warrant relief, "the petitioner must show (1) that an *unreasonable determination* of a factual issue was made and (2) that the state court decision was *based on* this improper finding." *Id*. (emphasis added).

As to Grant's first alleged factual error, he asserts that there is an "abundance of information on record" that demonstrates that his trial was unfair due to the Commonwealth's failure to disclose the *Brady* material. (Doc. 7 at 15.) He claims the Superior Court erred when it determined that, notwithstanding Mr. Doan's testimony, "overwhelming evidence of [Grant's] guilt" was presented at trial. According to Grant, the Superior Court was mistaken in explaining that other witnesses had also identified Grant and that "significant" circumstantial evidence inculpated his involvement in the crime. *Grant II* at *6. We do not agree that the Superior Court's determination of these facts was "unreasonable" based on the available record. Both Officer Zirilli and Officer Williams witnessed the crime and identified Grant at trial; Officer Zirilli had been only a few feet away from the robbery and Officer Williams had described the physical stature of the car passenger that matched Grant's characteristics. Officer Zirilli also identified Grant in a lineup. As to the circumstantial evidence, Ms. Bostic and Ms. Casey testified that they had purchased .9 mm firearms which they gave to Grant and which matched the type of weapon used in the crime. Ms. Bostic and Mr. Parker both testified that Grant had told them he was shot in the arm by police. Finally, the circumstances of Grant's arrival at the hospital only hours after the shooting—with a gunshot wound and a false story as to how he received that injury—led the police to believe he was involved in the crime. These factual findings are supported by the record established at Grant's trial. Thus, we will not disturb the state court's factual findings as to the "materiality" of the *Brady*

evidence in this case, and we accept the Superior Court's conclusion that Grant was not prejudiced by the government's non-disclosure.

As to Grant's second alleged factual error, he claims that the Superior Court's determination that "all" of Mr. Doan's convictions were processed under the alias "Bruce Doan," rather than his legal name, "Mahn Doan," was unreasonable. Indeed, the Superior Court adopted the PCRA court's finding that the Commonwealth was not "aware" of Mr. Doan's criminal convictions because of a clerical discrepancy regarding the name used by Mr. Doan in his records: "[The victim] did have several criminal convictions, but those convictions were *all* prosecuted under a different name[, Bruce Doan]. Therefore, searching for [the victim's] name would not have revealed the convictions." *Grant II* at *6 (quoting Tr. Ct. Op. 9/27/17 at 7) (emphasis added). Upon our review of the relevant state and federal dockets under which Mr. Doan was prosecuted, it is clear that Mr. Doan's alias "Bruce Doan" was not used in "all" of his convictions. Although Mr. Doan used the name "Bruce Doan" in his July 2001 state conviction, he was identified as "Bruce Doan a/k/a Mahn Huu Doan" in his June 2000 federal conviction and as "Mahn Huu Doan a/k/a Bruce Doan" in his September 2006 federal conviction. (Doc. 7, App'x A); (Doc. 19 at 1.) We are reluctant, however, to conclude that the Superior Court's factual finding was an unreasonable determination of the facts "in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2). First, the available state court record does not clarify whether all three of Mr. Doan's convictions were presented to the state court as part of the *Brady* claim. We cannot examine the reasonableness of the Superior Court's decision without considering the "totality of the evidence" that was before the court. *Eley*, 712 F.3d at 846, n.11. Second, without specific information as to the methods and technologies utilized by the Commonwealth when searching for criminal convictions, we are unable to ascertain whether the Superior Court's factual finding

regarding the Commonwealth's ability to search for Mr. Doan's criminal convictions was unreasonable.

Even if we agreed with Petitioner that the Superior Court's factual finding is "plainly controverted" by the evidence in the state court record, we do not believe that this factual correction would affect the outcome of the *Brady* analysis on *de novo* review. *Breighner*, 301 F. Supp. 2d at 369. Notably, the AEDPA requires us to assess whether the state court's decision was "based on" the unreasonable factual determination. *Id.* at 369, n.13; 28 U.S.C. § 2254(d)(2). "To fatally undermine the state fact-finding process, and render the resulting finding unreasonable, [the overlooked evidence must be highly probative and central to petitioner's claim]. [In other words,] the evidence in question must be sufficient to support petitioner's claim when considered in the context of the full record bearing on the issue presented in the habeas petition." *Leaf v. Lane*, No. 14-CV-04126, 2016 WL 6122794, at *4 (E.D. Pa. Oct. 20, 2016) (quoting *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004)); *see also Parker v. Sec'y for Dep't of Corr.*, 331 F.3d 764, 786 (11th Cir. 2003) (stating that habeas relief is not warranted when, even in light of a factual error, the result of the proceeding would have been the same). This particular factual finding by the Superior Court supported its determination that the Commonwealth could not have been aware of, and therefore could not have possessed, Mr. Doan's criminal history when he was prosecuted was under a different name. *See Grant II* at *6. Accordingly, the Superior Court held that Grant's claim failed on the second prong of the *Brady* test, as the government could not withhold evidence that it did not possess. *See id.* The Superior Court further explained, however, that Grant's claim *also* failed on the third prong of the *Brady* test, as Grant could not show that the evidence was "material." *See Grant II* at *6. As we have explained, merely establishing that the prosecution possessed favorable evidence does not itself amount to a *Brady* violation without a showing of

prejudice. *See Kyles*, 514 U.S. at 437-38. Therefore, even if we considered that this factual correction satisfies the *second* prong of Grant's *Brady* claim, it would not affect Grant's failure to satisfy the *third* prong, which required him to demonstrate that he was prejudiced by the suppression of material evidence. Accordingly, this factual finding, alone, is not "sufficient to support petitioner's claim when considered in the context of the full record." *Leaf*, No. 14-CV-04126, 2016 WL 6122794, at *4.

In sum, the Superior Court's factual finding as to the name used by Mr. Doan in his prior convictions affected only the outcome a non-dispositive prong of the *Brady* analysis. This factual finding does not change the outcome of Grant's *Brady* claim in its entirety. The remaining factual findings that Grant has challenged are reasonably based in the record. We conclude that Grant's ground on this basis does not afford him habeas relief, as he has not articulated how the Pennsylvania Superior Court's decision was contrary to federal law, nor has he demonstrated that the state court's decision was "based on" unreasonable findings of fact.

### B. Procedurally Defaulted Claims

Of the nine grounds Grant asserts in his petition for habeas relief, eight of those grounds are procedurally defaulted. Two of the procedurally defaulted grounds are defaulted without any proffered excuse. As for the remaining six, Grant attributes the default to his PCRA appeal counsel's alleged ineffectiveness and requests that we excuse the default under *Martinez*. For the reasons set out below, we conclude that all eight of Grant's procedurally defaulted claims are inexcusably defaulted and without merit.

### i. Procedurally Defaulted: No Excuse

Grounds 5 and 6 in Grant's petition for habeas relief are procedurally defaulted on independent and adequate state grounds, without excuse. In other words, Grant fails to articulate

any appropriate legal or factual reason as to why we should consider these claims on their merits. Grant presented Grounds 5 and 6 to the Pennsylvania Superior Court in the collateral appeal of his PCRA petition. As to Ground 5, Grant asserts that his trial and appellate counsel were ineffective in failing to challenge the introduction of Officer Williams's "overly prejudicial" 9-1-1 call, which was made during the high-speed chase following the armed robbery.[9] (Doc. 1 at 11.) With respect to Ground 6, Grant avers that his appellate counsel was ineffective "for not raising trial counsel's failure to object to the Commonwealth's failure to disclose the results of the ballistic expert's examination" on direct appeal.[10] (*Id*. at 11-12.) Despite Grant's facial presentation of these claims, the Superior Court dismissed them after determining that he had failed to adhere to state court appellate procedure. The court observed that Grant made "no attempt," and in fact, "utterly fail[ed] to present any discussion or argument" in his briefing that would support his appeal. *Grant II* at

---

[9] On direct appeal, Grant raised the following related issue for review with the Pennsylvania Superior Court: "Did not the lower court err by permitting the Commonwealth to play the 9-1-1 calls of the high speed chase and shooting at issue in this case, where the 9-1-1 calls were highly prejudicial and admitted only to appeal to the passions of the jurors by providing an overly emotional rendering of events?" *Grant I* at 4. We note that this claim is not the same as the ineffective assistance of counsel claim that is currently before us. The Superior Court found that the claim was without merit. Notwithstanding the procedural defects in Grant's PCRA appeal, the Superior Court stated that Grant's ineffective assistance of counsel claim was baseless, as the court had previously decided that the 9-1-1 tapes were not "highly prejudicial" on direct appeal. *Grant II* at *10 n.16 ("[I]n our disposition of [Grant's] direct appeal, this Court held that the trial court did not abuse its discretion in admitting the tapes. [..] Accordingly, [Grant's] claim that the tapes were highly prejudicial has been previously litigated and cannot be addressed in the context of the PCRA."). Also, notwithstanding the default, Grant's claim on Ground 5 appears to be unsupported by the record. Indeed, Grant confusingly acknowledges in his *own* petition that "[b]oth trial counsel and appellate counsel did indeed challenge the admissibility of the 9-1-1 tapes at trial and on direct appeal[.]" (Doc. 1 at 11.)

[10] After dismissing Grant's claim for failing to comply with state appellate procedure, the Superior Court also explained that under Pennsylvania law, "the time for challenging trial counsel's assistance is in a post-conviction relief petition, not on direct appeal." *Grant II* at *10 (citing 42 Pa. C.S. § 9543(a)(2)(ii)). Therefore, Grant's "appellate counsel could not be found ineffective for failing to challenge trial [counsel]'s stewardship on direct appeal." *Id*.

*8-10. Accordingly, Grant had "waived" these issues by failing to comply with Pennsylvania Rules of Appellate Procedure. *Id.* (citing Pa. R.A.P. 2119(a-e)). Grant's claims are not eligible for habeas review, as the Superior Court's dismissal of them was based on "independent and adequate" state law grounds. *Rolan*, 680 F.3d at 317-18. Furthermore, Grant does not offer, nor can we discern, any excuse for the procedural default of these grounds. Thus, we conclude that Grant's claims as to his trial counsel's alleged ineffectiveness are procedurally defaulted and do not afford him habeas relief.[11]

### ii. Procedurally Defaulted: *Martinez* Excuse

The remaining six claims Grant's petition for habeas relief are also procedurally defaulted. Specifically, Grounds 2, 3, 4, 7, 8 and 9 are procedurally defaulted on independent and adequate state grounds. Although Grant presented those claims to the Pennsylvania Superior Court in the collateral appeal of his PCRA petition, they were dismissed due to Grant's failure to adhere to proper state appellate procedure. As to Grounds 2, 3, 7, and 8, the Superior Court explained that Grant failed to develop a legal argument in his appellate briefing in support of his claims. *See Grant II* at *6-11 (citing Pa. R.A.P. 2119(a)-(e)). As to Ground 4, the Superior Court declined to address Grant's claim, as the issue was non-cognizable under the PCRA. *See id*. at *3, n.9 (citing 42 Pa.C.S. § 9543(a)(2)-(4); 42 Pa.C.S. § 9544(b)). Finally, as to Ground 9, the Superior Court found that Grant impermissibly attempted to raise this claim for the first time in his Rule 1925(b) statement. *See id* at *10-11 (citing Pa. R.A.P. 302(a)). These claims were all "waived" for consideration on appeal, and the Superior Court's dismissal of these claims in accordance with

---

[11] We note that Grant did not provide any additional legal argument for Grounds 5 and 6 in his "Memorandum of Law Supporting the Petition," "Reply to the Response," or either of his two amendments. (Docs. 5, 7, 19, 20.)

Grant's failure to comply with state appellate procedure is based on "independent and adequate state grounds." *Rolan*, 680 F.3d at 317-18.

Grant requests that we excuse the procedural default as to all six grounds, attributing the defects in his state court proceedings to the "ineffectiveness" of his PCRA appeal counsel. (Docs. 7, 19, 20.) *Martinez*, however, cannot excuse the default under these circumstances. The defaults in this case occurred on PCRA *appeal* rather than in the PCRA *initial-review* proceeding. In *Martinez*, the Supreme Court explained that the exception "does not concern attorney errors in other kinds of proceedings, *including appeals from initial-review collateral proceedings*[.]" 566 U.S. at 16 (emphasis added); *see also Norris v. Brooks*, 794 F.3d 401, 404 (3d Cir. 2015) ("*Martinez* made very clear that its exception to the general rule…applies only to attorney error causing procedural default during *initial-review collateral proceedings*.") (emphasis added). Thus, *Martinez* is inapplicable. Although Grant's claims are not eligible for the procedural default exception under *Martinez*, we will still address his contentions below, *arguendo*. This brings us to consider whether Grant's claims may be so "substantial" under *Martinez* as to warrant relief. We review the facts of Grant's case in relation to the applicable substantive law.

### 1. Ground 2: Trial counsel was ineffective for "not raising issues of police negligence and/or misconduct which occurred"

Grant's second ground for relief is based on his trial counsel's alleged ineffectiveness for failing to object to various instances of police misconduct or "extremely gross negligence" that he claims tainted his entire criminal process, from arrest to trial:

a. Trial counsel failed to object to Petitioner's arrest for lacking probable cause;

b. Trial counsel failed to object to the police's use of a "photo array lineup" that was unduly suggestive and conducted without the presence of Petitioner's counsel;

c.  Trial counsel failed to object to the police's failure to produce exculpatory fingerprint evidence collected from the vehicle;

d.  Trial counsel failed to object to the police's failure to conduct a gunshot residue test on Petitioner's clothing;

e.  Trial counsel failed to object to Officer Roman's testimony, after he "inaccurately" testified that the victim identified Petitioner at a local police station;

f.  Trial counsel failed to object to Officer Zirilli's testimony after he testified "untruthfully" that he called 9-1-1 and failed to re-call Officer Zirilli as a witness

(Doc. 7 at 21-28.) Below, we address Grant's allegations as to his trial counsel's ineffectiveness in failing to raise an objection on these six occasions.

