# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MICHAEL GRANT,                    :          CIVIL ACTION
     Petitioner,                :
                       :
       v.                      :
                       :          NO.  19-6132
KEVIN KAUFFMAN, *et al.*,          :
     Respondents.

## RESPONSE TO MOTION TO ALTER OR AMEND THE JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT THEREOF

Petitioner Michael Grant is a Pennsylvania state prisoner currently serving an aggregate term of twenty-five to fifty years of imprisonment followed by 15 years of probation for attempted murder, robbery of a motor vehicle, and related charges. Before this Court are his motion to alter or amend the judgment, ECF No. 35, and his memorandum of law in support thereof, ECF No. 46. After careful review of the record, Respondents conclude that Grant's motion should be granted "to correct manifest errors of law or fact." *Blystone v. Horn*, 664 F.3d 397, 415 (3d Cir. 2011).

Mahn Doan, the victim of the carjacking, was the prosecution's key trial witness and the first person to identify Grant as one of the perpetrators. After this Court appointed counsel to represent Grant in connection with his motion to alter or amend the judgment, the parties engaged in open-file discovery. While reviewing the District Attorney Office's files, Grant found

Doan's "complete criminal history," including numerous *crimen falsi* convictions from Philadelphia, Pennsylvania; federal court; and New Jersey. ECF No. 46 at 6. Grant also found federal docketing statements pertaining to Doan, along with articles from the Philadelphia Inquirer reporting that Doan was convicted of federal fraud claims before and after Grant's arrest. The articles explained that Doan served as a cooperating witness in a federal case. The Pennsylvania state convictions were not disclosed prior to trial. And the information pertaining to the federal and New Jersey convictions—the criminal records and news articles—was not discovered by Respondents until Grant's post-conviction counsel brought it to the PCRA's court attention. Grant's attempts to obtain PCRA relief on the basis that the Commonwealth failed to disclose Doan's convictions were unsuccessful.

Grant claims that the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose that Doan had prior state and federal convictions for offenses that qualified as *crimen falsi*, which could have been used to impeach him at trial. Respondents agree that the Commonwealth violated its *Brady* obligations by failing to disclose Doan's prior convictions.

Because Grant's claim has merit, he is entitled to relief from the judgment denying his petition for a writ of habeas corpus.[1]

**Background**

Grant filed a *pro se* petition for a writ of habeas corpus. ECF No. 1. He raised nine claims, including the claim that the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose that Mahn Doan, the victim of the carjacking who identified Grant as one of the perpetrators, had prior state and federal convictions for offenses that qualified as *crimen falsi*, which could have been used to impeach him at trial. Grant filed a motion requesting discovery, including discovery regarding Doan. ECF No. 5. The Magistrate Judge denied his motion because he had not established good cause; this denial was without prejudice. ECF No. 9.

In 2020, Respondents filed a response to Grant's petition, arguing that all the claims other than the *Brady* claim were procedurally defaulted and that the *Brady* claim was meritless because the Superior Court reasonably determined that Grant "'could not prove that the Commonwealth knew or

---

[1] Grant raised eight other claims in his habeas petition. ECF No. 1. In the interests of judicial economy, Respondents only address the *Brady* violations regarding the Commonwealth's failure to disclose Doan's state convictions. Grant is entitled to complete relief on this claim. Should the Court wish to hear from Respondents regarding Grant's remaining claims, Respondents respectfully request the opportunity to supplement this response.

possessed any impeachment evidence, and he cannot show that there is a reasonable probability the outcome of the trial would have been different or that he received an unfair trial.'" ECF No. 16 at 14 (quoting *Commonwealth v. Grant*, 2019 WL 1988665, *6 (Pa. Super. Ct. May 6, 2019)). Regarding possession, Respondents specifically argued that *Brady* was not violated because the Commonwealth did not possess the *federal* convictions; "[r]ather, it was within the control of the federal government, which played no role in the prosecution of this case." ECF No. 16 at 14. Respondents did not address Doan's *state* conviction in the response. *See* CP-51-CR-1007872-1999 (Doan was convicted of theft by unlawful taking, theft by deception, and criminal conspiracy in 2001 in the Philadelphia Court of Common Pleas).