### a. Trial counsel failed to object to Petitioner's arrest for lacking probable cause

Petitioner claims that his trial counsel failed to object after he was "subjected to an abuse of process" by being placed under arrest without a warrant and without circumstances that would give rise to probable cause. (Doc. 7 at 23.) It is well-established that probable cause exists for a warrantless arrest when, at the time of the arrest, the facts and circumstances within the arresting officer's knowledge are "sufficient to warrant a prudent man in believing that [the suspect] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Specifically, the Supreme Court has adopted a "totality of the circumstances" approach to evaluating whether probable cause exists for the issuance of a warrant. *Illinois v. Gates*, 462 U.S. 213, 214 (1983). Probable cause is a "fluid concept" which turns on "particular factual contexts." *Id*. at 232. "It is the function of the court to determine whether the objective facts available to the officers at the time of arrest were sufficient to justify a reasonable belief that an offense was being committed." *United States v. Glasser*, 750 F.2d 1197, 1205–06 (3d Cir. 1984) (citing *Beck*, 379 U.S. at 96).

As explained at Petitioner's trial, Officer Campbell was called to the Hospital of the University of Pennsylvania by hospital personnel who were treating a gunshot wound to Petitioner's arm. (N.T. 9/19/08, p. 129.) Petitioner told Officer Campbell that he was shot by unknown men while picking up food at a takeout restaurant on 49th Street and Paschall Avenue, and that a bystander had driven him to the hospital. (*Id*. at 131-32.) After the interview, Officer Campbell went to that location and did not find blood, shell casings, or any other evidence of a shooting. (*Id*. at 138.) He also did not find Petitioner's car, which Petitioner claimed had been abandoned at the scene. (*Id*.) Dispatchers confirmed that there were no reports of gunshots near 49th and Paschall Streets. (*Id*. at 138-39.) Petitioner's apparently false explanation for his injury, coupled with the fact that he had appeared at a hospital with a gunshot wound only hours after a high-speed chase that involved the discharge of a police weapon, led detectives to assemble a photo array that included Petitioner's photo. (*Id*. at 153.) Upon being identified by the victim in the photo array as the second carjacker who had robbed him at gunpoint, Petitioner was arrested while in the hospital. (*Id*. at 153-54.)

Having reviewed this series of events from the record, we cannot accept that the police lacked probable cause to arrest Petitioner. We are satisfied that the "totality of the circumstances" supported Petitioner's warrantless arrest. *See Wilson v. Russo*, 212 F.3d 781, 790 (3d Cir. 2000) (holding that a positive identification by a victim can support a finding of probable cause). Trial counsel cannot be ineffective for failing to raise a meritless objection. *See Sanders*, 165 F.3d at 253; *Fulford*, 825 F.2d at 9. Accordingly, we are unable to accept that Petitioner's claim would be "substantial" in accordance with *Martinez*, as his trial counsel was not ineffective for failing to object to a valid arrest. Therefore, this claim does not afford him habeas relief.

### b. Trial counsel failed to object to the police's use of a "photo array lineup" that was unduly suggestive and conducted without the presence of Petitioner's counsel

Next, Petitioner asserts that police violated his Sixth Amendment right to counsel by conducting a "photo array lineup" without the presence of counsel.[12] (Doc. 7 at 21.) He also argues that the photo array was unduly suggestive, in that police told Mr. Doan that a suspect was in the array before he made his identification. (*Id.*) Grant claims that his trial counsel was ineffective for failing to raise these constitutional violations at trial. (*Id.*) The Supreme Court has held that photo arrays should not be conducted in such a way as to highlight the suspect and elicit an identification of the suspect. *See Manson v. Brathwaite*, 432 U.S. 98, 104 (1977) (explaining that photographic identification procedures should not be "unnecessarily suggestive" or "conducive to irreparable mistaken identification"). Specifically, when presenting a photo array, police may not indicate exactly whom they suspect, emphasize certain distinctive features of the suspect, or tell the identifying witness that they have independent evidence that the suspect committed the crime. *See Simmons v. United States*, 390 U.S. 377, 383 (1968). Additionally, while the Supreme Court has stated that a criminal defendant has a right to counsel at a post-indictment *lineup*, the major exception to this principle is that no right to counsel attaches at a *photo array*, before or after formal charges are filed. *See United States v. Wade*, 388 U.S. 218, 240 (1967); *United States v. Ash*, 413 U.S. 300, 318-20 (1972). In Pennsylvania, the law regarding photo arrays is more

---

[12] As explained at trial, a photo array "is a photographic display that [is] created by a computerized photo imaging system in the police department" that includes still pictures the suspect and people who match the suspect's description. (N.T. 9/18/08, p. 157.) The photo array that police compiled for Mr. Doan included "eight males" that were "similar in race, approximate ages, the description, and the complexion and appearances" of Petitioner. (*Id.* at 159.) In contrast, a lineup is a live presentation of several persons, including the suspect, before an identifying witness. We note that Petitioner seems to conflate the concept of a "photo array" with a "lineup" in his petition. We clarify that Petitioner was identified by Mr. Doan in a *photo array* and review his claim in accordance with the appropriate precedent as to the use of photo arrays, specifically.

favorable to defendants than the federal standard. A defendant has a constitutional right to have counsel present during *any* post-arrest identification procedures. *See Commonwealth v. Harrell*, 65 A.3d 420, 438 (Pa. Super. 2013) (citing *Commonwealth v. Whiting*, 266 A.2d 738 (Pa. 1970)). The right to counsel is only triggered, however, by the arrest of the accused. *See id*.

At the outset, Grant has not produced any evidence to support his claim that his trial counsel was ineffective for failing to object to the photo array as unduly suggestive. In fact, the record reflects the exact opposite. Grant's counsel moved to suppress Mr. Doan's identification, arguing that police misconduct tainted the identification by failing to include "filler photos" with other men that looked like Grant and by implying to Mr. Doan that the suspect was one of the eight men included in the photo array. (N.T. 10/9/07, pp. 5-92); (N.T 10/10/07, pp. 5-37.) Not only did Grant's counsel challenge the admission of the identification at the pre-trial suppression hearing, but after the motion to suppress was denied, his counsel continued to raise concerns about the reliability of the photo array throughout trial. *See, e.g.* (N.T. 9/18/08, p. 159-63.) Upon our review of the record, we cannot discern any factual basis for Petitioner's claim that his trial counsel was deficient for failing to raise concerns about the manner in which the photo array was presented. Furthermore, Petitioner's allegation that his counsel failed to object to the presentation of the photo array without the presence of counsel is similarly unsupported. Indeed, Grant's counsel argued at the hearing to suppress the identification that Grant should have been represented by counsel when the photo array was shown to Mr. Doan. (N.T 10/9/07, pp. 8-17.) Notwithstanding the fact that counsel objected on this basis, the law makes clear that Petitioner's right to counsel had not attached when police presented Mr. Doan with a photo array that included his picture, as Grant was not under arrest at that time. *See Ash*, 413 U.S. at 318-20; *Harrell*, 65 A.3d at 438. *See also* (N.T. 10/09/07, p. 71) (explaining that Petitioner was arrested *after* he was identified by Mr. Doan).

We cannot accept that Petitioner's trial counsel was unreasonable in her efforts to object to the admission of the photo array evidence, as she filed a motion to suppress the evidence and continued to challenge the reliability of that evidence at trial. Additionally, there is no legal basis for Petitioner's claim that he should have had counsel present at the presentation of the photo array, and his counsel cannot be ineffective for failing to raise a meritless objection. *See Sanders*, 165 F.3d at 253; *Fulford*, 825 F.2d at 9. Accordingly, we are unable to accept that Petitioner's claim would be "substantial" in accordance with *Martinez*. Therefore, this claim does not afford him habeas relief.

### c. Trial counsel failed to object to the police's failure to produce exculpatory fingerprint evidence collected from the vehicle

In his next ground for relief, Petitioner claims that his trial counsel should have objected to the police's "destruction" of fingerprint evidence taken from the vehicle that "could have potentially eliminated Petitioner as a suspect." (Doc. 7 at 25-26.) Specifically, Petitioner points to the testimony of Officer Donna Jaconi, who dusted the stolen vehicle for fingerprints following the robbery and car chase. A member of the Philadelphia Police Department's Crime Scene Unit for thirteen years and a fingerprint technician with hundreds of hours of experience, Officer Jaconi explained at trial that when she searched the vehicle for fingerprints, there were no identifiable prints that could have been recovered for further analysis. (N.T. 9/22/08, p. 53.) Officer Jaconi confirmed that she was not "able to lift any fingerprints that [she] thought were sort of self-contained enough or complete enough for [her] to use[.]" (N.T. 9/22/08, p. 54.) She also verified that she had not been able to collect any "partial prints." (N.T. 9/22/08, p. 55.) Although she found some "smudges" that included "more than one fingerprint on top of the other," this information was not detailed enough for police to use it to "rule people out." (N.T. 9/22/08, p. 55.) Finally,

Officer Jaconi testified that the police never submitted those "smudges" to a fingerprint expert for further analysis, as they did not have "enough points" of identification and she believed them to be unusable. (N.T. 9/22/08, pp. 55-56.)

The record demonstrates that police were never in possession of the fingerprint evidence Petitioner alleges they destroyed. Petitioner does not identify any evidence that contradicts Officer Jaconi's sworn testimony, rather, he merely argues without support or citation that a fingerprinting expert could have "use[d] [smudges] for their exculpatory qualities." (Doc. 7 at 26.) Officer Jaconi clearly stated that she did not recover any identifiable fingerprints from the vehicle that could have been used by an expert in a fingerprint analysis to "rule out" suspects. We are satisfied that trial counsel was not constitutionally deficient in failing to object to the non-production of "exculpatory fingerprint evidence" that never existed. *See Sanders*, 165 F.3d at 253; *Fulford*, 825 F.2d at 9. We also point out that Grant's trial counsel questioned Officer Jaconi extensively on cross-examination in an attempt to cast doubt on her credentials, experience, and methodologies in closing argument. (N.T. 9/22/08, pp. 51-59); (N.T. 9/23/08, pp. 108-09). Accordingly, we are unable to accept that Petitioner's claim would be deemed "substantial" as required by the *Martinez* standard. This claim does not afford Petitioner habeas relief.

### d. Trial counsel failed to object to the police's failure to conduct a gunshot residue test on Petitioner's clothing

Petitioner also claims that his trial counsel should have objected to the fact that "gunshot residue tests requested by the investigators were never conducted (or the results were never revealed)." (Doc. 7 at 26.) Grant points to a property receipt prepared by Detective Joseph Marano that cataloged items that police confiscated from him following his arrest, including his clothing. (*Id*. at 67, App'x. B.) The property receipt states: "Chem Lab, please check items for traces of Gun [Shot] Residue and return results to Det. Tighe." (*Id*.) When questioned about the property receipt

at trial, Detective Marano explained that the lab can only carry out tests "when time permits and money permits and personnel [permits]." (N.T. 9/19/08, p. 170.) Due to the high volume of criminal cases in the city at the time, it was not unusual for the police to order tests and never receive results from the lab. (N.T. 9/19/08, p. 169-171.) Detective Marano stated that although he requested the test, he never received a report with final test results, nor could he confirm if the test was ever carried out. (N.T. 9/19/08, pp. 166-68.) Detective David Tighe, who was responsible for cataloging evidence in the investigation of the crime, also testified at trial that he was "not sure" if Grant's clothing was ever analyzed for gunshot residue. (N.T. 9/22/08, p. 180.) He stated that he did not receive a report that the clothing had been analyzed, and that if it was analyzed, he was not aware that any gunshot residue was ever found. (*Id*.) Detective Tighe noted that the results of gunshot residue tests are sent "directly to the District Attorney's office in most cases" and that no one from that office had contacted him about receiving "any type of report." (*Id*.) Finally, Detective Tighe explained that although a gunshot residue test would typically be ordered "to see if [Grant] fired a gun," the results of that test would not necessarily be considered reliable: "It's hard to get anything off of clothing when it comes to those reports, so we hardly ever ask for that." (N.T. 9/22/08, p. 181.)

In sum, Detective Marano and Detective Tighe were unaware if Petitioner's clothing was ever tested for gunshot residue and never received the results of any testing that was conducted. The fact that the property receipt requested the test does not confirm whether the test occurred or whether results were ever received. We note that Petitioner has not presented any evidence that the test was actually performed, and that Philadelphia Police Department or the District Attorney's Office possessed the results of that test. Thus, we are satisfied that trial counsel was not constitutionally deficient for failing to object to the non-production of test results that did not exist.

*See Sanders*, 165 F.3d at 253; *Fulford*, 825 F.2d at 9. Furthermore, in the fulfillment of his constitutional obligation, trial counsel reasonably raised concerns that the test was never carried out both during the cross-examinations of Detectives Marano and Tighe, but also during closing argument. (N.T. 9/19/08, pp. 158-66); (N.T. 9/22/08, pp. 167-80); (N.T. 9/23/08, pp. 108-09.) We cannot accept Petitioner's argument that trial counsel was ineffective, and even if we did, the claim could not be said to be "substantial" in accordance with *Martinez*. It does not afford Grant habeas relief.