Grant filed a reply in support of his petition. ECF No. 19. In it, he argued that Respondents had failed to address Doan's state conviction, and that, at a minimum, the state conviction was possessed by the Commonwealth. *Id.* at 1. Grant argued that Doan's convictions were material because they suggest that Doan had cooperated with the Commonwealth on prior cases and therefore had a "potential bias in favor of the prosecution." *Id.* at 2. He asked that either the Court grant his petition "or order discovery (including

but not limited to Mr. Doan's state and federal records, his federal transcripts showing his cooperation, any files the Philadelphia Police of District Attorney's office may have regarding his cooperation…)." *Id.* at 4–5.

Grant also separately filed a renewed motion for discovery. ECF No. 17. In that motion, he asked for "Doan's criminal record (including whether or not he cooperated with the DA on those or any other cases)." *Id.* at 1. He argued that this information "is necessary to show the extent of the *Brady* violation." *Id.* This motion was never ruled on.

A report and recommendation ("R&R") was issued recommending that Grant's petition be denied. ECF No. 30. The R&R found that Grant was not entitled to relief on his *Brady* claim because the following determinations by the Superior Court were reasonable: (1) that the Commonwealth did not "possess" any impeachment evidence (ECF No. 30 at 14–15, n.8), and (2) that Doan's convictions were not material under *Brady* due to the evidence of his guilt, which it characterized as overwhelming. (ECF No. 30 at 15–16). Grant filed objections to the R&R in which he noted that his second request for discovery had not been ruled on, and he argued that the requested discovery was important because the full extent of Doan's record was relevant

to the *Brady* materiality analysis, since any cooperation with the government would allow for impeachment based on bias as opposed to generic untruthfulness. ECF No. 32 at 1.

As to the *Brady* claim directly, he argued that the Superior Court's determination that the Commonwealth did not possess Doan's criminal record because "those convictions were all prosecuted under a different name. Therefore, searching for Mr. Doan's name would not have revealed the convictions" was inaccurate. *Id.* at 2 (quoting *Grant*, 2019 WL 1988665 at *6). Contrary to the Superior Court opinion, some of Doan's convictions were prosecuted under his legal name. *Id.* at 2–3. And when the Commonwealth was ordered to provide Doan's criminal record during PCRA proceedings, it found his full record in the Commonwealth's National Crime Information Center ("NCIC") criminal record database. *Id.* at 3. Therefore, Grant argued, Doan's criminal record was in the possession of the Commonwealth, and thus the Commonwealth's failure to provide that record to the defense was a *Brady* violation. He also argued that the lack of physical evidence and the discrepancies in witness testimony made the Superior Court's finding of overwhelming evidence unreasonable. *Id.* at 6–8.

This Court approved and adopted the R&R and dismissed Grant's habeas petition. ECF No. 34. Less than two weeks later, Grant filed a motion

to alter judgment under Rule 59(e) of the Federal Rules of Civil Procedure. ECF No. 35. Such a motion may be granted, among other reasons, "to correct manifest errors of law or fact." *Blystone v. Horn*, 664 F.3d 397, 415 (3d Cir. 2011); Wright and Miller, *Federal Practice and Procedure*, § 2810.1 (2d ed. 1995). In this motion, Grant again argues that he is entitled to relief on his *Brady* claim and that he should have been provided with discovery given the good cause shown in this case. ECF No. 35 at 4.

This Court ordered Respondents to respond to Grant's motion. ECF No. 36. Respondents filed a motion to appoint counsel, and Thomas A. Dreyer, Esquire, was appointed to represent Grant. ECF Nos. 39, 42. The parties engaged in voluntary discovery, and Grant filed a counseled memorandum of law in support of his motion to alter or amend the judgment. ECF No. 46. Through discovery, Grant found Doan's "complete criminal history," including numerous *crimen falsi* convictions from Philadelphia, Pennsylvania; federal court; and New Jersey. ECF No. 46 at 6. He also found federal docketing statements pertaining to Doan, along with articles from the Philadelphia Inquirer reporting that Doan was convicted of federal fraud claims before and after Grant's arrest.  The articles explained that Doan served as a cooperating witness in a federal case. Doan's complete criminal history, docketing statements, and news articles were obtained by the DAO during

Doan's PCRA proceedings—they were not obtained before Grant's trial. After Doan's PCRA counsel brought the news articles to the PCRA court's attention, the DAO requested a search of its NCIC database, uncovering Doan's Pennsylvania, federal, and New Jersey convictions.

After careful review, and as explained below, Respondents concede that Grant's motion should be granted because the Commonwealth violated its *Brady* obligations by failing to disclose Doan's convictions.