> **e. Trial counsel failed to object to Officer Roman's testimony, after he "inaccurately" testified that the victim identified Petitioner at a local police station**

Petitioner next claims that his trial counsel should have objected when Officer Jose Roman "inaccurately" told the jury that Petitioner was identified by the victim, Mr. Doan, at a local police station shortly after the crime. (Doc. 7 at 27.) Specifically, Officer Roman testified that, following the apprehension of one of the suspects in the car chase, he took the victim to a station located on 6th and Wolf Streets where the suspect was being detained. (N.T. 9/18/08, p. 144.) The testimony at issue is Officer Roman's accidental reference to Antwuan White as "the Defendant" that was identified by the victim at this location:

> [Officer Roman]: [The police were] holding a male who was later identified as Antwuan White. The [victim] immediately identified the Defendant at that location, he also stated the Defendant was wearing—
>
> Ms. Jayaraman: Objection, Your Honor.
>
> The Court: Sustained.

(*Id.*) The record is clear that Ms. Jayaraman objected immediately upon hearing Officer Roman's erroneous testimony. Furthermore, Ms. Jayaraman clarified on cross-examination that Officer

Roman had been referencing White, not Grant, as the suspect who was identified at the station on 6th and Wolf Streets:

> [Ms. Jayaraman]: You transported Mr. Doan to 6th and Ritner for the identification?
>
> [Officer Roman]: 6th and Wolf.
>
> [Ms. Jayaraman]: Thank you. And you saw [the suspect] who was apprehended, right?
>
> [Officer Roman]: Yes, I did.
>
> [Ms. Jayaraman]: And that was Mr. Antwuan White, is that right?
>
> [Officer Roman]: Yes.

(N.T. 9/18/08, p. 154.) Thus, we are satisfied that Grant's trial counsel was not constitutionally deficient, as she promptly objected to the witness's misstatement and later corrected the error before the jury. Accordingly, we are unable to accept that Petitioner's claim would be "substantial" in accordance with *Martinez*. This claim does not afford him habeas relief.

### f. Trial counsel failed to object to Officer Zirilli's testimony after he testified "untruthfully" that he called 9-1-1 and failed to re-call Officer Zirilli as a witness

Finally, Grant claims that his trial counsel was ineffective for failing to object to Officer Zirilli's apparently "untrue" testimony that he called 9-1-1 and for failing to call Officer Zirilli again after his first round of testimony. (Doc. 7 at 25.) At trial, Officer Zirilli testified that Mr. Doan came to his house looking for help after the robbery. (N.T. 9/18/08, p. 123.) He claimed that he called 9-1-1 and gave the operator a description of the suspects. (N.T. 9/18/08, p. 124.) The Commonwealth then played a 9-1-1 call, after which Officer Zirilli confirmed that his voice was on the call. (*Id*.) On cross-examination, Ms. Jayaraman pointed out that Mr. Doan was already on the phone with 9-1-1 operators before he knocked on Officer Zirilli's door. (N.T. 9/18/08, p. 134.)

That is, Mr. Doan—not Officer Zirilli—had dialed 9-1-1, as only Mr. Doan's voice could be heard at the beginning of the tape.

> [Ms. Jayaraman]: You didn't call 9-1-1 on that [call] did you?

> [Officer Zirilli]: Not on that one.

(N.T. 9/18/08, pp. 131-32.)

Although Ms. Jayaraman did not "object" to Officer Zirilli's "untruthful" testimony on direct examination, the record clearly demonstrates that Ms. Jayaraman addressed the inconsistencies in Officer Zirilli's recollection on cross-examination. We are satisfied that Grant's trial counsel was not constitutionally deficient in her questioning of Officer Zirilli. Furthermore, as to Petitioner's allegations that Ms. Jayaraman failed to call Officer Zirilli on another day of trial for further questioning, the record reflects that Ms. Jayaraman did, in fact, attempt to re-call Officer Zirilli. (N.T. 9/19/08, p. 5.) Although Officer Zirilli had been subpoenaed to appear, the Commonwealth explained that the Philadelphia Police Department would not allow Officer Zirilli to use more overtime to attend trial. (N.T. 9/19/08, pp. 5-7.) That reason notwithstanding, the trial court did not allow Ms. Jayaraman to re-call Officer Zirilli as he had already testified fully, and the court did not want to disrupt the Commonwealth's case. (N.T. 9/19/08, p. 7.) In short, Officer Zirilli's unavailability cannot be attributed to Ms. Jayaraman's ineffectiveness. Therefore, we are unable to accept that Petitioner's claim would be deemed "substantial" in accordance with *Martinez*. This claim does not afford Grant habeas relief.

### 2. Ground 3: Trial counsel and appellate counsel were ineffective in attempting to challenge the admission of identification evidence

Grant's next ground for relief is based on his trial and appellate counsel's alleged ineffectiveness for failing to challenge the admission of Mr. Doan's identification. (Doc. 7 at 29.)

Grant claims that although he was not formally arrested while he was being treated for his gunshot wound at the hospital, he was effectively detained by police during their investigation, such that the circumstances made him feel that he was not free to leave. (*Id*. at 31.) In Grant's view, "because this arrest occurred prior to the photo array identification, Petitioner was entitled to have counsel during the photo array identification." (*Id*.) Grant acknowledges that his counsel "noted his intention to argue that Petitioner suffered an illegal arrest" at the hearing to suppress the photo array identification, specifically, that "Petitioner should have had the assistance of counsel at the photo array." (*Id*. at 29) (citing N.T. 10/9/07, pp. 8-11.) Still, Grant claims that "[m]otion counsel in fact did nothing to show that Petitioner was under illegal arrest, but only argued that the photo array was unduly suggestive." (*Id*.) From our review of the suppression hearing record, Petitioner's counsel did not advance the argument that the photo array should be suppressed based on a violation of Petitioner's Sixth Amendment right to counsel; his attorney effectively abandoned that argument at some point during the two-day suppression hearing. To determine if counsel was ineffective for failing to pursue this basis for suppression, we review the facts presented at the hearing to assess whether the argument any merit.

The record from the suppression hearing shows that Grant arrived at the hospital at approximately 10:20 p.m. to receive treatment for his gunshot wound. (N.T. 10/9/07, p. 35.) Hospital personnel subsequently notified police that Grant had come into the Emergency Room, which is routine practice "whenever a gunshot or a stabbing victim" arrives for treatment. (*Id*. at pp. 30-33.) At approximately 2:00 a.m. Officer Campbell received a radio call assigning him to Grant's case at the hospital. (*Id*. at p. 35.) Upon his arrival at the hospital, Officer Campbell observed that Petitioner's wounds had been "cleaned and dressed," and that he had been waiting for the police for approximately four hours. (*Id*. at pp. 36-37, 40.) Hospital personnel indicated

that Grant was going to be admitted overnight for observation after his police interview. (*Id*. at pp. 36-37.) Officer Campbell interviewed Grant for about a half hour, took his statement and recorded some basic identifying information, and then left. (*Id*. at p. 36.) He emphasized that when he left, Grant was not considered a suspect at that time and that Grant was "unattended by police" at the hospital. (*Id*. at pp. 36, 55-56.) Officer Campbell then investigated Grant's explanation for his injury and determined that Grant's story was false. (*Id*. at pp. 57-59.) Grant's arrest report indicates that detectives began to suspect that Grant was involved in the shooting and assembled a photo array with his picture at around 3:00 a.m., which they then took to the victim's home. (Doc. 7, App'x. D.) The victim said that Detective Park arrived at his house sometime between 3:00 a.m. and 4:00 a.m., at which point he identified Grant. (N.T. 10/10/07 p. 20.) Grant was placed under arrest at the hospital at around 4:15 a.m. (N.T. 10/9/07, p. 71.); (Doc. 7, App'x. D.)

We acknowledge that a person is considered "seized" under both the Fourth Amendment and the Pennsylvania Constitution when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *California v. Hodari D*., 499 U.S. 621, 627-28 (1991); *Commonwealth v. Adams*, 205 A.3d 1195, 1200 (Pa. 2019) (explaining that Pennsylvania also follows "the free to leave test" in determining whether a "seizure" has occurred). As discussed above, the federal standard for photo arrays does not require the presence of counsel either before or after arrest. *See Richardson v. Superintendent Coal Twp. SCI*, 905 F.3d 750, 765 (3d Cir. 2018) ("Defendants have no right to counsel when police show witnesses photo arrays[.]") (citing *Ash*, 413 U.S. at 318-20). In Pennsylvania, the right to have counsel present at a photo array attaches *only* after arrest. *See Harrell*, 65 A.3d at 438. Based on the evidence presented at the suppression hearing, we cannot accept that Grant was unlawfully "seized" by police at any point before his formal arrest at 4:15 a.m.. Officer Campbell explained

that he interviewed Grant believing that he was a victim of a shooting, not a suspect in a crime. At no point did Officer Campbell tell Grant he could not leave the hospital, and in fact, he left Grant alone at the hospital for several hours without any police supervision. Grant was also not detained at the hospital at the direction of law enforcement, rather, he was held overnight by hospital personnel for observation purposes. Despite Petitioner's insistence that he was "placed under police guard; handcuffed to the hospital bed […] the room phone was removed and all of [his] property was seized," he has not produced any evidence to support these allegations, which are contrary to the available testimony.[13] In short, after reviewing the timeline of events, we have no reason to believe that Grant was not "free to leave" at the time Mr. Doan was shown his picture. Thus, under both Pennsylvania and federal law, he was not entitled to have counsel present at the photo array.

Having reviewed the relevant testimony, we are unconvinced that Grant's counsel was ineffective for failing to pursue this argument at the suppression hearing, as it likely became apparent that there was no factual basis to support his objection. Similarly, appellate counsel cannot have been deficient in refusing to pursue an untenable argument on appeal. *See, e.g.*, *Sanders*, 165 F.3d at 253; *Fulford*, 825 F.2d at 9. Therefore, we are unable to accept that

---

[13] The hearing testimony, as well as the arrest records, clearly state that the victim's photo array identification was the *basis* of Grant's arrest and that his arrest did not happen until after that identification was made. We note that after his arrest, Grant stayed the rest of the night in the hospital, at which point he was likely detained in the manner he describes. (Doc. 7, App'x D) ("GRANT WAS ARRESTED INSIDE HUP AND [WAS] HELD OVERNIGHT FOR FURTHER TREATMENT.") As to his clothing, specifically, Detective Marano testified that Petitioner's clothing was actually collected by hospital personnel, not police, who initially believed that Petitioner was a victim of a crime. (N.T. 9/19/08, pp. 154, 163) ("At that time [we were] looking at [Grant] as a complainant and not a suspect or offender in any way."). This version of events was confirmed by the stipulated testimony of Dr. Patrick Kim from the hospital, which was read to the jury: "Mr. Grant was asked to change into a hospital gown and the hospital staff took his valuables for safekeeping." (N.T. 9/24/08, p. 8.)

Petitioner's claim would be deemed "substantial" in accordance with *Martinez*. This claim does not afford Grant habeas relief.

### 3. Ground 4: The preliminary hearing court erred in denying Petitioner's request for a lineup

Grant claims that the court erred when the magistrate judge denied his request for an in-person lineup. (Doc. 1 at 10); (Doc. 7 at 32-33.) Although Grant concedes that the decision to order a lineup is within the judge's discretion, he claims that the preliminary hearing court's decision was based on "erroneous arrest information." (Doc. 7 at 33.) Specifically, he asserts that the prosecutor mistakenly referenced the circumstances of Petitioner's co-defendant's arrest, and as a result incorrectly stated that Petitioner was arrested at the scene of the crime rather than at the hospital. (*Id*. at 32-33.)

In seeking the issuance of the writ of habeas corpus, Grant carries the burden of articulating specific allegations related to his state court proceedings that demonstrate distinct violations of federal law. *See* 28 U.S.C. § 2254(d); *see also Woodford*, 537 U.S. at 25 ("[I]t is the habeas applicant's burden to show that the state court applied [federal law] to the facts of his case in an objectively unreasonable manner."). Despite this burden, Grant does not successfully argue that the preliminary hearing court's denial of a lineup was contrary to, or involved an unreasonable application of, any clearly established federal law or Constitutional provision that applies in these circumstances. He contends that the Supreme Court's decision in *U.S. v. Wade*, 388 U.S. 218 ( 1967) sets out a test for evaluating a "determination to deny a lineup," however, Grant misstates the law from this case. (Doc. 19 at 10.) In fact, the excerpt Petitioner cites from *Wade* sets out the proper test for determining whether an in-court identification by a witness who participated in a pretrial lineup is admissible where counsel was absent from that lineup. *Id*. at 241. That rule has no applicability here, where Grant is challenging the preliminary hearing court's exercise of

discretion in denying a lineup. As such, Grant has not pointed to an applicable statute or Constitutional right in his briefing, and we cannot identify any such grounds for habeas review; a defendant does not have a constitutionally protected right to a lineup upon request to a court. *See Commonwealth v. Ruza*, 511 A.2d 808, 810 (Pa. 1986) (holding there is no constitutional right to preliminary hearing in Pennsylvania); *McCray v. Illinois*, 386 U.S. 300, 314 (1967) (holding there is no federal right to confront witnesses at a preliminary hearing.) For these reasons, we are not satisfied that Grant's claim is so "substantial" to warrant relief under *Martinez*, and conclude that this challenge does not afford him habeas relief.

### 4. Ground 7: Trial counsel was ineffective for failing to request adequate jury instructions

Grant's next ground for relief is based on his trial counsel's alleged ineffectiveness in failing to request "adequate" jury instructions on five separate issues. (Doc. 1 at 12-14.) Specifically, Grant claims that the following instructions were either insufficient or altogether omitted from his trial due to his trial counsel's ineffectiveness:

a. Trial counsel should have objected to the trial court's "reasonable doubt" instruction, as it was "fundamentally flawed";

b. Trial counsel should have requested an instruction to the jury that "potentially exculpatory evidence" from fingerprinting and gunshot residue on Petitioner's clothing was destroyed by police;

c. Trial counsel should have requested an instruction to the jury that Officer Roman's testimony was "counterfactual," "erroneous," and "false";

d. Trial counsel should have requested a prior inconsistent statement instruction to the jury regarding the victim's identification testimony;

    e.   Trial counsel should have requested a cautionary instruction to the jury that Officer Zirilli's testimony was "unreliable."