## Argument

The Commonwealth has an obligation to disclose to the defense information that is favorable to guilt or punishment of the defendant. *Brady v. Maryland*, 373 U.S. 83 (1963). This obligation requires that the Commonwealth disclose information that is exculpatory as well as impeaching. *Smith v. Cain*, 565 U.S. 73 (2012). To prove a *Brady* violation, the "evidence at issue" must meet "three critical elements":

> First, the evidence "must be favorable to the accused, either because it is exculpatory, or because it is impeaching." . . . Second, it "must have been suppressed by the State, either willfully or inadvertently." . . . Third, the evidence must have been material such that prejudice resulted from its suppression. . . .
>
> The "touchstone of materiality is a 'reasonable probability' of a different result." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Materiality "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal ... [Rather], [a]

'reasonable probability' of a different result is ... shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id.* (internal quotation marks omitted).

*Dennis v. Sec'y, Pennsylvania Dep't of Corr.*, 834 F.3d 263, 284–85 (3d Cir. 2016) (citations omitted).

At the outset, Respondents are constrained to acknowledge that their 2020 response to Grant's petition, ECF No. 16, was erroneous because it did not address Doan's state convictions when it represented to the Court that the Commonwealth did not possess Doan's convictions. Doan's state convictions from Philadelphia County plainly were possessed by the Commonwealth. The Commonwealth, therefore, did suppress Doan's state convictions. Whether the suppression of Doan's record was purposeful is not a relevant consideration under *Brady*. *See Brady*, 373 U.S. at 87 ("suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, *irrespective of the good faith or bad faith of the prosecution*.") (emphasis added). And the Commonwealth's subsequent retrieval of Doan's state convictions during PCRA proceedings shows that had the Commonwealth searched for Doan's criminal record prior to trial, his state conviction would have been retrieved. *See Kyles v. Whitley*, 514 U.S. 419, 437

(1995) ("the individual prosecutor has a duty to learn of any favorable evidence" in the government's possession). It is undisputed that evidence that Doan, the prosecution's witness, had been convicted of *crimen falsi* was favorable under *Brady. Commonwealth v. Grant*, No. 1847 EDA 2019 WL 1988665, at *6 (Pa. Super. Ct. May 6, 2019). Therefore, the only real issue is whether Doan's criminal record was material under *Brady*.

Following the lead of Respondents' response, the R&R concluded that the Superior Court reasonably held that Doan's criminal record was not material due to the overwhelming evidence of Grant's guilt. However, Respondent's response, the R&R, and the Superior Court opinion did not acknowledge that the jury deliberated over three days in this case. *See* N.T. 9/23/08; N.T. 9/24/08; and N.T. 9/25/08. During deliberations, the jury asked twelve questions, including six that related to Doan's testimony. N.T. 9/24/08 at 3–7. The jury asked for reasonable doubt to be redefined. N.T. 9/25/08 at 6. And the jury reported that it was deadlocked on all counts, twice. N.T. 9/24/08 at 13; N.T. 9/25/08 at 3. The second time, the trial court gave the jury a "Spencer charge," *Commonwealth v. Spencer*, 275 A.2d 299 (Pa. 1971), urging them to "consult with each other and to deliberate with a view towards reaching a unanimous agreement" and to "reexamine his or

her own views and to change his opinion if convinced that it is erroneous." N.T. 9/25/08 at 5.

The length of the deliberations and the fact that the jury indicated they were deadlocked twice are difficult to square with the Superior Court's determination that the evidence of guilt here was "overwhelming." *See Johnson v. Superintendent Fayette SCI*, 949 F.3d 791, 805 (3d Cir. 2020) ("the length of jury deliberations may be one consideration in assessing the strength of the prosecution's case"). Although Respondents' 2020 response omitted any mention of the length of the jury's deliberations, its questions during deliberations, or the fact that the jury twice reported being deadlocked, Respondents now recognize that this record bears directly on whether the evidence of guilt was strong enough to foreclose materiality.

The evidence of guilt included identifications of Grant as the perpetrator by Doan and by Officer John Zirilli. But there was no physical evidence connecting Grant to the crime. Doan initially described the person alleged to be Grant as weighing 130 pounds—when Grant weighed 300 pounds at the time—and Officer Zirilli, who did not know Grant prior to this incident, only identified Grant two years after the incident. And that identification was made only after Doan was the first and only other witness to identify Grant. While some evidence of Grant's guilt remains, given the lack of

physical evidence and the fact that the jury stated it was deadlocked twice, Respondents must now acknowledge that there was not overwhelming evidence of guilt here.