(Doc. 7 at 33-39.) Below, we address Grant's allegations as to his trial counsel's ineffectiveness on these five occasions.

### a. Trial counsel should have objected to the trial court's "reasonable doubt" instruction, as it was "fundamentally flawed"

Grant first claims that his trial counsel was ineffective for failing to object to the trial court's instruction on the Commonwealth's burden of proof. (Doc. 7 at 34-35.) Specifically, Grant points out that the trial court mistakenly added the word "reasonable" before the word "doubt" when defining reasonable doubt: "Although the Commonwealth has the burden of proving that the Defendant is guilty, this does not mean that the Commonwealth must prove its case beyond *all reasonable doubt* or to a mathematical certainty[.]" (*Id*. at 35) (citing N.T. 9/23/08, p. 157) (emphasis added). In Pennsylvania, the suggested standard instruction reads in relevant part: "Although the Commonwealth has the burden of proving that the defendant is guilty, this does not mean that the Commonwealth must prove its case beyond *all doubt* and to a mathematical certainty[.]" 7.01 PRESUMPTION OF INNOCENCE--BURDEN OF PROOF--REASONABLE DOUBT, Pa. SSJI (Crim), § 7.01. The trial court's "erroneous" version of this instruction that included the word "reasonable" was given during the charging phase and was repeated again upon request by the jury during their deliberations. (N.T. 9/25/08, p. 7.) Grant avers that his trial counsel failed to object to this "fundamentally flawed" version of the instruction, and as a result "served to diminish the Commonwealth's burden in the eyes of the jury[.]" (*Id*.)

In support of his argument, Grant points to *Sullivan v. Louisiana*, in which the Supreme Court held that a "constitutionally deficient" reasonable doubt instruction can never be a harmless

error. 508 U.S. 275, 280-82 (1993). Even so, the Supreme Court instructs us to assess the sufficiency of jury instructions according to "the well-established proposition that a single instruction to a jury may not be judged in artificial isolation but must be viewed in the context of the overall charge." *Boyde v. California*, 494 U.S. 370, 378 (1990) (internal citation omitted). Accordingly, we review the entirety of the trial court's reasonable doubt instruction:

> What is a reasonable doubt? Although the Commonwealth has the burden of proving that the Defendant is guilty, this does not mean that the Commonwealth must prove its case beyond all reasonable doubt or to a mathematical certainty, nor must the Commonwealth demonstrate the complete impossib[ility] of innocence.

> A reasonable doubt is a doubt that would cause a reasonable, careful, and sensible person to pause, hesitate, or refrain from acting upon a matter of highest importance in his or her own affairs or to his or her own interests. A reasonable doubt must be a real doubt. A reasonable doubt must fairly arise out of the evidence that was presented or out of the lack of evidence presented with respect to some element of each of the crimes charged. A reasonable doubt must be a real doubt. It may not be an imagined one nor may it be a doubt manufactured to avoid carrying out an unpleasant duty.

> So, jurors, to summarize, you may not find the Defendant guilty based upon a mere suspicion of guilt. The Commonwealth has the burden of proving the Defendant guilty beyond a reasonable doubt.

(N.T. 9/23/08, pp. 157-58.)

Viewed as a whole, we cannot accept that a slight deviation in language from the suggested standard jury instruction tainted the accuracy of the trial court's entire definition of "reasonable doubt." The trial court's "error" was negligible, especially when we consider that it was followed by a clear and thorough explanation of reasonable doubt that was consistent with the suggested standard jury instruction.[14] We are not convinced that Grant's counsel's failure to object to a minor

---

[14] Petitioner cites to *Vonville v. Kerestes*, No. 3:14-CV-1582, 2019 WL 1040747 (M.D. Pa. Mar. 5, 2019), for the proposition that the omission or inclusion of a single word, even if inadvertent, can cause a constitutional violation that would warrant habeas relief. (Doc. 19 at 11). In *Vonville*,

misstatement undermined the integrity of the jury's deliberations such that there was a "reasonable probability" that the outcome of his trial would have been different. *Strickland* 466 U.S. at 694. Accordingly, we are unable to accept that Petitioner's claim would be "substantial" in accordance with *Martinez*, as he was not prejudiced by his counsel's conduct. Therefore, this claim does not afford him habeas relief.

> **b. Trial counsel should have requested an instruction to the jury that "potentially exculpatory evidence" from fingerprinting and gunshot residue on Petitioner's clothing was destroyed by police**

In his next ground for relief, Petitioner contends that Officer Jaconi admitted to the "destruction" of exculpatory fingerprint evidence taken from the vehicle involved in the crime. (Doc. 7 at 36.) Specifically, he claims "[Officer] Jaconi testified that she fingerprinted the interior [and] exterior of the vehicle and on her own (using only her naked eye) determined the fingerprints were not useful enough to be an identifiable print and did not save and submit them for further analysis." (*Id*.) He also asserts that "[a] similar situation occurred with the lack of gunshot residue tests results on the clothing confiscated from Petitioner in the hospital [when he was arrested]." (*Id*.) That is, "[d]espite the lab user fee being requested in order to conduct a gunshot residue test of the clothing, results of the requested tests were never produced [by police]." (Doc. 1 at 13.)

---

the trial court mistakenly omitted the word "not" when giving a no-adverse inference instruction based on the defendant's refusal to testify, erroneously stating: "You *may* infer any inference of guilt from the fact that he did not testify in his own defense." *Id*. at *4 (emphasis added). *Vonville* is clearly distinguishable from this case, as the court's omission in that case fundamentally changed the instruction in a completely *opposite* manner, blatantly violating the defendant's Fifth Amendment right against self-incrimination. The error in Grant's instruction did not fundamentally change the nature of the charge, and it was cured by the trial court's subsequent extensive and accurate definition of reasonable doubt.

Grant argues that his trial counsel should have requested a "destruction of evidence charge."[15] His counsel's failure to do so "prejudiced Petitioner by not alerting the jury that there was possibly evidence that would have been useful to the defense but was destroyed by the Commonwealth." (Doc. 7 at 37.)

Generally, Pennsylvania courts have held that jury instructions are only appropriate if they are supported by the evidence. *See Commonwealth v. Buterbaugh*, 91 A.3d 1247, 1257 (Pa. Super. 2014) ("[I]t has long been the rule in this Commonwealth that a trial court should not instruct the

---

[15] Petitioner does not articulate the specific "destruction of evidence charge" he wishes had been requested by his trial counsel. We assume that Petitioner would have requested some iteration of Pennsylvania Suggested Standard Criminal Jury Instruction 3.21B, "FAILURE TO PRODUCE DOCUMENT OR OTHER TANGIBLE EVIDENCE AT TRIAL," which reads in relevant part:

> If three factors are present, and there is no satisfactory explanation for a party's failure to produce an item, the jury is allowed to draw a common-sense inference that the item would have been evidence unfavorable to that party. The three necessary factors are:
>
> *First*, the item is available to that party and not to the other;
>
> *Second*, it appears the item contains or shows special information material to the issue; and
>
> *Third*, the item would not be merely cumulative evidence.
>
> Therefore, if you find these three factors present and there is no satisfactory explanation for the [Commonwealth's] failure to produce [the evidence] at this trial, you may infer, if you choose to do so, that it would have been evidence unfavorable to [the Commonwealth].

Pa. SSJI (Crim), § 3.21(B)(2)(3). We note that although Petitioner's counsel did not request a 3.21(B) instruction as to the fingerprint and gunshot residue evidence, she *did* request a 3.21(B) instruction to be read to the jury regarding two documents that the Commonwealth failed to produce; namely, a pedestrian stop memo and a letter received by Ms. Bostic that she referenced in her testimony. (N.T. 9/23/08, pp. 66-67.) After hearing argument from both sides, including the Commonwealth's explanation for the missing documents, the Court denied counsel's request for the instruction. (N.T. 9/23/08, pp. 66-87.)

jury on legal principles which have no application to the facts presented at trial."); *Commonwealth v. M. Baker*, 963 A.2d 495, 506 (Pa. Super. 2008) ("[T]he relevant inquiry for this Court […] is whether such charge was warranted by the evidence in the case."). That is, jury instructions regarding matters which are not before the court, or unsupported by the evidence, serve no purpose other than to confuse the jury. *See Commonwealth v. Carter*, 466 A.2d 1328, 1332 (Pa. 1983). Upon our review of the record, we cannot accept that a "destruction of the evidence" instruction was warranted by the evidence presented at trial. Despite Petitioner's insistence that police "destroyed" exculpatory evidence, thus warranting a "destruction of the evidence charge," the record does not support his argument. As discussed above, *supra* Sections III.B.ii.1.c, d, police officers testified that the evidence Grant claims they destroyed never even existed. Indeed, Officer Jaconi clearly stated that she did not recover any identifiable fingerprints from the vehicle that could have been used by an expert in a fingerprint analysis to "rule out" suspects. (N.T. 9/22/18, pp. 53-55.) As a result, no fingerprint evidence was collected. (*Id*.) Likewise, Detective Marano and Detective Tighe testified that they were not aware that Petitioner's clothing was ever tested for gunshot residue, and that they did not have results of any test in their possession. (N.T. 9/19/08, pp. 166-68; 180.) Petitioner does not identify any other evidence that contradicts this sworn testimony by Officer Jaconi, Detective Marano, or Detective Tighe. Thus, we are satisfied that trial counsel was not constitutionally deficient in failing to request a jury instruction that police had destroyed evidence when there was no factual support for that allegation in the record. Even if trial counsel had been unreasonable, we cannot ascertain how Petitioner was prejudiced such that the outcome of his trial would have been different. Petitioner's averment that the evidence would have been "exculpatory" is similarly unsupported by the record, as Officer Jaconi testified

that the fingerprints from the scene were unusable, and Detective Tighe testified that the results of the gunshot residue test are rarely conclusive. (N.T. 9/22/08, pp. 53-55; 180-81.)

For these reasons, we are unable to accept that Petitioner's claim would be "substantial" in accordance with *Martinez*. We conclude that Petitioner's ineffective assistance of counsel claim does not afford him habeas relief, as it is both procedurally defaulted and without merit.[16]

### c. Trial counsel should have requested an instruction to the jury that Officer Roman's testimony was "counterfactual," "erroneous," and "false"

Petitioner next claims that Officer Roman "counterfactually" told the jury that Petitioner was identified by the victim, Mr. Doan, at a local police station shortly after the crime. (Doc. 7 at 34.) As discussed above, *supra* Section III.B.ii.1.e, Officer Roman mistakenly referred to Antwuan White as "the Defendant" at Grant's trial. Grant claims that Officer Roman's "false and highly prejudicial statement" warranted a corrective instruction.[17] We disagree. Grant fails to demonstrate how he was prejudiced by his counsel's failure to request an instruction that would have corrected

---

[16] Petitioner also argues that "where law enforcement authorities fail to preserve evidence favorable to a defendant, the value of which being apparent at the time of its destruction, and where that defendant is unable to obtain comparable evidence by other means, relief on habeas corpus is warranted." (Doc. 7 at 37) (citing *California v. Trombetta*, 467 U.S. 479, 489 (1984)). The duty to preserve evidence, however, is "limited to evidence that might be expected to play a significant role in the suspect's defense." *Trombetta*, 467 U.S. at 488; *see also Moore v. Illinois*, 408 U.S. 786, 795 (1972) ("We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case."). Again, we note that Petitioner has not demonstrated that the "exculpatory" evidence he alleges the police destroyed ever *existed*. As such, we cannot ascertain how unusable fingerprints and an unconfirmed gunshot residue report could have played a "significant role" in Grant's defense or proved his innocence.

[17] Grant claims that, "with only one defendant in front of the jury, it is unreasonable to assume that the jury would have inferred that Officer Roman was [talking] about Mr. White when he spoke of the defendant's arrest; Petitioner was the only defendant present [at trial]." (Doc. 19 at 10.) On the contrary, it is perfectly reasonable to assume that a jury would have inferred that Officer Roman was referring to White when he accidentally said "the Defendant," especially when we consider that Officer Roman explicitly stated White's name in the immediately preceding sentence.

Officer Roman's mistaken reference to White as "the Defendant" at Petitioner's trial. In our view, Officer Roman's error was negligible when viewed in light of Grant's entire case, especially when we consider that Grant's counsel immediately objected to Officer Roman's misstatement and on cross-examination clarified that Officer Roman had been referencing White, not Grant, as the suspect who was identified at the station on 6th and Wolf Streets: (N.T. 9/18/08, p. 154.)

We are not convinced that Grant's counsel's failure to request an instruction as to this sole, minor discrepancy in Officer Roman's testimony undermined Grant's defense such that there was a "reasonable probability" that the outcome of his trial would have been different. *Strickland* 466 U.S. at 694. Therefore, we are unable to accept that Petitioner's claim would be deemed "substantial" in accordance with *Martinez*. This claim does not afford Grant habeas relief.