Grant repeatedly requested discovery to determine whether Doan cooperated with the Commonwealth and therefore may have been biased. The parties engaged in open-file discovery after counsel was appointed by this Court. While reviewing the District Attorney Office's files, Grant found Doan's "complete criminal history," ECF No. 46 at 6, including numerous *crimen falsi* convictions from Philadelphia, Pennsylvania, *id.* Exh. A, federal court, *id.* Exhs. B and C, and New Jersey, *id.* Exh. D.

Grant argues that the Commonwealth violated *Brady* because it suppressed not only the evidence of Doan's Pennsylvania convictions, but also the federal and New Jersey convictions. As previously noted, Respondents do not dispute that they failed to disclose Doan's Pennsylvania convictions. During the PCRA proceedings, the Commonwealth requested a federal criminal record report on Doan, in response to the fact that Grant's PCRA counsel found "federal docketing statements of a Mahn Huu Bruce Doan along with articles from the Philadelphia Inquirer" showing that Doan "had been convicted of federal fraud claims before an[d] after the arrest of Mr. Grant and had served as a cooperating witness in [a] federal case and was

essentially acting as an agent of the Government." *See* Exh. A (9/7/2016 letter to Judge Byrd from Grant's PCRA counsel) and Exh. B (9/22/2016 e-mail requesting federal criminal record report.). The information pertaining to the federal and New Jersey convictions—the news articles and criminal records—was not discovered by Respondents until Grant's PCRA counsel brought it to the PCRA's court attention.

The Commonwealth's failure to disclose Doan's Pennsylvania convictions runs afoul of *Brady*; the Commonwealth must learn of and disclose those convictions. *See Kyles*, 514 U.S. at 437 (Commonwealth has "a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"); *Youngblood v. Virginia*, 547 U.S. 867, 869–70 (2006) (same); *Johnson v. Folino*, 705 F.3d 117, 128 (3d Cir. 2013) (same); *United States v. Reyeros*, 537 F.3d 270, 281 (3d Cir. 2008) (state prosecutor has duty to "obtain and turn over" favorable evidence known to state police officer). Here, the Commonwealth did not search its NCIC database prior to Grant's trial. Had the Commonwealth done so, it would have uncovered Doan's Pennsylvania, federal, and New Jersey convictions.

Though information possessed by federal agencies is not typically imputed to state agencies, *Reyeros*, 537 F.3d at 281, the District Attorney's Office can access the NCIC database. The Commonwealth did not search for,

or provide, any evidence of Doan's convictions prior to trial. Instead, Doan's state, federal and New Jersey convictions were revealed when the DAO searched the NCIC database during Grant's PCRA proceedings, in response to PCRA counsel's request. Had that search occurred prior to Grant's trial, the Commonwealth would have been in possession of Grant's entire criminal history. Then, to comply with *Brady*, the Commonwealth would have been duty-bound to disclose not only Doan's Pennsylvania convictions, but also his federal and New Jersey convictions.

Regardless, with Doan's state convictions in hand, competent counsel would have undertaken a further investigation into Doan's full criminal history. That would have uncovered Doan's federal and New Jersey convictions, which were easily discovered by Respondents during the PCRA proceedings, and by PCRA counsel's own research revealing the news articles about Doan's cooperation with federal authorities. Thus, had competent counsel known of Doan's other convictions, it would have altered defense preparation and cross-examination at trial. *See Dennis*, 834 F.3d at 311 ("[a]lterations in defense preparation and cross-examination at trial are precisely the types of qualities that make evidence material under *Brady*.").

The Commonwealth's theory was that Grant and an accomplice robbed and carjacked Doan at gunpoint; Doan's identification and testimony was critical to the Commonwealth's case.

*Doan's identification and testimony presented at the suppression hearing:*

Prior to trial, Grant unsuccessfully moved to suppress the out-of-court photographic identification and all in-court identifications made by Doan. At the suppression hearing, Officer Ryan Murphy testified that, on the evening of December 29, 2006, he interviewed Doan regarding a gunpoint robbery at 2800 Bittern Place in Philadelphia. Doan described two male robbers. The first was "5'5, approximately 130 pounds" with a dark complexion, wearing a black puffy jacket, black skull cap, and armed with a black semi-automatic pistol. N.T. 10/9/08 at 22–23. The second male was "5'7, approximately 150 pounds" with a muscular build, also wearing a puffy black jacket, ski mask, and armed with a "small black revolver." *Id.* Office Murphy memorialized these descriptions in a police report.