### d. Trial counsel should have requested a prior inconsistent statement instruction to the jury regarding the victim's identification testimony

Grant also asserts that an instruction should have been given as to the inconsistency in the victim's description of his attackers. (Doc. 7 at 38.) Petitioner points out that Mr. Doan described his assailant as: "5'4", 140-150 lbs, dark complexion, right-handed wearing a puffy black jacket." (*Id*.) Mr. Doan also told police that his attackers were "wearing masks the entire time," but later described them as "wearing hats." (*Id*.) He later said that their masks were "pulled down" at the time of the attack, but then then said the masks were "pushed up." (*Id*.) Mr. Doan also said that Petitioner had a "silver type of beard." (*Id*.) At the time of the incident, however, Grant claims he was "5'9", 300+ lbs, light complexion, left-handed, wearing a brown and white varsity jacket and had a stark black goatee only." (*Id*.) Petitioner claims that without any instruction as to the inconsistency between Mr. Doan's initial description of his attacker and Petitioner's actual physical characteristics, the victim's statements appeared "completely valid and virtually

uncontested" to the jury. (*Id*.) He asserts that the harm he incurred from the victim's statements could have been cured with an appropriate instruction, which his attorney failed to request.

We do not agree that Grant's counsel was ineffective for failing to request an instruction as to the credibility and reliability of Mr. Doan's identification testimony. Indeed, Grant has failed to demonstrate that his counsel's conduct was unreasonable or that he was prejudiced by his counsel's actions such that the outcome of his trial would have been different. Of key importance in our analysis is that the trial court issued a lengthy instruction to the jury regarding their consideration of a witness's testimony, recounted in relevant part below:

> The matter of the credibility of the witness, that is whether his or her testimony is believable and accurate in whole or in part is solely for your determination. I shall mention factors which bear on that determination and which you should consider. They include […] the accuracy of his or her memory and recollection. […] The consistency or inconsistency of his or testimony, as well as its reasonableness or unreasonableness in light of all of the evidence in the case. […] If you find there were conflicts in the testimony, you jurors have the duty of deciding which testimony to believe. […] Also, it is not uncommon for a witness to be innocently mistaken in his or her own recollection of how something happened. […]

(N.T. 9/23/08, pp. 159-161.) We cannot ascertain how Grant's trial counsel could have been deficient in failing to request an instruction that the trial court gave *sua sponte*, nor how Grant was prejudiced by the charge that was ultimately given. Furthermore, we note that Petitioner's trial counsel, Ms. Jayaraman, questioned Mr. Doan extensively on cross-examination about his inconsistent description of Grant. (N.T. 9/18/08, pp. 91-107.) Specifically, Ms. Jayaraman pointed out that Mr. Doan may have been distracted by the gun or disoriented by the darkness, and she highlighted repeated discrepancies between the clothing and physical characteristics of the assailant Mr. Doan described and Petitioner. (*Id*.) The accuracy of Mr. Doan's statement was again contested by trial counsel in closing arguments, during which Ms. Jayaraman argued that the police

had mistakenly arrested Grant, and that the real perpetrator was still at large. (N.T. 9/23/08, pp. 96-100.) Upon reviewing Ms. Jayaraman's representation at trial, we do not agree that Mr. Doan's testimony appeared, as Petitioner claims, "completely valid and virtually uncontested" to the jury. (Doc. 7 at 38.) We are not convinced that Grant's counsel's failure to request an instruction as to the allegedly dubious veracity of Mr. Doan's testimony was unreasonable, as the issue had already been brought to light and argued at length at other stages in the trial.

Finally, we note that the proper time to present arguments as to the credibility and reliability of a witness is not at the charging phase; attacking inconsistencies in a specific witness's testimony is not a valid basis for jury instruction. In any event, it is unlikely this failure undermined Grant's defense such that there was a "reasonable probability" that the outcome of his trial would have been different, as the trial court issued its own instruction as to how a jury should consider a witness's statement. *Strickland* 466 U.S. at 694. Therefore, we are unable to accept that Petitioner's claim would be "substantial" in accordance with *Martinez* and this claim does not afford him habeas relief.

### e. Trial counsel should have requested a cautionary instruction to the jury that Officer Zirilli's testimony was "unreliable"

Finally, Grant claims that an instruction should have been given as to the unreliability of Officer Zirilli's testimony. (Doc. 7 at 38.) Petitioner claims that Officer Zirilli "never came forward as a potential eyewitness until […] nearly a year later after the incident." (*Id*.) He also points out that Officer Zirilli never filed a police report regarding the incident, and "counterfactually" claimed to have called 9-1-1 on Mr. Doan's behalf. (*Id*.) Finally, Grant claims that Officer Zirilli's description of the perpetrator as being "a black male, early to mid 20s, about 6 feet to 6 feet 2" was inaccurate and did not match Grant's characteristics. (*Id*.) (citing N.T. 9/18/08 p. 134.)

We do not agree that Grant's counsel was ineffective for failing to request an instruction as the credibility and reliability of Officer Zirilli's testimony. Once more, Grant has failed to demonstrate that his counsel's conduct was unreasonable or that he was prejudiced by his counsel's actions such that the outcome of his trial would have been different. We reiterate that the trial court issued a lengthy instruction to the jury regarding their consideration of a witness's reliability based on several factors, including the witness's interests, friendships, animosities, bias, prejudice, demeanor, apparent accuracy of recollections, and ability to observe. (N.T. 9/23/08, pp. 159-161.) Again, we cannot ascertain how Grant's trial counsel could have been deficient in failing to request an instruction that the trial court gave *sua sponte*, nor how Grant was prejudiced by the charge that was ultimately given. Furthermore, Ms. Jayaraman cross-examined Officer Zirilli extensively on the reliability of his testimony, highlighting the fact that Officer Zirilli was an off-duty police officer who witnessed the crime, but did not intervene to defend Mr. Doan, or give a signed statement to police, or testify at the preliminary hearing, or offer to identify the perpetrator in a lineup. (N.T. 9/18/08, pp. 132-34.) Ms. Jayaraman also noted for the jury that Officer Zirilli did not give a formal statement as to what he witnessed until a year later, during an investigation by Internal Affairs. (N.T. 9/18/08, p. 134.) Finally, Ms. Jayaraman emphasized that, as a police officer, Officer Zirilli should be familiar with giving quick and accurate descriptions of perpetrators, but that his description of Petitioner was not consistent with Petitioner's actual characteristics. (N.T. 9/8/08, p. 134-35.)

As we previously explained, the appropriate time to present arguments as to the reliability of a witness is not at the charging phase; attacking incongruities in a specific witness's testimony is not a valid basis for jury instruction. Grant's counsel was not ineffective for failing to request an instruction as to the "unreliability" of Officer Zirilli's testimony, as she already addressed this

issue before the jury at other stages in the trial. It is unlikely that counsel's "failure" to request a specific instruction as to Officer Zirilli's statement undermined Grant's defense such that there was a "reasonable probability" that the outcome of his trial would have been different, where the trial court issued its own instruction as to the consideration of witness credibility and reliability. *Strickland* 466 U.S. at 694. Thus, we are unable to accept that Petitioner's claim would be "substantial" in accordance with *Martinez* and this claim does not afford him habeas relief.

### 5. Ground 8: Trial counsel was ineffective for failing to object to or request a mistrial based on alleged prosecutorial misconduct

Grant's eighth ground for relief is based on his trial counsel's alleged ineffectiveness after failing to object or request a mistrial based on the prosecutor's conduct at his trial. (Doc. 7 at 39-54.) Specifically, Grant claims that the Commonwealth acted in "bad faith" in various ways, and at no point did his trial counsel object to this misconduct:

a. The prosecution made statements that were speculative or not based in the record;

b. The prosecution improperly vouched for the testimony of government witnesses;

c. The prosecution failed to correct false testimony;

d. The prosecution made statements that were "denigrating to the defense and/or designed to inflame the passions of the jury;"

e. The prosecution made misrepresentations and told "blatant lies" at various stages in criminal process;

f. The prosecution engaged in misconduct when it admitted testimony that "allowed surprise expert witness testimony in the guise of a layperson."[18]

---

[18] As a minor correction, we note that the Commonwealth does not have the authority to "admit" testimony into the record. The Commonwealth may, however, "introduce" or "present" evidence, which the trial court then has the discretion to admit.

(Doc. 7 at 39-54.) Below, we address Grant's allegations as to his trial counsel's ineffectiveness on these six occasions.

Under both Pennsylvania and federal law, prosecutors are given "considerable latitude" in presenting the case to the jury and may present arguments "with logical force and vigor." *Commonwealth v. Ogrod*, 839 A.2d 294, 334 (Pa. 2003); *United States v. Werme*, 939 F.2d 108, 117 (3d Cir. 1991). Even so, a prosecutor has "a special obligation" to avoid "improper suggestions, insinuations, and assertions of personal knowledge which may induce the jury to trust the Government's judgment rather than the jury's own view of the evidence." *Rollins v. Horn*, No. CIV.A.00-1288, 2005 WL 1806504, at *14 (E.D. Pa. July 26, 2005) (quoting *Berger v. United States,* 295 U.S. 78, 88, (1935)) (internal quotation marks omitted). Such comments can "convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant, thus jeopardizing the defendant's right to be tried solely on the basis of the evidence presented to the jury." *Id*. (citing *United States v. Young*, 470 U.S. 1, 18 (1985)). A prosecutor may state his or her views of what the evidence shows, as well as reasonable inferences and conclusions that the evidence supports, however, "it is clearly improper to introduce information based on personal belief or knowledge." *United States v. Zehrbach,* 47 F.3d 1252, 1266-67 (3d Cir. 1995). In the event that a prosecutor's statements were improper, a defendant must demonstrate that the comments were prejudicial, in that they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Parker v. Matthews*, 567 U.S. 37, 45 (2012) (citing *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). The remarks should not be viewed in isolation, but in the context of the trial as a whole, including the severity of the prosecutorial misconduct, the effect of curative instructions, and the quantum of evidence against

the petitioner. *See Greer v. Miller*, 483 U.S. 756, 766 (1987); *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001).

### a. The prosecution made statements that were speculative or not based in the record

Petitioner points to four different statements made by the prosecutor that he claims were based on evidence not before the jury, and upon which his counsel should have objected. The first statement is the prosecutor's implication during Officer Zirilli's re-direct examination that Officer Zirilli made a 9-1-1 phone call separate from the 9-1-1 phone call made by Mr. Doan:

> [Prosecutor]: Okay. And one final question, the 9-1-1 portion of the 9-1-1 tape that I played today, is it possible [ ] there are other 9-1-1 tapes out there?
>
> [Officer Zirilli]: That's correct, it could be.

(N.T. 9/18/08, p. 140.) Upon our review of Officer Zirilli's entire testimony, we do not believe the prosecutor's question was improperly speculative. On direct examination, Officer Zirilli claimed that he had called 9-1-1 after Mr. Doan told him he was robbed. (N.T. 9/18/08, pp. 122-24.) Then, on cross examination, Grant's counsel insinuated that Officer Zirilli had lied by claiming he had called 9-1-1, as Mr. Doan's voice was first to be heard on the recording. (N.T. 9/18/08, pp. 131-32.) Officer Zirilli then explained that although he did not call 9-1-1 on the recording that included Mr. Doan's voice, he had called 9-1-1 separately:

> [Ms. Jayaraman]: You didn't call 9-1-1 on that [call] did you?
>
> [Officer Zirilli]: Not on that one.

(*Id.*) It is well established that "prosecutors may argue all reasonable inferences from the record, giving fair responses to defense strategies, including those developed on cross examination[.]" *Boston v. Mooney*, 141 F. Supp. 3d 352, 373 (E.D. Pa. 2015) (internal citations omitted). Given that Grant's counsel "opened the door" on this topic during cross-examination, at which point

Officer Zirilli testified that he had made a separate 9-1-1 call, we cannot accept that it was improper of the prosecutor to ask Officer Zirilli about the existence of that call on re-direct examination.

Petitioner also points to a statement made by the prosecutor during closing argument, in which she attempted to explain the absence of Grant's blood in the getaway car. The Commonwealth's theory was that Grant had been shot by police and that Grant's never-recovered black puffy jacket likely soaked up the blood from his injury: "A puffy coat […] absorbs the blood so it doesn't get on the inside of the car, it doesn't get on your jeans. Keeps all of the mess in the inside of the coat. That's to explain why there's no blood on the inside of the car." (N.T. 9/23/08, p. 136.) Again, we note that prosecutors are permitted to argue "reasonable inferences" from the record and provide "fair responses to defense strategies." *Mooney*, 141 F. Supp. 3d at 373. During Grant's closing argument, defense counsel told the jury that Grant could not have been shot in the getaway car, as "[t]here's not a drop of blood in the car, on the door, on the outside of the car, around the car […] [n]owhere in the passenger seat, on the back of the seat or on the seat itself, on the door, nowhere do we find any blood." (N.T. 9/23/08, p. 118.) Ms. Jayaraman told the jury that the lack of blood in the car proved that the Commonwealth's theory didn't "make sense." (N.T. 9/23/08, p. 119.) In light of these statements in Grant's closing argument, the prosecutor was allowed to respond to Petitioner's counsel by offering an alternate explanation for the lack of blood in the car, based on reasonable inferences from the record—namely, that Grant had been wearing a black puffy jacket at the time of the shooting which absorbed the blood.

The next statement that Petitioner raises for our examination is the prosecutor's closing argument as to the importance of the gunshot residue test evidence, or rather, lack thereof:

> And as for all of the gun residue argument that has been going on, and I know there has been lots and lots of questioning from the Defense about his gun residue stuff. The Defense alleges that the jacket that the Defendant wore into the hospital was not tested for

> gunpowder residue. Let me say, of course, gunpowder residue on a jacket that someone was shot when they were wearing. I don't think that would have been probative of anything. I don't see how anyone would have cared if a bullet went through your jacket. Well, okay, then that's not going to show if you shot anybody, it's going to show that you got shot. I don't see how that would [have] been worth the expense of testing and dragging everyone through that. So that's not probative of much of anything and wouldn't have proved Defendant's guilt or innocence of that case. So I think that's the end of that.