Also at the suppression hearing, Officer Christopher Campbell testified that around 2 a.m. on December 30, 2006, he responded to a radio call for a gun shot victim. Officer Campbell met and interviewed Grant, who was shot in the arm earlier that evening. N.T. 10/9/07 at 30–33. Grant told Officer

Campbell that he stopped at a convenience store on his way to South Philadelphia. As he approached the store, he saw some "undesirable men" standing outside; Grant turned and walked away. *Id.* Grant heard gunshots and realized he had been shot in the arm. An unknown passerby stopped to help Grant and drove him to the hospital. *Id.*

Officer Campbell called the detective assigned to Doan's robbery case and provided the detective with Grant's identifying information. *Id.* at 38. Officer Campbell went to the area where he believed Grant was shot; he didn't find witnesses or evidence of a shooting. *Id.* at 34–37; 41–50. Two report were prepared by Officer Campbell. The first memorialized the radio call and Grant's interview at the hospital; the second charged Grant with false reporting following Officer Campbell's investigation and the fact that Doan picked Grant out of a photographic array. *Id.* at 54–60.

Detective Deayoung Park testified that he prepared a photographic array containing Grant's picture and seven fillers. Detective Park took the array to Doan's house at 4 a.m. on December 30, 2006, waking Doan and asking him to view the array. *Id.* at 69–71. Doan was told that the array contained eight men—one suspect and seven fillers—all with similar height, weight and physical features. Doan selected Grant's photograph. *Id.* at 80–

83. On December 30, 2006, Grant was 5'10" and weighed close to 300 pounds. *Id.* at 72–76.

Doan was the final witness presented at the suppression hearing. He testified that, on December 29, 2006, he was robbed and his car was stolen by two men. One "tall" man was 5'7" and about 130 pounds, the other "short" man was 5'5" and 150 pounds. N.T. 10/10/07 at 7–29. Doan said that the short man was wearing a mask at first, but he pushed it up on his forehead, exposing his entire face, and never pulled it back down. *Id.* Doan identified Grant as the short man in the photographic array and in the courtroom during the suppression hearing. *Id.*

*Doan's identification and testimony presented at trial:*

Grant's jury trial began on September 18, 2008, spanning four days and involving the testimony of twenty witnesses. Doan was the first to testify. He testified that on the evening of December 29, 2006, he was robbed and carjacked by two unknown males. N.T. 9/18/08 at 64–90. They approached Doan from behind, wearing ski masks over their faces, both wearing black puffy coats. Doan said the shorter of the two, carrying a 9 mm handgun, demanded Doan's money and the keys to his car. *Id.* Doan stalled by pretending not to understand English; the short man became frustrated and pulled his mask up to his forehead, exposing his face. *Id.* The short man

grabbed Doan by his jacket. *Id.* at 96. Eventually Doan gave the men his car keys, money, and two cell phones. The taller man, armed with a .38 revolver, was unable to start the car; the short man forced Doan to start it. Then, with the tall man in the driver's seat and the short man in the front passenger seat, the men drove away. *Id.*

Doan testified that after they drove away, an off-duty officer (later known to be Officer Michael Williams) in a red Honda saw the whole thing, circled around twice, and asked Doan if he had been carjacked. *Id.* at 79. Doan said yes; the off-duty officer chased the carjackers. Doan further testified that a second off-duty officer (later known to be Officer Zirilli) lived across the street from where he was carjacked. That officer saw Doan but thought he was "playing around, joking." *Id.* Doan went to talk to the second off-duty officer at his house, who Doan testified first called 911. *Id.* at 81. Doan testified that he heard gunfire after on-duty patrol officers arrived on the scene. *Id.*

Doan described the tall man as a black male, 5'7" to 5'8", 150 pounds. He described the short man as 5'5" tall, approximately 130 pounds. *Id.* at 101. Doan was taken to the police station, where he identified the tall man in person. Police officers showed him several other people but Doan didn't recognize any of them as the short man. *Id.* at 86–88. When the detectives

came to his house with the photographic array at 4 a.m. on December 30, 2006, Doan identified Grant as the short man.