(N.T. 9/23/08, pp. 139-140.) Petitioner claims that the prosecutor improperly made these comments without the support of expert testimony in the record. (Doc. 7 at 43.) Upon our review of the prosecutor's statement, we do not accept that it was improperly speculative. At trial, Detective Tighe explained that it is difficult for police to collect gunshot residue from clothing, and so gunshot residue tests are "hardly ever" requested by investigators, as they are often inconclusive. (N.T. 9/22/08, p. 181.) Accordingly, the prosecutor's comment on the probative value of a gunshot residue test was based in the record.

Finally, Grant points to a statement made by the prosecution during closing argument, offering an explanation as to why Officer Zirilli failed to go to the police station immediately after he and Mr. Doan called 9-1-1:

> Now, the Defense made a lot of fuss about the fact that Police Officer Zirilli didn't jump out and run down to Southwest Detectives, maybe you wouldn't either if you were having a party at your house and you weren't there.

(N.T. 9/23/08, p. 132.) We agree with Grant that there is no basis for this statement in the record, as Officer Zirilli never testified specifically as to why he did not immediately go to the police station after the crime, much less mention "a party" at his home. Although this comment was improper, in the overall context of entire closing arguments and the trial record, we do not find this sole statement was sufficient to "infect" the trial with unfairness "as to make the resulting

conviction a denial of due process." *Parker*, 567 U.S. at 45; *Werts v. Vaughn*, 228 F.3d 178, 200 (3d Cir. 2000) ("[A] single wayward statement amounts to an ordinary trial error, which is insufficient to constitute a denial of due process.").

We accept that some of these statements—particularly if taking them collectively—must be read and considered in the context of the court's instructions. The trial court issued comprehensive instructions to the jury both before and after closing argument, reminding the jurors that statements made in closing argument were not evidence for their consideration during deliberations:

> Now, even though these arguments do not constitute evidence, you should consider them carefully.
>
> In their arguments the attorneys for both sides will call to your attention the evidence which they consider material and they will ask you to draw certain inferences from that evidence. You must keep in mind, however, that you are not bound by their recollection of the evidence. It is your recollection of the evidence and your recollection alone which must guide you during your deliberations in this case.
>
> So if there is a discrepancy between the attorney's recollection and your own, you are obviously bound by your recollection of the evidence. Nor are you limited in your consideration of the evidence to that which is mentioned by these attorneys. You must consider all of the evidence which you deem material to the issues involved in this case.
>
> Now, to the extent that inferences which the attorneys ask you to draw are supported by the evidence and appeal to your reason and your judgment, then you may consider your inference or those inferences in your deliberations.
>
> . . .
>
> Your determination of the facts in this case should not be based on [...] which attorney made the better speech nor on which attorney you liked better.
>
> . . .

> I remind you that in my preliminary instructions I told you, jurors, that statements made by the attorneys did not constitute evidence and, therefore, they were not binding on you.

(N.T. 9/23/08, pp. 88-89, 155-56, 163.) These instructions cure the possible prejudicial effect of any of the four statements Grant has identified. Both Pennsylvania and federal law presume that, absent evidence to the contrary, a jury deliberated in accordance with the court's instructions. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Commonwealth v. Laird*, 988 A.2d 618, 629 (Pa. 2010). Therefore, even if the prosecutor made speculative comments or statements not based in evidence during closing argument, the jury was instructed that those statements were not to be considered as evidence. Accordingly, it is unlikely Grant's counsel's failure to object to these statements was constitutionally deficient, as the prosecutor's statements were either proper or, if improper, could not have undermined Grant's defense such that there was a "reasonable probability" that the outcome of his trial would have been different. *Strickland* 466 U.S. at 694. Therefore, we are unable to accept that Petitioner's claim would be deemed "substantial" in accordance with *Martinez*. This claim does not afford Grant habeas relief.

### b. The prosecution improperly vouched for the testimony of government witnesses

Grant also complains of three instances from the prosecution's closing argument where his attorney should have objected on the basis of improper "vouching." (Doc. 7 at 43-44.) As a general rule, a prosecutor may comment on the credibility of a witness so long as he or she does not express a personal belief; vouching is proper when based on the witnesses' demeanor or other observable events at trial, such as testimony and other evidence. *See United States v. Weatherly*, 525 F.3d 265, 271 (3d Cir. 2008); *United States v. Rivas*, 493 F.3d 131, 137 (3d Cir. 2007). A prosecutor may not, however, vouch for the credibility of a witness based on the prosecutor's personal knowledge, experience, or opinions. *See United States v. Young*, 470 U.S. 1, 18–19 (1985). Improper vouching

occurs when two criteria are met: "(1) the prosecutor must assure the jury that testimony of a Government witness is credible; and (2) this assurance is based on either the prosecutor's personal knowledge, or other information not contained in the record." *United States v. Lee*, 612 F.3d 170, 195 (3d Cir. 2010) (quoting *United States v. Walker*, 155 F.3d 180, 187 (3d Cir. 1998)). Although it is permissible for counsel to argue inferences, an inference must flow logically and convincingly from the facts in the record. *See United States v. Navarro*, 145 F.3d 580, 593 (3d Cir. 1998). Counsel's argument "crosse[s] the line" when relying upon "extra-record evidence" or when "urging the jury to speculate rather than infer." *Weatherly*, 525 F.3d at 272; *Rivas*, 493 F.3d at 138.

The first instance of alleged improper vouching was when the prosecutor discussed Mr. Doan's familiarity with guns, such that he could identify a .9 mm when it was pointed in his face: "Now, the 9mm, Mahn Doan knows about .9mms. He told us he used to be a gun guy before he got married and then got rid of the guns, so he can identify a 9mm, and he said he had a 9mm." (N.T. 9/23/08, p. 129.) This statement was not improper vouching, as it is supported by Mr. Doan's trial testimony. During direct examination, Mr. Doan testified as follows:

> [Prosecutor]: Have you ever seen a gun before?
>
> [Mr. Doan]: Yes.
>
> [Prosecutor]: When have you seen guns?
>
> [Mr. Doan]: I use[d] to own a lot of guns.
>
> [Prosecutor]: A lot of guns?
>
> [Mr. Doan]: .9 mm, Glock, Smith & Wesson, you name it. I was a lover of guns before I got married.
>
> . . .
>
> [Prosecutor]: So now you said that you used to own a .9 mm?
>
> [Mr. Doan]: Yes.

[Prosecutor]: And did you recognize either of these guns?

[Mr. Doan]: Yes. The Defendant had a .9 mm black, to my knowledge, it was .9 mm, and the tall guy had a .38, it looked like a .38 round shot revolver.

. . .

[Prosecutor]: And because you had prior—before you got married you own[ed] a .9 mm, you believed the Defendant owned or was carrying a .9 mm?

[Mr. Doan]: Right.

(N.T. 9/18/08, pp. 68-69.) As we have stated, a prosecutor may comment on the credibility of a witness when that comment is based on the witness's trial testimony. *See Weatherly*, 525 F.3d at 271. Here, we cannot say that the prosecutor engaged in any misconduct by directly referencing Mr. Doan's trial testimony when discussing his credibility in closing arguments.

The second instance of alleged improper vouching was in reference to the prosecution's comment on Ms. Casey's credibility: "Lawandra Casey was crying on the witness stand, she couldn't have been more credible. She regrets what she's done. She hates him. She can't believe this happened to her. She can't believe she is in this position." (N.T. 9/23/08, p. 142.) Again, this statement was also not improper vouching, as it is supported by Ms. Casey's trial testimony. At trial, Ms. Casey testified on direct examination that her straw purchase of the gun for Grant had resulted in charges against her. (N.T. 9/23/08, p. 22.) She then testified about how she felt about Grant: "I trusted him. That was my friend. No matter how many times I asked him about [the gun], he was always going to bring it to me and he never did. Now, I'm sitting in here. After all of everything that's happened to me." (N.T. 9/23/08, p. 23.) Ms. Casey then became upset on the stand, to the extent that the trial court even nasked her if she needed a break. (*Id.*) A prosecutor may comment on the credibility of a witness when that comment is based on the witness's trial

testimony, including the witness's *demeanor* on the stand. *See Weatherly*, 525 F.3d at 271. Here, we cannot say the prosecutor's vouching was improper when it was directly based on events from Ms. Casey's trial testimony.

The third and final instance of alleged improper vouching was in reference to the prosecution's assurance that the police officers at trial had testified truthfully: "The witnesses that we have put forward are the police. The police have testified honestly. They've come in here and shown you all of their paperwork." (N.T. 9/23/08, p. 142.) We accept that this statement was improper vouching as to the candor and integrity of the Commonwealth's witnesses, as the prosecutor inappropriately speculated on the credibility of those witnesses based on the intrinsic fact that they were police officers. In short, the prosecutor drew an inference "far beyond what the *evidence* could reasonably support." *Commonwealth. v. Culver*, 51 A.3d 866, 878 (Pa. Super. 2012) (emphasis added). Although the prosecutor crossed the line into improper vouching by making gratuitous statements regarding the honesty of the police officers, we are not convinced that Petitioner was prejudiced by his counsel's failure to object to these statements in Commonwealth's closing argument. Significantly, as we have already recounted, the trial court instructed the jury that remarks made during closing argument are not to be considered as evidence, and that they should rely on their own observations and the evidence presented at trial in determining the credibility of a witness. *See supra* Section III.B.ii.4.d.; Section III.B.ii.5.a. Absent evidence to the contrary, we presume that the jury followed these instructions. *See Weeks*, 528 U.S. at 234. Thus, any prejudice that resulted by counsel's failure to object to this statement was likely rectified by these curative instructions. Accordingly, we do not accept that there is a "reasonable probability" that the outcome of Grant's trial would have been different had his counsel objected. *Strickland* 466 U.S. at 694. Therefore, we are unable to accept that Petitioner's

claim would be "substantial" in accordance with *Martinez* and this claim does not afford him habeas relief.

### c. The prosecution failed to correct false testimony

Petitioner also claims that his counsel did not object when the prosecutor failed to correct false testimony or otherwise manipulated incorrect or misleading testimony at two separate instances during his trial. (Doc. 7 at 45.) In allowing the false testimony, Grant claims that the prosecution violated his rights under *Napue v. Illinois*, 360 U.S. 264 (1959). A violation of *Napue* occurs when: "(1) [the witness] committed perjury; (2) the government knew or should have known of his perjury; (3) the testimony went uncorrected; and (4) there is any reasonable likelihood that the false testimony could have affected the verdict." *Lambert v. Blackwell,* 387 F.3d 210, 242 (3d Cir. 2004). Grant frames these two *Napue* violations as ineffective assistance of counsel claims under *Strickland*, alleging that his attorney was deficient for failing to raise these examples of prosecutorial misconduct at trial.

First, Grant points to Mr. Doan's testimony at his suppression hearing, where Mr. Doan stated that "an off-duty police officer," later identified as Officer Zirilli, had called 9-1-1 after he had been robbed. (N.T. 10/10/07, p. 17.) Petitioner contends that this was a "blatant lie," as the 9-1-1 call recording was later played at trial and Mr. Doan was heard speaking to the 9-1-1 operator before he knocked on Officer Zirilli's door. (N.T. 9/18/08, p. 132.) Grant also points out that Mr. Doan's testimony at the suppression hearing and Officer Zirilli's testimony at trial was inconsistent with Mr. Doan's first testimony at Grant's preliminary hearing, where Mr. Doan failed to mention Officer Zirilli at all. (N.T. 3/19/07, p. 21.) These circumstances, although they involve inconsistent testimony, do not present a *Napue* violation. The conflicts in Mr. Doan and Officer Zirilli's stories as to who, exactly, called 9-1-1 were contested extensively throughout the trial, both by the prosecutor and by Mr. Doan's counsel. (N.T. 9/18/08, pp. 81, 96-97, 131-34.) In fact, Ms.

Jayaraman pursued a line questioning on this topic during Mr. Doan's cross-examination, and impeached him before the jury with his prior testimony:

> [Ms. Jayaraman]: Now, you stated earlier when the District Attorney was asking you questions that the first thing that there was an Officer Zirilli, the second off-duty officer, and that you went to him and that he called 9-1-1 once you were there. But now we heard the 9-1-1 tapes, you called 9-1-1 before you even got to Officer Zirilli's house and knocked on the door.
>
> [Mr. Doan]: Right.
>
> [Ms. Jayaraman]: So the first person to call 9-1-1 wasn't Officer Zirilli, it was you, correct?
>
> [Mr. Doan]: Right.

(N.T. 9/18/08, pp. 96-97.) On Officer Zirilli's direct and re-direct examination, however, he insisted that he had called 9-1-1 separately. (N.T. 9/18/08, pp. 131-32.) Even now, we cannot say which statement from this conflicting testimony was decidedly "true" or "false" such that the prosecution violated *Napue* in allowing these statements to be left "uncorrected." Thus, "[i]n contrast to the interests sought to be protected in *Napue*, the jury in the case at bar was presented with all of the evidence and was free to determine which evidence was most persuasive." *Ford v. Superintendent, SCI-Frackville*, No. 2:12-CV-01278, 2013 WL 5457801, at *22 (E.D. Pa. Sept. 19, 2013) (explaining that introducing prior inconsistent statements to highlight conflicts in testimony of witnesses does not amount to a *Napue* violation). As an aside, we are not convinced that testimony as to the *exact* person who dialed 9-1-1, either Officer Zirilli or Mr. Doan, is a fact so material to Grant's conviction that it affected the outcome of his verdict, as required by *Napue*. *See Lambert*, 387 F.3d at 242. As Grant's underlying *Napue* claim is without merit, we cannot say that his counsel acted deficiently under *Strickland*. Therefore, we are unable to accept that

Petitioner's claim would be deemed "substantial" in accordance with *Martinez*. This claim does not afford Grant habeas relief.