Grant's defense attorney's cross-examination was limited to questioning Doan about weaknesses or inconsistencies in his identification of Grant. For example, Doan's physical description estimated Grant's weight at less than half of his actual weight at the time the crime occurred—130 pounds as opposed to 300 pounds. N.T. 9/18/08 at 101. After the 911 tapes were played, Doan admitted that he called 911 in the first instance, before he knocked on Officer Zirilli's door. Doan also admitted that, on the call, he said that both men had masks on. *Id.* at 98. When shown the coat that Grant was wearing at the time of the incident, Doan agreed that it was not a black puffy coat. *Id.* at 99. On cross-examination, Doan also testified that he circled Grant's picture in the photographic array because Grant was depicted with pigtails, but Grant didn't have pigtails in the picture—he only had them at the time of trial. *Id.* at 105–06. Further, the man in the picture Doan circled had a black beard, as did Grant, but Doan testified at the preliminary hearing that the short man "had a silver-type of beard." *Id.* at 107.

Police Officer John Zirilli, the second off-duty officer mentioned by Doan, testified that on December 29, 2006, he was visiting his girlfriend at 2811 Bittern Place. As the officer was taking out the trash, he saw Doan

across the street talking to an unknown black male. *Id.* at 119–138. Doan called to Officer Zirilli, "hey police," and the officer waved to Doan before going back into his girlfriend's house. *Id.* A few minutes later, Doan knocked on Officer Zirilli's door, yelling that he was robbed. Officer Zirilli testified that he called 911, gave a description to the 12th District Supervisor, and passed Doan off to the supervisor. *Id.* at 122.

On cross-examination, Grant's defense attorney elicited testimony from Officer Zirilli demonstrating that his description of the incident did not align with Doan's testimony. Officer Zirilli testified that he was outside for approximately five minutes. He saw Doan with one man; he didn't see any guns or ski masks. *Id.* at 128. Nor did Officer Zirilli see anyone grab Doan's jacket. *Id.* at 129. Officer Zirilli insisted that he called 911 in the first instance, but when the 911 tape was played, he admitted that Doan was already on the phone with 911 when Doan knocked on his door. *Id.* at 132.

On cross-examination, Officer Zirilli testified that he could "absolutely identify" Grant as being the only black male he remembered on location. *Id.* at 132. Officer Zirilli confirmed that he didn't make any statements to police on the night of the incident, or the next day, week, or month. He never made any signed statement at all, and he didn't testify at Grant's preliminary hearing. Nor did Officer Zirilli provide details about Grant's appearance to

police or identify Grant from a photographic array. And despite evidence that many residents in the area said they heard gunshots, Officer Zirilli denied hearing any. *Id.* at 136. Officer Zirilli looked at Grant in the courtroom, two years later, and identified him as the black male he saw with Doan on the night of the incident. *Id.*

Officer Michael Williams, who was also off-duty, testified that he watched the incident from his car on his way home. *Id.* at 185. He said he saw Doan and two men wearing ski masks; one man was driving, the other was standing outside of the car with Doan. *Id.* at 186. Officer Williams did not see either of their faces. He confirmed that they were both wearing puffy jackets; he could not tell if they had weapons. *Id.* at 188. Officer Williams also testified that the man standing outside of the car with Doan was short (shorter than Doan, who testified that he was 5'7"). *Id.*

Doan had *crimen falsi* convictions prior to his testimony in Grant's case. Were he subjected to cross-examination about those convictions, it is likely that his credibility would have been questioned by the jury. Further, Doan appears to have been a federal cooperating witness under pressure to provide information to law enforcement. Doan was facing sentencing on felony charges in federal court for conspiracy to commit wire fraud, identity fraud, and making false statements at the time of Grant's trial. The docket reflects

that Doan pleaded guilty to those charges in 2006; his sentencing was scheduled for June 23, 2008, but was postponed until October 14, 2008, approximately one month after Doan testified at Grant's trial. Dkt. No. 06-cr-357-MMB (E.D. Pa. 2006); ECF No. 192. That date was continued and Doan was eventually sentenced on June 17, 2009. *Id.*; ECF Nos. 317, 320. Doan was also indicted for conspiracy to commit murder for hire in 2009, after Grant's trial. Dkt. No. 09-cr-361-TJS (E.D. Pa. 2009). The jury was also deprived of the opportunity to consider these facts, which would call Doan's credibility into question and raises potential bias. *See Davis v. Alaska*, 415 U.S. 308 (1974) (evidence of bias stemming from probationer status so especially probative of credibility that prohibition on cross-examination for such bias violates due process).