Second, Petitioner references Officer Roman's testimony that Mr. Doan had identified Grant at a local police station shortly after the crime. (Doc. 7 at 46.) Officer Roman was recounting the events of the crime on direct examination when he mistakenly referred to Antwuan White (Grant's co-conspirator) as "the Defendant," specifically stating: "[The police were] holding a male who was later identified as Antwuan White. The [victim] immediately identified the Defendant at that location[.]" (N.T. 9/18/08, p. 144.) We accept that this testimony was not accurate and potentially misleading, as Grant was not identified by Mr. Doan for several hours after the crime, when Mr. Doan was shown a photo array at his home. (N.T. 9/18/08, pp. 88-91.) Furthermore, Grant was the only "Defendant" at trial—White did not appear at Grant's trial as a co-defendant. Our review of the record reveals that the prosecutor knew that this information was not accurate and did not correct Officer Roman's testimony or explain that his reference to "the Defendant" was in fact a reference to White, rather than Grant. Even so, we cannot accept that this prosecutorial misstep amounted to a *Napue* violation. Namely, there is not a "reasonable likelihood" that Officer Roman's misstatement could have affected the verdict. *See Lambert*, 387 F.3d at 242. Numerous witnesses testified as to the correct place and manner that Grant was identified by Mr. Doan—in fact, the photo array shown to Mr. Doan at his home was a central issue of contention throughout Grant's trial. Furthermore, as discussed above, the record shows that Ms. Jayaraman objected immediately upon hearing Officer Roman's erroneous testimony and clarified on cross-examination that Officer Roman had meant to say that Mr. Doan identified

White, not Grant, at the police station located on 6th and Wolf Streets.[19] *See supra* Section III.B.ii.1.e. (citing N.T. 9/18/08, p. 154.) Thus, even notwithstanding any *Napue* violation, we do not accept that Ms. Jayaraman acted unreasonably in her representation of Grant, nor did her conduct prejudice Grant's defense such that the outcome of his trial would have been different. *See Strickland*, 466 U.S. at 694. Therefore, we are unable to accept that Petitioner's claim would be "substantial" in accordance with *Martinez* and this claim does not afford him habeas relief.

### d. The prosecution made statements that were "denigrating to the defense and/or designed to inflame the passions of the jury"

Grant also alleges that his counsel was ineffective for failing to object to statements made during the prosecutor's closing argument that were disparaging to the defense. (Doc. 7.) Specifically, the prosecutor stated:

> When you think about the fact that the Defense now is saying—how dare they say that he looked at him, Mahn Doan, wrong. It's offensive, it's arrogant. How dare they come in here. [The Defendant] took his mask off, he [stared] at him, he yelled at him, and now he's saying you don't know who I am. They were out there together. They had this happen together. The Defendant did this to him[.]
>
> . . .
>
> I ask you, ladies and gentlemen, what kind of man gets women [Ms. Casey and Ms. Bostic] to buy him these kinds of guns?

_____

[19] We note that there is an outstanding question as to whether *Napue* requires a prosecutor to correct false testimony that is also known by the defense to be false. The extent of a prosecutor's obligation in these circumstances is unclear, as the Supreme Court has not yet determined whether a prosecutor could avoid a *Napue* violation if the *defense* corrected the erroneous or perjurious testimony. *See, e.g., Long v. Pfister*, 874 F.3d 544, 548 (7th Cir. 2017) ("All *Napue* itself holds is that perjury known to the prosecution must be corrected before the jury retires. The Court did not say when or by whom."). In any event, we note that Grant's claim is not a *Napue* claim but an ineffective assistance of counsel claim under *Strickland*. Thus, we are not obligated to determine whether relief should be awarded in accordance with *Napue*, but whether Grant's counsel alleged failure to "object or request a mistrial" in these circumstances was constitutionally deficient. (Doc. 7 at 39.) As we have explained, not only does the record reflect that Ms. Jayaraman did indeed object, but she also corrected the error on cross-examination.

. . .

And the last Defense argument is frankly offensive and should offend your notion of justice. The Defense comes in here and points the fingers at the police officers in the case and it's offensive, it's horrifying. […] The police officers in this case are part of many, many different units. […] They have all been sitting here working for you, coming in to testify, they worked very hard. They were out on this case and they have worked – I guess, the best way to say this is that frankly in order for them to have done what the Defense has alleged which is to come up with some large scale conspiracy to frame Michael Grant, I think that they probably could have done a much better job.

. . .

This whole thing, these women [Ms. Casey and Ms. Bostic], Gregory Parker, you know, I guess, the best way to describe is birds of a feather flock together. These are the people he [Grant] picked. These are his people, not ours.

(N.T. 9/23/08, pp. 130, 138, 140-41, 142.) Of these four statements, the latter two that reference the prosecution's defense of the police and the shortcomings of Ms. Casey, Ms. Bostic, and Mr. Parker are not improper. As to the statement about the police, defense counsel had previously implied in her closing argument that the officers in this case were "drum[ming] up a bunch of evidence" against Grant to protect Officer Williams from an Internal Affairs investigation: "They [the police] wanted him [Grant] in here and they wanted to make their testimony match and fit something." (N.T. 9/23/08, p. 102.) Ms. Jayaraman characterized the police testimony as "odd" and "suspicious," and accused the officers of "rally[ing] around the brother officer" as a "band of blue" by refusing to "sell out" Officer Williams. (N.T. 9/23/08, pp. 101-02.) The prosecutor was allowed considerable latitude to respond to this theory of police misconduct presented by the defense. As to the statement about Ms. Casey, Ms. Bostic, and Mr. Parker, Ms. Jayaraman previously discussed that all three witnesses had "in common" past or pending convictions, and

that these were the Commonwealth's "star witnesses." (N.T. 9/23/08, pp. 104-06.) In turn, the Commonwealth was permitted to point out that these witnesses also had "in common" an association with Grant, which is why they were called to the stand in the first place.

As for the other two statements, we agree that the prosecutor's calling the defense "offensive" and "arrogant" for asking the jury to discredit Mr. Doan's identification was improper, as were her statements in attacking Grant's character for the straw purchase of the .9mm guns by Ms. Casey and Ms. Bostic. A prosecutor "may not express his personal opinion regarding a defendant's guilt, credibility, or trial strategy." *Commonwealth v. Gilman*, 368 A.2d 253, 258 (1977). Nor can the prosecutor "invite the jury to act based on prejudice." *Brown v. Garman*, No. CV 16-872, 2017 WL 5896903, at *13 (E.D. Pa. Aug. 28, 2017), *report and recommendation adopted*, No. CV 16-872, 2017 WL 5885659 (E.D. Pa. Nov. 28, 2017). Nevertheless, Grant has not met his burden to show that these two statements, standing alone, were so improper that they "infected" his trial with prejudice. Accordingly, it is unlikely Grant's counsel's failure to object to these statements was constitutionally deficient, as we do not accept that they undermined Grant's defense such that there was a "reasonable probability" that the outcome of his trial would have been different. *Strickland* 466 U.S. at 694. Furthermore, as we have explained, the Commonwealth presented extensive evidence of Grant's guilt at trial, such that we are not convinced these statements by the prosecutor substantially affected the outcome of Grant's proceeding. *See supra* Section III.A.i. Therefore, we are unable to accept that Petitioner's claim would be deemed "substantial" in accordance with *Martinez*. This claim does not afford Grant habeas relief.

### e. The prosecution made misrepresentations and told "blatant lies" at various stages in criminal process

Next, Petitioner alleges that the prosecution lied and misrepresented the facts of his case at his preliminary hearing, at his motion *in limine* hearing, and at various times during trial. (Doc. 7

at 49.) Accordingly, his counsel was ineffective for failing to object or request a mistrial upon the entry of this allegedly false information into the record. (*Id.*)

At his preliminary hearing, Grant claimed that after the prosecutor correctly noted that he was apprehended by police at the hospital and identified by Mr. Doan several hours later, the prosecutor then recounted incorrect information about his arrest that actually pertained to his co-conspirator, White. (*Id.*) (citing N.T. 3/19/07, pp. 14-16.) We acknowledge that a preliminary hearing is a "critical stage of a criminal prosecution" in Pennsylvania and therefore entitles the accused to assistance of effective counsel. *Ditch v. Grace*, 479 F.3d 249, 253 (3d Cir. 2007). Even so, to the extent that Petitioner claims the information presented at his preliminary hearing was incorrect, "any error was rendered moot following his jury trial." *Miller v. Lamas*, No. CIV.A. 10-293, 2012 WL 761999, at *5 (W.D. Pa. Feb. 15, 2012), *report and recommendation adopted*, No. CIV.A. 10-293, 2012 WL 750908 (W.D. Pa. Mar. 7, 2012). Furthermore, he has not shown that the evidence presented at the hearing ultimately "tainted the verdict" at trial. *Commonwealth v. Hess*, 414 A.2d 1043, 1048 (Pa. 1980); *cf. Barber v. Page*, 390 U.S. 719, 725 (1968) ("A preliminary hearing is ordinarily a much less searching exploration into the merits of a case than a trial, simply because its function is the more limited one of determining whether probable cause exists to hold the accused for trial."). Thus, we cannot accept that Grant was prejudiced by his counsel's failure to object to the recitation of this information at the preliminary hearing, as it did not affect the jury's ultimate consideration of the evidence.

Grant also claims that the prosecutor lied at the motion *in limine* hearing that was held two days before his trial commenced. During the hearing, the prosecutor stated that she was unsure whether Grant legally possessed a .9mm firearm: "I don't have [Grant's gun registrations] with me. I just know—I'll pull them. I do know the six guns that were registered to the Defendant were

never able to be found or located or put in his possession in any way. And they were all bought years before. They were all from early 2000 or something like that 2000 or 2001. That's the information the detectives told me." (N.T. 9/15/08, pp. 47-48.) The motion court subsequently ordered the Commonwealth to produce the registrations at trial, and Grant's counsel preserved an objection on the record that the Commonwealth would be in violation of *Brady* if they were not produced. (*Id*.) Two days later, on the first day of Grant's jury trial, the prosecutor brought the records of Grant's gun purchases before the court and read them into the record. (N.T. 9/17/08, pp. 13-16.) Grant's gun registration revealed that he legally owned a .9mm Beretta at the time of the crime. (*Id*.) We cannot ascertain how Grant was prejudiced by this series of events, either by the conduct of the prosecutor or his counsel. We are unwilling to accept that the prosecutor lied to the court when she represented that she was personally unaware of the specific guns Grant had purchased, and even if she had lied, or was at least mistaken, the error was ultimately cured when she produced the records at trial. Nor can we say that Grant's counsel was ineffective for failing to object to the missing gun registrations, as she did, in fact, object.

In addition to the statements made at his preliminary hearing and motion *in limine* hearing, Grant claims that four other statements by the prosecutor from closing argument were untrue.[20] The first statement was: "And we know for a fact that that was this Defendant [Grant] firing that gun." (N.T. 9/23/08, p. 146.) This statement was supported by the evidence in the record and is a reasonable inference based on the facts presented at trial. In fact, the prosecutor subsequently followed up this sentence with: "We know because the ballistics show it, we know because Mahn

---

[20] In addition to these statements, Grant *again* asserts that the prosecutor's statement regarding Ms. Casey, Ms. Bostic, and Mr. Parker "flocking together," the prosecutor's vouching for police officers, and the prosecutor's implication that Grant was a bad man for getting "women to buy him these kinds of guns" were lies and misrepresentations. As we have already addressed the propriety of these statements, we need not address them again.

Doan ID'd him as doing it." (*Id.*) Accordingly, there was no basis for Grant's counsel to object to the prosecutor's argument. The second statement was: "The […] reason the Defendant guilty is he had access to .9 mms." (N.T. 9/23/08, pp. 136-37.) The record clearly reflects that this fact was verified at trial, as Grant not only legally owned a .9mm weapon but had stolen two from Ms. Casey and Ms. Bostic. To the extent that Grant challenges the prosecutor's characterization of him as "guilty," we note that prosecutors are allowed to engage in "oratorical flair" and are given "considerable latitude" in presenting their arguments—we cannot pretend that prosecutor was not seeking a guilty verdict. *Ogrod*, 839 A.2d at 334; *Brown*, 2017 WL 5896903, at *10. The third statement was: "[Sharee Bostic is] looking at a five to ten-year mandatory because of what this man has done to her." Again, this statement was supported by evidence in the record. Ms. Bostic testified that she was arrested for her straw purchase of the .9mm handgun, and that once she knew the mandatory sentence for that crime was five to ten years, she agreed to cooperate with the Commonwealth in exchange for a lower sentence. (N.T. 9/22/08, p. 128-29.) Again, there was no valid basis for Grant's counsel to object to the prosecutor's statement, as Ms. Bostic had testified to this fact at trial.[21] The fourth and final statement was: "The Defendant was identified as wearing

---

[21] Grant also makes the argument that the testimony of Ms. Casey and Ms. Bostic related to their illegal purchases of .9mm weapons on his behalf was improperly admitted against him as "other crimes" evidence. In Pennsylvania, evidence of a defendant's past "crimes, wrongs, or other acts" is not admissible to demonstrate the defendant's criminal character or propensity to commit crimes. Pa.R.E. 404(b)(1). This evidence may be admissible, however, for certain "permitted uses," such as "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Pa.R.E. 404(b)(2); *see also Commonwealth v. Cook*, 952 A.2d 594, 616 (Pa. 2008) (allowing evidence of crimes and bad acts to explain a witness's behavior); *Commonwealth v. Lark*, 543 A.2d 491, 497 (Pa. 1988) (permitting evidence of crimes and bad acts to establish background information in the case); *Commonwealth v. Barnhart*, 434 A.2d 191, 193 (Pa. Super. 1981) (admitting evidence of crimes and bad acts to explain the relationship between the parties). In this case, the straw purchase of the .9mm weapon was introduced to demonstrate both means and opportunity, as Grant had access to the same kind of firearm that was used in the commission of the crime. Accordingly, this claim is without merit in addition to being procedurally defaulted, as it was not raised in Grant's state appellate process.

a puffy coat on the scene by Mahn Doan and jeans. We have the jeans that the Defendant was wearing right here when he got into the University of Pennsylvania. […] There is also no blood on the jeans that the Defendant wore into the hospital." (N.T. 9/23/08, p. 135.) Unlike the other statements Grant has raised for our review, we note that his counsel actually objected to the prosecutor's statement. Therefore, we cannot accept that the representation offered by Grant's counsel was in violation of *Strickland*, as Ms. Jayaraman acted reasonably by objecting to improper statements, and Grant was not prejudiced by her failure to object on meritless bases. *See* 466 U.S. at 694. Therefore, we are unable to accept that Petitioner's claim would be deemed "substantial" in accordance with *Martinez*. This claim does not afford Grant habeas relief.