As Grant points out, defense counsel would have been able to question Doan about his use of eight different names and why he identified himself to law enforcement authorities with seven different aliases. ECF No. 46 at 14. It is also likely that the trial court would have instructed the jury it could consider Doan's prior convictions in deciding whether it believed all or part of his testimony. *Id.*

The evidence and use of the prior convictions would also have substantially impacted the substance of the defense's closing statement. In closing,

defense counsel stated that "the best evidence came from Mr. Mahn Doan." 9/23/08 N.T. at 123. She highlighted that the first description of the perpetrator given by Doan at the scene was that he weighed 130 pounds and had a dark complexion and explained that he was "inaccurate"—but with the impeaching evidence of the *crimen falsi* convictions, defense counsel would have been able to imply that Doan was lying and biased. *Id.* at 96. Doan was the only witness who identified Grant. On cross-examination, Officer Zirilli gave a conflicting account of the incident from Doan and Officer Williams, the only other witnesses who claimed to see the incident, and Officer Zirilli's identification of Grant was called into question. The other witnesses were unable to provide any corroborating information regarding Doan's identification of Grant. And all of the alleged identifications of Grant had serious issues—Grant was 5'10", weighed 300 pounds, and had a black beard at the time of trial. Every witness claiming to have seen the incident described the man alleged to be Grant as 5'5"and weighing 130 pounds. Doan additionally chose Grant from a photographic array with a black beard, and Doan said, pigtails. But Doan told police that the perpetrator had a silver beard, and the picture Doan chose did not depict Grant with pigtails—he only had pigtails at the trial.

The undisclosed information establishes a reasonable probability that the outcome of the trial would have been different had the Commonwealth honored its *Brady* obligations; therefore, Grant is entitled to a new trial. *See Dennis*, 834 F.3d at 311–12 (a new trial is required when "[h]ad the *Brady* material been disclosed, there is a reasonable probability that the outcome of the trial would have been different, and its suppression undermines confidence in the verdict."). The court must "consider the constitutional error in light of all the evidence to determine whether it 'put[s] the whole case in such a different light as to undermine confidence in the verdict." *Dennis*, 834 F.3d at 295 (quoting *Kyles v. Whitley*, 513 U.S. 419, 435 (1995)).

Respondents reiterate that the evidence of guilt was not overwhelming. No physical evidence tied Grant to the crime. The jury deliberated over three days and deadlocked twice during its deliberations. It asked twelve questions—half pertained directly to Doan's testimony. This indicates that the jury was focused on Doan. Under these circumstances, if defense counsel had the ammunition to attack Doan's credibility, a different outcome was reasonably likely. For example, defense counsel could have used the information from Doan's federal cases to show that his sentencing was delayed until after his testimony in Grant's case, and to question him about whether he was being offered any favorable consideration for his testimony

at Grant's trial. Defense counsel also could have imputed Doan's credibility by the very nature of the *crimen falsi* charges and convictions. With impeachment evidence and evidence of bias, the jury could have discounted Doan's testimony and his identification of Grant. The remainder of the evidence was not reasonably likely to lead to conviction—especially given the jury's equivocations on the record as presented without impeaching Doan.

In short, there is a reasonable probability that, had the *Brady* material pertaining to Doan's state *crimen falsi* convictions been disclosed, the outcome of the trial would have been different. Grant is entitled to a new trial.

**Conclusion**

For the foregoing reasons, this Court should grant the motion to alter the judgment, issue a conditional writ of habeas corpus, and order that Grant be retried within 180 days or released from custody.

Respectfully submitted,

*/s/ Jaclyn Mason*
JACLYN MASON
Assistant District Attorney
Federal Litigation Unit

MICHAEL GRANT,        :              CIVIL ACTION
          **Petitioner,**     :
                          :
        **v.**           :
                          :             NO.  19-6132
KEVIN KAUFFMAN, *et al.*,  :
          **Respondents.**

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2023, the foregoing was served on counsel of record via this Court's CM/ECF electronic filing system:

THOMAS A. DREYER
30 RUNNING BROOK RD
GLEN MILLS, PA 19342
610-742-7883
tdreyer610@aol.com

*/s/ Jaclyn Mason*