### f. The prosecution engaged in misconduct when it admitted testimony that "allowed surprise expert witness testimony in the guise of a layperson"

Finally, Petitioner claims that Officer Jaconi's testimony on the fingerprint evidence and Detective Marano and Detective Tighe's testimony on the gunshot residue test amounted to prejudicial "surprise expert testimony," in that testimony from laypersons had been admitted to the trial record "as if they were scientific facts." (Doc. 7 at 55.) Grant alleges that the prosecution acted in bad faith in bringing expert testimony under "the guise" of lay testimony, and that his counsel was ineffective for failing to object or otherwise impeach these witnesses. (*Id*.) At the outset, we note that Pennsylvania Rule of Evidence 701 governs the proper scope of admissible lay testimony:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are rationally based on the perception of the witness, helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and not based on scientific, technical, or other specialized knowledge within the scope of Rule 702 [governing expert testimony].

Pa.R.E. 701.

Turning first to Officer Jaconi's testimony, Grant argues that it was improper for her to opine that it was "basically impossible" to lift fingerprints off of a steering wheel, and similarly improper for her to state that "partial print[s]" and "smudges" were not useable for a fingerprint examination. (N.T. 9/22/08, p. 47-55.) We disagree. Police officers may offer lay testimony about their professional responsibilities in the course of an investigation, including methods used by the police department to handle evidence that may have fingerprints. *See Commonwealth v. Valle*, No. 143 EDA 2014, 2015 WL 6746576, at *4 (Pa. Super. July 24, 2015). Specifically, the scope of this lay testimony may include the ease or difficulty in lifting fingerprints from certain surfaces. *See id.* (explaining that a police officer had "technical knowledge" to testify as to the difficulty of finding fingerprints on corroded gun); *see also Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1201 (3d Cir. 1995) (holding that "a lay witness with first-hand knowledge *can* offer an opinion akin to expert testimony in most cases, so long as the trial judge determines that the witness possesses sufficient and relevant specialized knowledge or experience to offer the opinion."). Officer Jaconi's testimony falls square within the bounds of this rule. She testified that she was employed by the Philadelphia Police Department as an investigator in the Crime Scene Unit, and in the scope of that position she collects evidence such as blood, clothing, ballistics, and fingerprints. (N.T. 9/22/18, pp. 37-38.) As it is Officer Jaconi's *job* to lift fingerprints at the crime scene, we believe she could attest to the circumstances she experienced in attempting to collect those fingerprints.[22]

---

[22] We acknowledge that Officer Jaconi referred to *herself* as an expert when Grant's counsel challenged her methods of collecting fingerprints on cross-examination:

> [Ms. Jayaraman]: You look at the vehicle with your naked eye and look at it and say, I don't see anything that looks like we can use fingerprints; is that right?

Next, Petitioner claims that Detective Marano and Detective Tighe's testimony regarding the gunshot residue test was inappropriately admitted. He takes issue with Detective Marano's testimony that the test should be administered within six hours of a gun being fired and Detective Tighe's testimony that the gunshot residue tests ordered by the police department are rarely conclusive, as it is "hard to get anything off of clothing."[23] (N.T. 9/19/08, pp. 156-57); (N.T. 9/22/08, p. 181.) Again, we disagree with Petitioner that these statements were offered as improper expert opinions. Detective Marano explicitly stated during his testimony that the "six hour" guideline was determined by departmental policy: "[A]ccording to the procedures and policies of our Crime Scene Unit, it is recommended that [the gunshot residue test] be done six hours after or prior to the alleged firing of a gun. From the documents of our Crime Scene Unit and our crime lab, after six hours they have never had a positive reading for gunshot residue." (N.T. 9/19/08, p. 156.) Similarly, Detective Tighe also commented on the fact that the department "hardly ever ask[s]" for gunshot residue tests due to the difficulty in recovering gunshot residue. (N.T. 9/22/08, p. 181.) Police officers may offer lay testimony based on their experience with "investigative

---

[Officer Jaconi]: As a fingerprint expert I know a partial print we can use as an identifiable print.

(N.T. 9/22/08, p. 53.) We note, however, that the trial court did not instruct the jury to consider Officer Jaconi's testimony as expert testimony. At the charging phase, the trial court explained that only Officer Grandizio, the Commonwealth's ballistics expert, was permitted to supply the jury with "specialized information explanation, and opinions" and that all other witnesses were "regular witnesses" that could "testify only about things that they personally perceived, things they saw or heard themselves." (N.T. 9/23/08, p. 164.) The trial court also gave a similar instruction to the jury when Officer Grandizio first appeared on the stand—which was not given when Officer Jaconi (or any other witness) testified.

[23] Petitioner also challenges Detective Marano's testimony on the basis that he provided a "detailed explanation of the sensitivity of the test." (Doc 7 at 55.) Upon our review of Detective Marano's testimony, there is no factual basis for this claim. Detective Marano did not testify or otherwise provide "detailed" commentary as to the sensitivity of the gunshot residue test.

procedures or *departmental policy* regarding the submission of evidence for forensic analysis[.]"
*Commonwealth v. Fudge*, 213 A.3d 321, 329 (Pa. Super. 2019) (emphasis added). Accordingly,
the statements by both officers were appropriate lay testimony. Even if Detective Marano and
Detective Tighe had improperly offered expert opinions on the gunshot residue test, those opinions
would have been cumulative of the testimony offered by the Commonwealth's ballistics expert,
Officer Grandizio. Like Detective Marano and Detective Tighe, Officer Grandizio also testified
that the test must be done within hours of firing a gun and stated that overall effectiveness of the
test "depends" on various factors related to the condition of the test subject's clothing and skin.
(N.T. 9/22/08, pp. 100-03.)

Accordingly, Grant's counsel was not unreasonable for failing to raise a meritless
objection, and it is also unlikely that her failure to object prejudiced Grant's defense such that there
was a "reasonable probability" that the outcome of his trial would have been different. *Strickland*
466 U.S. at 694. We are unable to accept that Petitioner's claim would be deemed "substantial" in
accordance with *Martinez*. This claim does not afford Grant habeas relief.

### 6. Ground 9: Trial counsel was ineffective for failing to file post-sentence motions challenging "excessive" discretionary aspects of Petitioner's sentence

Grant's final ground for relief is based on his trial counsel's alleged ineffectiveness for
failing to challenge his sentence. (Doc. 7 at 57.) Grant was sentenced to 10-20 years for first-
degree robbery, to run concurrent with a sentence of 10-20 years for robbery of a motor vehicle;
10-20 consecutive years for first-degree aggravated assault, to run concurrent with a sentence of
10-20 years for attempted murder; 2.5-5 consecutive years for violation of the Uniform Firearms
Act; and 2.5-5 consecutive years for possession of an instrument of crime. (N.T. 11/25/08, pp. 47-
49.) Grant's aggregate sentence was calculated at 25-50 years of incarceration, followed by 15

years of probation.[24] (*Id.* at 49.) He claims that the sentencing court did not acknowledge "mitigating factors" and "did not properly consider Petitioner's high intelligence, youth, probability of rehabilitation, [education], work history, […] Petitioner's ability to obtain legitimate employment; Petitioner's previous legitimate business endeavors; Petitioner's family support; [and] Petitioner's prior record score." (*Id.* at 57-58.) For these reasons, his counsel should have challenged the "inappropriateness" of the sentence. (*Id.*)

Contrary to Grant's claims, the sentencing court adequately explained its upward departure from the guidelines, as required by Pennsylvania law.[25] *See Commonwealth v. Walls*, 926 A.2d 957, 967 (Pa. 2007) (sentencing court must consider the pre-sentence report, guidelines recommendation, protection of the public, gravity of the offense, and rehabilitative needs of the defendant, and explain any reasons for departing from the guidelines). Despite Grant's accusation that the sentencing court ignored "mitigating factors," it expressly stated on the record that Grant's "superior intelligence," "age and education, your position in life including the fact that you have no prior conviction […] your need for rehabilitation," as well as the "presentence report and

---

[24] On the charge of criminal conspiracy, the Court imposed a term of 10 years consecutive probation. On the weapons charges, the Court imposed 5 years of probation to run consecutive to the probation on criminal conspiracy. (N.T. 11/25/08, p. 49.)

[25] There is no dispute that Grant's sentence was an upward departure from the guidelines and statutory minimums; we note that it also did not exceed the statutory maximum. *See* 204 PA. C.S. § 303.1 *et seq.*; 18 PA. C.S. §§ 1102(c), 1103. At Grant's sentencing hearing, counsel agreed on the following guideline computations. (N.T. 11/25/08, pp. 6-8.) Robbery carried a mandatory of 5 to 10 years, and with a deadly weapon enhancement, the guidelines suggested 40-54 months, plus or minus 12. (*Id.*) Robbery of a motor vehicle carried a mandatory of 5-10 years, and with a deadly weapon enhancement, the guidelines suggested 40-52 months, plus or minus 12. (*Id.*) Criminal conspiracy to commit robbery carried a guideline computation of 30-42 months, plus or minus 12. (*Id.*) Aggravated assault carried a mandatory of 5-10 years, and the guideline computation was 30-42 months, plus or minus 12. (*Id.*) Attempted murder carried a mandatory of 5-10 years, and with a deadly weapon enhancement, the guidelines suggested 78-96 months, plus or minus 12. (*Id.*) The weapons charges carried a guideline computation of 12-24 months, RS to 9 months, and RS to 1 month. (*Id.*)

mental health evaluation" had been considered. (N.T. 11/25/08, pp. 44, 47.) It also heard from several witnesses who vouched for Grant's character and value to society. (*Id*. at pp. 8-19.) Notwithstanding these factors, the sentencing court emphasized that Grant's crimes were "egregious" and "put a great number of persons in danger." (*Id*. at p. 44.) Not only did Grant hold a gun to the head of a fellow citizen, but he engaged in a high-speed chase throughout a residential South Philadelphia neighborhood, discharging a firearm "indiscriminately" in an attempt to shoot an off-duty police officer who was in pursuit. (*Id*. at pp. 44-46.) In the words of the court, it was a "miracle no one was killed." (*Id*. at p. 46.) The prosecutor emphasized that Grant refused to take responsibility for his actions even after his conviction, and the court ultimately decided that his sentence should reflect "needs of society to be protected from you, the need to afford the citizens of this city a measure of safety from you." (*Id*. at pp. 39, 47.)

Thus, the record proves that the sentencing court did, in fact, expressly acknowledge the factors it considered in deciding the discretionary aspects of Grant's sentence. Accordingly, we cannot accept that a challenge by Grant's counsel on this basis would have had merit. As we have explained, counsel cannot be ineffective for failing to litigate a meritless claim. *See, e.g.*, *Sanders*, 165 F.3d at 253; *Fulford*, 825 F.2d at 9. Therefore, we are unable to accept that Petitioner's claim would be deemed "substantial" in accordance with *Martinez*. This claim does not afford Grant habeas relief.

## IV.  CONCLUSION

None of the nine grounds for relief presented in Grant's habeas petition provide a basis for relief. The claims were either procedurally defaulted or without merit, having been reasonably rejected by the state court. We therefore cannot recommend that habeas relief be granted on any of the grounds raised.

Pursuant to Local Appellate Rule 22.2 of the Rules of the United States Court of Appeals for the Third Circuit, at the time a final order denying a habeas petition is issued, the district court judge is required to make a determination as to whether a certificate of appealability ("COA") should issue. A COA should not issue unless the petitioner demonstrates that jurists of reason would find it to be debatable whether the petition states a valid claim for the denial of a constitutional right. Where claims were dismissed for a procedural reason, jurists would also have to debate the correctness of that procedural determination.

Here, for the reasons set forth above, we do not believe a reasonable jurist would find the Court to have erred in dismissing the present petition. Accordingly, we do not believe a COA should issue. Our Recommendation follows.

## RECOMMENDATION

AND NOW, this 27th day of July, 2022, it is respectfully **RECOMMENDED** that the petition for a writ of habeas corpus be **DENIED AND DISMISSED**. It is **FURTHER RECOMMENDED** that a certificate of appealability should **NOT ISSUE**, as we do not believe that Petitioner has demonstrated that reasonable jurists would find either the correctness of the procedural aspects of this Recommendation nor the validity of the substantive claims debatable.

Petitioner may file objections to this Report and Recommendation. *See* Local Civ. Rule 72.1. Failure to file timely objections may constitute a waiver of any appellate rights.

BY THE COURT:


/s/ David R. Strawbridge, USMJ
DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE